

**A**

FILED: NEW YORK COUNTY CLERK 01/03/2023 05:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 650033/2023

RECEIVED NYSCEF: 01/04/2023

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — x

NOELLE DUNPHY

      *Plaintiff,*

    — vs —

RUDOLPH W. GIULIANI,
GIULIANI PARTNERS, LLC,
GIULIANI GROUP, LLC,
GIULIANI SECURITY & SAFETY, LLC,
JOHN and/or JANE DOES 1-10

      *Defendants.*

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — x

**SUMMONS WITH NOTICE**

Index No.:

Plaintiff designates New York County as the place of trial. Trial by jury is demanded.

**TO THE ABOVE-NAMED DEFENDANTS:**

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on plaintiffs' attorney within twenty (20) days after service of this summons, exclusive of the date of service, or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York.

    **PLEASE TAKE NOTICE THAT** this is an action brought by NOELLE DUNPHY (hereinafter, "PLAINTIFF") against RUDOLPH W. GIULIANI (hereinafter, "GIULIANI"), in his individual capacity, as well as GIULIANI PARTNERS, LLC, GIULIANI GROUP, LLC, and GIULIANI SAFETY & SECURITY, LLC, (hereinafter, collectively, the "GIULIANI ENTITIES"), in addition to JOHN and/or JANE DOES 1-10 (hereinafter, "DOES"), their

identities and affiliations being unknown to PLAINTIFF at this time, arising from the wrongful conduct of GIULIANI, and the GIULIANI ENTITIES operating under GIULIANI'S managerial direction, during the course of PLAINTIFF'S employment with both GIULIANI, personally, and the GIULIANI ENTITIES, professionally, (hereinafter, together, "DEFENDANTS"), in concert with DOES whose identities are presently unknown but reasonably ascertainable.

Specifically, and upon information and belief, PLAINTIFF alleges the following causes of action: (1) breach of contract; (2) non-payment of wages; (3) unjust enrichment; (4) promissory estoppel; (5) negligent infliction of emotional distress; (6) intentional infliction of emotional distress; (7) sexual harassment; (8) quid pro quo sexual harassment, (9) retaliatory dismissal; (10) legal malpractice; (11) tortious interference; (12) defamation.

PLAINTIFF began her employment with DEFENDANTS in January 2019, having been retained for business development work and other work. PLAINTIFF was professionally qualified for the work offered, with a degree from Columbia University and 17 years of business experience, mainly in business development, marketing, writing, and communications. PLAINTIFF'S Ivy League education, work experience, and large network of potential clients for GIULIANI, made the salary GIULIANI promised reasonably believable and justified according to the marketability of her skill sets, and the value to DEFENDANTS' lucrative business operations.  The salary was comparable to that of MARIA RYAN ("MARIA"), who was paid approximately $1 million a year.  In 2018, MARIA, due to holding a consuming, full-time job out-of-state, and running her family household out-of-state, would work in person for Giuliani.

At all times material to the causes of action alleged herein, DEFENDANT reported directly to GIULIANI, who exercised full supervisory control over PLAINTIFF'S work for GIULIANI, in his personal capacity, as well as his professional capacity as a managing member

FILED: NEW YORK COUNTY CLERK 01/03/2023 05:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 650033/2023

RECEIVED NYSCEF: 01/04/2023

3

of the GIULIANI ENTITIES. GIULIANI directly supervised the times, locations, manners, objectives, and other specific details of PLAINTIFF'S work product, which was, pursuant to PLAINTIFF'S employment agreement, performed only on behalf of DEFENDANTS, to the exclusion of PLAINTIFF'S other potential employment and income.

DEFENDANTS routinely expensed PLAINTIFF'S activities via the official, corporate GIULIANI ENTITIES credit card. PLAINTIFF did, on occasion, incur employment-related expenses on her personal cards, which remain unreimbursed to this day, despite the promises of DEFENDANTS to cover said expenditures. PLAINTIFF'S time was consumed by work-related duties through 2021.

From the beginning of PLAINTIFF'S employment in 2019, DEFENDANTS, under GIULIANI'S leadership, maintained a toxic and sexually hostile work environment, pervaded by disparaging and discriminatory comments directed against women, minorities, and those suspected of "disloyalty" on a thin-to-nonexistent evidentiary basis. Despite attempting to cultivate a public image of himself as "America's Mayor," GIULIANI frequently made racist, bigoted, anti-Semitic, anti-LGBTQ, and misogynistic remarks, often during confused and hostile alcohol-laced tirades, further reinforcing the toxicity of the workplace operating under his direction, adding to the chronic and pervasive violations of applicable New York State and New York City laws prohibiting discrimination in the workplace.

During this time, GIULIANI'S publicly documented abuse of alcohol worsened, fueled in part by his caustic and expensive public divorce, mounting political controversies, legal entanglements, and public humiliation before, during, and after the 2020 Presidential Election and violent January 6 attack upon the United States Capitol. On every day of the week,

FILED: NEW YORK COUNTY CLERK 01/03/2023 05:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 650033/2023

RECEIVED NYSCEF: 01/04/2023

4

GIULIANI would begin drinking shortly after awakening and would continue consuming alcohol persistently and in excess, affecting his behavior as her boss and lawyer.

Despite PLAINTIFF'S objections and perseverance, maintained in earnest hopes of improvements within DEFENDANTS' workplace environment, as well as the hope that steadily increasing sums of deferred compensation would be paid, egregious and unlawful conduct by DEFENDANTS persisted through 2021, when PLAINTIFF was illegally discharged by DEFENDANTS.

At the beginning of PLAINTIFF'S employment, GIULIANI was embroiled in acrimonious, high-profile divorce proceedings in which he and his then-wife litigated the division of tens of millions of dollars in marital assets. At the time, he also served as the personal attorney to the President of the United States, frequently attracting political controversy, intense media coverage, and public scrutiny of his every action. At GIULIANI'S insistence, PLAINTIFF was required, as a condition of employment, to consent to receiving deferred compensation and be an off-the-books, secret employee. No male employees were subject to this arrangement, establishing a strong presumption that GIULIANI'S workplace conduct was disparate and discriminatory based on the account of sex.

Although the deferred compensation agreement was far from ideal, PLAINTIFF reasonably believed that GIULIANI'S present and future earning potential was sufficient to cover the amounts promised, and was forced, by binary choice, to accept and detrimentally rely upon the offered terms, expecting that transitory financial issues would ultimately be resolved.

During PLAINTIFF'S employment with DEFENDANTS, GIULIANI sexually harassed PLAINTIFF and demanded sexual favors as part of a pattern of quid-pro-quo sexual harassment.

INDEX NO. 650033/2023
RECEIVED NYSCEF: 01/04/2023

5

By 2021, GIULIANI'S desire had shifted, on and off, to another employee, resulting in his impermissible and retaliatory discharge of PLAINTIFF from his employ, not on the basis of any legitimate reason, and without issuing the compensation for work already done. Upon conclusion, PLAINTIFF received no back pay or severance in any form, nor any reimbursement for employment expenses incurred on personal credit cards, despite GIULIANI'S promises, leaving DEFENDANTS unjustly enriched following their willful and illegal discharge of PLAINTIFF, in part on the account of sex, and in breach of contract to pay wages duly earned, despite GIULIANI'S clear and unambiguous promises to pay duly-earned compensation, on which PLAINTIFF relied, leaving PLAINTIFF injured upon non-payment. PLAINTIFF suffered a substantial loss in promised income, as well as the loss of deferred compensation and promised reimbursement.

At one point, PLAINTIFF attempted to find some value in an otherwise-difficult situation by requesting GIULIANI'S assistance in finding gainful employment with other organizations with which DEFENDANTS maintained ongoing relationships. Despite PLAINTIFF'S qualifications and satisfactory work, GIULIANI refused.

In his refusal, GIULIANI became spiteful and hostile towards the thought of PLAINTIFF'S income continuity, demanding that PLAINTIFF remain silent about all associations with DEFENDANTS.

At these times, GIULIANI threatened PLAINTIFF with further retaliation if she did not stay silent, stating that his private investigators and political connections to President Trump enabled him to retaliate in other ways, express and implied. PLAINTIFF reasonably believed GIULIANI'S threats of retaliation, especially owing to the extreme power imbalance and PLAINTIFF'S lived trauma as a survivor of domestic violence, a fact well-known to GIULIANI.

FILED: NEW YORK COUNTY CLERK 01/03/2023 05:05 PM

NYSCEF DOC. NO. 1

INDEX NO. 650033/2023

RECEIVED NYSCEF: 01/04/2023

6

In January 2019, GIULIANI offered to represent PLAINTIFF, pro bono, in legal actions surrounding assault and abuse that she suffered as a victim of domestic violence who was attempting to heal. GIULIANI freely offered his legal counsel and expertise, explaining that he wished to help PLAINTIFF achieve justice, receive compensation for her physical injuries, and access other remedies available to survivors of violence. Within the context of an attorney-client relationship, PLAINTIFF divulged details covering the most traumatic and painful experiences of her life, reasonably believing that the former United States Attorney for the Southern District of New York was knowledgeable about matters of law, trustworthy, motivated to assist a crime victim in securing justice and closure, and capable of providing effective counsel.

The quality and effectiveness of GIULIANI'S counsel proved to be the exact opposite of what PLAINTIFF expected from the former federal prosecutor. GIULIANI was frequently intoxicated while discussing matters of law, and he leveraged his counsel to pressure her for sexual quid-pro-quos during lawyer-client consultations.

At times, he seemed unable to remember key facts or to follow the basic details of fact patterns relevant to the case. PLAINTIFF would frequently need to remind GIULIANI of said details. Ultimately, the statute of limitations expired, leaving PLAINTIFF without redress, and without knowledge of her loss of redress, until it was too late.

As a result of GIULIANI'S legal malpractice, PLAINTIFF was re-victimized, re-traumatized, left without legal redress, and substantially worse off than before GIULIANI agreed to represent her in hopes of securing justice against an abuser. Instead, GIULIANI leveraged the traumatic details of PLAINTIFF'S prior victimization to fulfill his morally bankrupt sexual compulsions and fetishes.

FILED: NEW YORK COUNTY CLERK 01/03/2023 05:05 PM          INDEX NO. 650033/2023
NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 01/04/2023

7

Rudolph W. Giuliani, the former US Attorney, once hailed as "America's Mayor," is a sexist sexual predator and abuser. PLAINTIFF did not immediately bring this action, owing to reasonable fears of retaliation, re-aggravation of prior trauma, and threats.

PLAINTIFF refuses to be coerced into silence any longer.

As both PLAINTIFF'S employer and attorney, GIULIANI'S willful, wanton, and wrongful conduct occurred with extreme malice and conscious disregard for the law, for his obligations as a lawyer and boss, and basic standards of ethics and decency. Consequently, PLAINTIFF petitions this court for punitive damages on all causes of action alleged herein. Furthermore, PLAINTIFF alleges that each and every cause of action alleged *supra* contributed to a pattern of intentional and negligent inflictions of emotional distress.

At all times material to the causes of action alleged herein, GIULIANI was a resident of New York City in the County of New York in the State of New York. Additionally, the GIULIANI ENTITIES maintained their primary places of business in the same. Furthermore, much of the actionable conduct alleged herein occurred while PLAINTIFF and/or GIULIANI were physically present within New York City and/or the State of New York, despite periodic employment-related travel to other jurisdictions in connection with the business activities of the GIULIANI ENTITIES, the personal affairs of GIULIANI, and remote work. Accordingly, PLAINTIFF designates New York County as the place of trial. Venue is proper on the basis of the residencies of all parties as well as the primary locations of actionable conduct.

**WHEREFORE**, PLAINTIFF demands compensatory monetary relief for breach of contract, unpaid wages, and legal malpractice in the sum of three million, one hundred thousand dollars ($3,100,000.00), plus interest, or in such sum as a jury may decide, along with punitive damages in an amount to be determined by a jury, prejudgment interest, costs, and disbursements

FILED: NEW YORK COUNTY CLERK 01/03/2023 05:05 PM
NYSCEF DOC. NO. 1

INDEX NO. 650033/2023
RECEIVED NYSCEF: 01/04/2023

8

of this action, as well as such other relief as the court deems just and proper. Furthermore, PLAINTIFF petitions the jury and this honorable court to award punitive damages on each and every cause of action alleged herein. Furthermore, if PLAINTIFF should retain counsel at any point during this proceeding, PLAINTIFF demands the award of attorneys' fees as provided under New York law.

**PLEASE TAKE FURTHER NOTICE THAT**, should you fail to appear, judgment will be taken against DEFENDANTS, jointly and severally, by default for the aforementioned sum of three million, one hundred thousand dollars ($3,100,000.00), along with punitive damages, prejudgment interest, costs, and disbursements of this action, attorneys' fees, punitive damages, as well as such other relief as the court deems just and proper.

Dated: December 31, 2022

Noelle A. Dunphy
**By:   /s/ Noelle A. Dunphy**
*Pro se*
22 Maria Court
Holbrook, NY
917.868.5763
seekingjusticeforcourt@gmail.com

FILED: NEW YORK COUNTY CLERK 01/26/2023 12:49 PM
NYSCEF DOC. NO. 2

INDEX NO. 650033/2023
RECEIVED NYSCEF: 01/26/2023

## IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

**NOELLE DUNPHY**

Plaintiff/Petitioner

vs.

**RUDOLPH W GIULIANI; ET AL**

Defendant/Respondent

Hearing Date:
INDEX NO: **650033/2023**
Index Date: **01/04/2023**
AFFIDAVIT OF SERVICE OF:
Summons with notice; NOTICE OF ELECTRONIC FILING

Received by **Stephen Theus**, on the **9th day of January, 2023 at 12:38 PM** to be served upon **GIULIANI PARTNERS, LLC** at **28 LIBERTY STREET, NEW YORK, New York County, NY 10005**.

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **10th day of January, 2023 at 11:02 AM** at the address of **28 LIBERTY STREET, NEW YORK, New York County, NY 10005**, this affiant served the above described documents upon **GIULIANI PARTNERS, LLC** in the manner described below:

**CORPORATE SERVICE,** by personally delivering 1 true and correct copy(ies) of the above described documents, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**Mohamed Dansoko, Intake Specialist , I delivered the documents to Mohamed Dansoko, Intake Specialist who indicated they were the person authorized to accept with identity confirmed by subject stating their name. The individual accepted service with direct delivery. The individual appeared to be a black-haired black male contact 25-35 years of age, 6'0"-6'2" tall and weighing 180-200 lbs.**

**Deponent asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.**

Executed on _____1 / 10 / _____, 20 23

_____

**Stephen Theus Reg. # 2074985-DCA, NYC DCWP, NY**

ABC Legal Services, LLC
DCA Lic. #1380619 Exp. 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

STATE OF NEW YORK COUNTY OF __K I N G S__
SWORN TO AND SUBSCRIBED BEFORE ME THIS __10__ OF __1__ 20 _23_ BY _Stephen Theus_ (AFFIANT NAME)

_____
SIGNATURE OF NOTARY PUBLIC

_John Foster, JP_
PRINT, TYPE OR STAMP NOTARY'S COMMISSIONED NAME

PERSONALLY KNOWN __✓__ OR PRODUCED IDENTIFICATION_____
TYPE OF IDENTIFICATION PRODUCED_____

JOHN T. FOSTER, JR.
Commissioner of Deeds
City of New York - No.2-11214
Qualified in Kings County
Commission Expires July 1, 2023

Page 1 of 1
FOR: **NOELLE DUNPHY**
REF: **REF-11667282 (1-6)**

Tracking #: **0099080300**

**FILED: NEW YORK COUNTY CLERK 01/26/2023 12:49 PM**
NYSCEF DOC. NO. 2

INDEX NO. 650033/2023
RECEIVED NYSCEF: 01/26/2023

## IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

**NOELLE DUNPHY**

Plaintiff/Petitioner

vs.

**RUDOLPH W GIULIANI; ET AL**

Defendant/Respondent

| | |
|---|---|
| Hearing Date: | |
| INDEX NO: | **650033/2023** |
| Index Date: | **01/04/2023** |
| AFFIDAVIT OF SERVICE OF: | |
| **Summons with notice; NOTICE OF ELECTRONIC FILING** | |

Received by Stephen Theus, on the **9th day of January, 2023 at 12:37 PM** to be served upon **GIULANI GROUP LLC** at **28 LIBERTY STREET, NEW YORK, New York County, NY 10005**.

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **10th day of January, 2023 at 11:03 AM** at the address of **28 LIBERTY STREET, NEW YORK, New York County, NY 10005**, this affiant served the above described documents upon **GIULANI GROUP LLC** in the manner described below:

**CORPORATE SERVICE**, by personally delivering **1** true and correct copy(ies) of the above described documents, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**Mohamed Dansoko, Intake Specialist , I delivered the documents to Mohamed Dansoko, Intake Specialist who indicated they were the person authorized to accept with identity confirmed by subject stating their name. The individual accepted service with direct delivery. The individual appeared to be a black-haired black male contact 25-35 years of age, 6'0"-6'2" tall and weighing 180-200 lbs.**

**Deponent asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.**

Executed on _____1/10/_____, 20**23**.

_____
**Stephen Theus, Reg. # 2074985-DCA, NYC DCWP, NY**

ABC Legal Services, LLC
DCA Lic. #1380619 Exp. 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

STATE OF NEW YORK COUNTY OF _KINGS_
SWORN TO AND SUBSCRIBED BEFORE ME THIS _10_ OF _1_ 20**23** BY _Stephen Theus_ (AFFIANT NAME)

_____
SIGNATURE OF NOTARY PUBLIC

_John Foster JR_
PRINT, TYPE OR STAMP NOTARY'S COMMISSIONED NAME

PERSONALLY KNOWN _✓_ OR PRODUCED IDENTIFICATION_____
TYPE OF IDENTIFICATION PRODUCED_____

JOHN T. FOSTER, JR.
Commissioner of Deeds
City of New York - No.2-11214
Qualified in Kings County
Commission Expires July 1, 2023

Page 1 of 1
FOR: **NOELLE DUNPHY**
REF: **REF-11667282 (1-6)**

Tracking #: **0099080373**

**FILED: NEW YORK COUNTY CLERK 01/26/2023 12:49 PM**

NYSCEF DOC. NO. 2

INDEX NO. 650033/2023

RECEIVED NYSCEF: 01/26/2023

## IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

**NOELLE DUNPHY**

Plaintiff/Petitioner

vs.

**RUDOLPH W GIULIANI; ET AL**

Defendant/Respondent

| | |
|---|---|
| Hearing Date: | |
| INDEX NO: | **650033/2023** |
| Index Date: | **01/04/2023** |
| AFFIDAVIT OF SERVICE OF: | |
| **SUMMONS WITH NOTICE** | |

Received by **Saidah Said**, on the **4th day of January, 2023 at 10:23 PM** to be served upon **RUDOLPH W. GIULIANI** at **45 East 66th Street 10w, New York, New York, New York County, NY 10065.**

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the **18th day of January, 2023 at 1:10 PM** at the address of **45 East 66th Street 10w, New York, New York County, NY 10065**, this affiant served the above described documents upon **RUDOLPH W. GIULIANI** in the manner described below:

**SUBSTITUTE SERVICE**, by leaving **1** true and correct copy(ies) of the above described documents, with the date and hour of service endorsed thereon by this affiant, with **Joe Fenster Security/door Man**, a person of suitable age and discretion who stated they reside at the defendant's usual place of abode listed above.
On the date of ___1|20|23_____, affiant then deposited in the United States mail, in the county where the property is situated, the above described documents in an envelope bearing the legend "personal and confidential" and not indicating on the outside thereof, by return address or otherwise, that the communication is from an attorney or concerns an action against the person to be served.  This was mailed with proper postage to:

**RUDOLPH W. GIULIANI**
**45 East 66th Street 10w**
**New York, NY 10065**

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS:
**Joe Fenster Security/door Man, I delivered the documents to Joe Fenster Security/door Man who indicated they were the front security with identity confirmed by subject stating their name. The individual accepted service with direct delivery. The individual appeared to be a gray-haired white male contact over 65 years of age, 6'0''-6'2'' tall and weighing 200-240 lbs with a mustache. Subject is still away.**

**Deponent asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.**

Executed on ___1|20_____, 20_23_.

_____

**Saidah Said, Reg. # 2109922-DCA, New York , NY**

ABC Legal Services, LLC
DCA Lic. #1380619 Exp. 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

STATE OF NEW YORK COUNTY OF _RICHMOND_
SWORN TO AND SUBSCRIBED BEFORE ME THIS _20_ OF _JAN 2023_ BY _SAIDAH SAID_ (AFFIANT NAME)

_____
SIGNATURE OF NOTARY PUBLIC
_HULYA TAHMAZ_
PRINT, TYPE OR STAMP NOTARY'S COMMISSIONED NAME

PERSONALLY KNOWN_____ OR PRODUCED IDENTIFICATION _✓_
TYPE OF IDENTIFICATION PRODUCED _DRIVER license_

Hulya Tahmaz
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01TA6334795
Qualified in Richmond County
Commission Expires 12/21/2023

Page 1 of 1
FOR: **NOELLE DUNPHY**
REF: **REF-11667282**

Tracking #: **0099653183**

FILED: NEW YORK COUNTY CLERK 01/26/2023 12:49 PM
NYSCEF DOC. NO. 2

INDEX NO. 650033/2023
RECEIVED NYSCEF: 01/26/2023

**IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK**

| | |
|---|---|
| **NOELLE DUNPHY** | Hearing Date: |
| Plaintiff/Petitioner | INDEX NO:     **650033/2023** |
| vs. | Index Date:    **01/04/2023** |
| **RUDOLPH W GIULIANI; ET AL** | DECLARATION OF NON-SERVICE OF: |
| Defendant/Respondent | **SUMMONS WITH NOTICE** |

Received by **Islam Alaaeldin**, on the **4th day of January, 2023 at 5:18 PM** to be served upon **GIULIANI PARTNERS, LLC** at **445 Park Avenue 18a, New York, New York County, NY 10022**.

The undersigned hereby declares: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

Declarant states s(he) attempted to serve **GIULIANI PARTNERS, LLC** at the address of: **445 Park Avenue 18a, New York, NY 10022** and was unable to effect service for the following reasons:

**1/5/2023 9:55 AM: I spoke with an individual who indicated they were the building's management and they stated subject moved.**

Declarant hereby states under penalty of perjury under the laws of the State of New York that the statement above is true and correct.

Date:  01/05/2023

**Islam Alaaeldin, Reg. # 2106710-dca, NYC DCWP, NY**
ABC Legal Services, LLC
DCA Lic. #1380619 Exp, 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

Page 1 of 1
FOR:  **NOELLE DUNPHY**
REF:  **REF-11667282**

Tracking #: **0098853396**

FILED: NEW YORK COUNTY CLERK 01/26/2023 12:49 PM

NYSCEF DOC. NO. 2

INDEX NO. 650033/2023

RECEIVED NYSCEF: 01/26/2023

**IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK**

| | |
|---|---|
| **NOELLE DUNPHY** | Hearing Date: |
| Plaintiff/Petitioner | INDEX NO: **650033/2023** |
| vs. | Index Date: **01/04/2023** |
| **RUDOLPH W GIULIANI; ET AL** | DECLARATION OF NON-SERVICE OF: |
| Defendant/Respondent | **SUMMONS WITH NOTICE** |

Received by **Islam Alaaeldin**, on the **4th day of January, 2023 at 5:18 PM** to be served upon **GIULIANI SECURITY & SAFETY, LLC** at **445 Park Ave #18a, New York, New York County, NY 10022**.

The undersigned hereby declares: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

Declarant states s(he) attempted to serve **GIULIANI SECURITY & SAFETY, LLC** at the address of: **445 Park Ave #18a, New York, NY 10022** and was unable to effect service for the following reasons:

**1/5/2023 9:55 AM: I spoke with an individual who indicated they were the building's management and they stated subject moved.**

Declarant hereby states under penalty of perjury under the laws of the State of New York that the statement above is true and correct.

Date: 01/05/2023

**Islam Alaaeldin, Reg. # 2106710-dca, NYC DCWP, NY**
ABC Legal Services, LLC
DCA Lic. #1380619 Exp, 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

Page 1 of 1
FOR: **NOELLE DUNPHY**
REF: **REF-11667282**

Tracking #: **0098853403**

FILED: NEW YORK COUNTY CLERK 01/26/2023 12:49 PM    INDEX NO. 650033/2023
NYSCEF DOC. NO. 2                                    RECEIVED NYSCEF: 01/26/2023

## IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK

| | |
|---|---|
| NOELLE DUNPHY | Hearing Date: |
| Plaintiff/Petitioner | INDEX NO: **650033/2023** |
| vs. | Index Date: **01/04/2023** |
| **RUDOLPH W GIULIANI; ET AL** | AFFIDAVIT OF SERVICE OF: |
| Defendant/Respondent | Summons with notice; NOTICE OF ELECTRONIC FILING |

Received by John Habermehl, on the 13th day of January, 2023 at 1:08 PM to be served upon GIULIANI SECURITY & SAFETY, LLC at 1 COMMERCE PLAZA, ALBANY, Albany County, NY 12260.

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a citizen of the United States, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, and is competent to be a witness therein.

On the 13th day of January, 2023 at 1:09 PM at the address of 1 COMMERCE PLAZA, ALBANY, Albany County, NY 12260, this affiant served the above described documents upon GIULIANI SECURITY & SAFETY, LLC in the manner described below:

CORPORATE SERVICE, by personally delivering 1 true and correct copy(ies) of the above described documents, with the date and hour of service endorsed thereon by this affiant, to the corporation described as the named defendant.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY(IES) OF THIS PROCESS WAS LEFT IS AS FOLLOWS: Nancy DOUGHERTY , I delivered the documents to Nancy DOUGHERTY who indicated they were the person authorized to accept with identity confirmed by subject saying yes when named. The individual accepted service with direct delivery. The individual appeared to be a black-haired white female contact 55-65 years of age, 5'4"-5'6" tall and weighing 140-160 lbs with glasses.

Deponent asked the indicated person whether the defendant and/or present occupant was presently in the military service of the United States Government or in active duty in the military service of the State of New York or a dependent of anybody in the military and defendant and/or present occupant refused to indicate.

Executed on ___1 / 14___ , 20 2̲3̲.

John Habermehl, NY
ABC Legal Services, LLC
DCA Lic. #1380619 Exp. 02/28/24
147 Prince St, Suite 4-6, Brooklyn, NY 11201

STATE OF NEW YORK COUNTY OF ___Rensselaer___
SWORN TO AND SUBSCRIBED BEFORE ME THIS ___14___ OF ___Jan___ 20 23 BY ___John Habermehl___ (AFFIANT NAME)

_____
SIGNATURE OF NOTARY PUBLIC
___Richard J. Warren___
PRINT, TYPE OR STAMP NOTARY'S COMMISSIONED NAME

Richard J. Warren
Notary Public, State of New York
Qualified in Rensselaer County
No. 01WA6098217
Commission Expires Sept. 08, 20 23

PERSONALLY KNOWN ___X___ OR PRODUCED IDENTIFICATION_____
TYPE OF IDENTIFICATION PRODUCED_____

Page 1 of 1
FOR: **NOELLE DUNPHY**
REF: REF-11667262 (1-6)

Tracking #: 0099326503

FILED: NEW YORK COUNTY CLERK 02/02/2023 03:27 PM
NYSCEF DOC. NO. 3

INDEX NO. 650033/2023
RECEIVED NYSCEF: 02/02/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

NOELLE DUNPHY,

                  *Plaintiff,*

        *-against-*

RUDOLPH W. GIULIANI, GIULIANI
PARTNERS, LLC, GIULIANI GROUP, LLC,
GIULIANI SECURITY & SAFETY, LLC, JOHN
AND/OR JANE DOES 1-10,

                  *Defendants.*

-------------------------------------------------------------X

Index No: 650033/2023

NOTICE OF APPEARANCE AND
DEMAND FOR COMPLAINT

       **PLEASE TAKE NOTICE**, that the undersigned, Adam S. Katz of Goldberg Segalla LLP

will represent Giuliani Partners LLC, Giuliani Group, LLP and Giuliani Security & Safety LLC in

the above-captioned action. Please enter this appearance and notify the undersigned attorney of all

filings in this matter at the contact information listed below.[1]

       **PLEASE TAKE FURTHER NOTICE**, that demand is hereby made for Plaintiff Noelle

Dunphy to serve a complaint in this action, within twenty (20) days, as required by CPLR 3012(b).

Dated: February 2, 2023
      New York, New York

                        Respectfully Submitted,

                        GOLDBERG SEGALLA LLP

                        Adam S. Katz, Esq.
                        711 Third Avenue, Ste. 1900
                        New York, NY 10017
                        akatz@goldbergsegalla.com
                        646-292-8787

---

[1] Defendants Giuliani Partners, LLC, Giuliani Group, LLC, and Giuliani Security & Safety LLC have not been served the summons with notice and these defendants do not waive any defenses based on service.

FILED: NEW YORK COUNTY CLERK 02/04/2023 08:34 PM
INDEX NO. 650033/2023
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 02/04/2023

SUPREME COURT of the STATE of NEW YORK
COUNTY of NEW YORK

------------------------------------------------------------X

NOELLE DUNPHY,

        *Plaintiff,*

      -against-

RUDOLPH W. GIULIANI, GIULIANI
PARTNERS, LLC, GIULIANI GROUP, LLC,
GIULIANI SECURITY & SAFETY, LLC, JOHN
AND/OR JANES DOES 1-10,

        *Defendants.*

Index No: 650033/2023

NOTICE OF APPEARANCE
AND DEMAND FOR
COMPLAINT

------------------------------------------------------------X

**PLEASE TAKE NOTICE**, that the undersigned, Rudolph W. Giuliani, Esq., will

represent himself, *pro se*, in the above-captioned action. Please enter this appearance and notify

the undersigned attorney of all filings in this matter at the contact information listed below.[1]

**PLEASE TAKE FURTHER NOTICE**, that demand is hereby made for Plaintiff Noelle

Dunphy to serve a complaint in this action, within twenty (20) days, as required by CPLR 3012(b).

Dated: February 2, 2023
     New York, New York

Respectfully Submitted,

Rudolph W. Giuliani

---

[1] Defendants Giuliani Partners, LLC, Giuliani Group, LLC, and Giuliani Security & Safety LLC have not been
served the summons with notice.

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

------------------------------------------------------------x

NOELLE DUNPHY,                                    Index No.: **650033**/2023

      Plaintiff,

-against-

RUDOLPH W. GIULIANI, GIULIANI PARTNERS, LLC, GIULIANI GROUP, LLC,
GIULIANI SAFETY & SECURITY, LLC, in addition to JOHN and/or JANE DOES 1-10

      Defendants.

------------------------------------------------------------x


Feb. 24, 2023

Due to the high profile nature of the defendants, it has been a hardship securing legal advice and I request time
to vet candidates to assist with this claim.

May I have an extension to finish legal research to make a professional claim?

Best regards,

*Noelle Dunphy*

Noelle Dunphy

FILED: NEW YORK COUNTY CLERK 02/24/2023 05:46 PM
NYSCEF DOC. NO. 6

INDEX NO. 650033/2023
RECEIVED NYSCEF: 02/24/2023

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

-----------------------------------------------------------------x

NOELLE DUNPHY,                                    Index No.: **650033**/2023

     Plaintiff,

-against-

RUDOLPH W. GIULIANI, GIULIANI PARTNERS, LLC, GIULIANI GROUP, LLC,
GIULIANI SAFETY & SECURITY, LLC, in addition to JOHN and/or JANE DOES 1-10

     Defendants.

-----------------------------------------------------------x

Feb. 24, 2023

Due to the high profile nature of the defendants, it has been a hardship securing legal advice and I request time to vet candidates to assist with this claim.

May I have an extension to finish legal research to make a professional claim?

Best regards,

*Noelle Dunphy*

Noelle Dunphy

FILED: NEW YORK COUNTY CLERK 04/03/2023 11:18 AM

NYSCEF DOC. NO. 7

INDEX NO. 650033/2023

RECEIVED NYSCEF: 04/03/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

NOELLE DUNPHY,                                                  :
                                                               :   Index No.: 650033/2023
                              Plaintiff,                        :
                                                               :
         -against-                                             :   **NOTICE OF**
                                                               :   **APPEARANCE**
RUDOLPH W. GIULIANI,                                           :
GIULIANI PARTNERS, LLC,                                        :
GIULIANI GROUP, LLC,                                           :
GIULIANI SECURITY & SAFETY, LLC,                              :
JOHN and/or JANE DOES 1-10,                                   :
                                                               :
                              Defendants.                       :
-------------------------------------------------------------------X

**PLEASE TAKE NOTICE** that Justin T. Kelton of Abrams Fensterman, LLP hereby

appears as counsel for Plaintiff Noelle Dunphy in the above-captioned matter, and requests that all

papers be served on him at the address below.

Dated:    Brooklyn, New York
          April 3, 2023

                                        **ABRAMS FENSTERMAN, LLP**

                                         _/s/ Justin T. Kelton_____
                                        Justin T. Kelton
                                        1 MetroTech Center, Suite 1701
                                        Brooklyn, NY 11201
                                        Tel: (718) 215-5300 x 501
                                        Fax: (718) 215-5304
                                        Email: jkelton@abramslaw.com
                                        *Attorneys for Plaintiff*
                                        *Noelle Dunphy*

FILED: NEW YORK COUNTY CLERK 04/03/2023 11:31 AM

NYSCEF DOC. NO. 8

INDEX NO. 650033/2023

RECEIVED NYSCEF: 04/03/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------X

NOELLE DUNPHY,                                          :
                                                       :      Index No.: 650033/2023
                            Plaintiff,                 :
                                                       :
        -against-                                      :      **NOTICE OF**
                                                       :      **APPEARANCE**
RUDOLPH W. GIULIANI,                                   :
GIULIANI PARTNERS, LLC,                                :
GIULIANI GROUP, LLC,                                   :
GIULIANI SECURITY & SAFETY, LLC,                       :
JOHN and/or JANE DOES 1-10,                            :
                                                       :
                            Defendants.                :

----------------------------------------------------------------X

 

 

**PLEASE TAKE NOTICE** that Amanda P. Small of Abrams Fensterman, LLP hereby

appears as counsel for Plaintiff Noelle Dunphy in the above-captioned matter, and requests that all

papers be served on her at the address below.

 

 

Dated:     Brooklyn, New York
           April 3, 2023

 

                                                **ABRAMS FENSTERMAN, LLP**

                                                 */s/ Amanda P. Small*
                                                Amanda P. Small
                                                1 MetroTech Center, Suite 1701
                                                Brooklyn, NY 11201
                                                Tel: (718) 215-5300 x 501
                                                Fax: (718) 215-5304
                                                Email:  jkelton@abramslaw.com
                                                *Attorneys for Plaintiff*
                                                *Noelle Dunphy*

FILED: NEW YORK COUNTY CLERK 04/03/2023 04:38 PM

NYSCEF DOC. NO. 9

INDEX NO. 650033/2023

RECEIVED NYSCEF: 04/03/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

NOELLE DUNPHY,                                    :
                                                 :    Index No.: 650033/2023
                        Plaintiff,               :
                                                 :
           -against-                             :    **NOTICE OF**
                                                 :    **APPEARANCE**
RUDOLPH W. GIULIANI,                             :
GIULIANI PARTNERS, LLC,                          :
GIULIANI GROUP, LLC,                             :
GIULIANI SECURITY & SAFETY, LLC,                 :
JOHN and/or JANE DOES 1-10,                      :
                                                 :
                        Defendants.              :

-------------------------------------------------------------------X

**PLEASE TAKE NOTICE** that Sharon P. Stiller of Abrams Fensterman, LLP hereby

appears as counsel for Plaintiff Noelle Dunphy in the above-captioned matter, and requests that all

papers be served on her at the address below.

Dated:     Brooklyn, New York
           April 3, 2023

                                        **ABRAMS FENSTERMAN, LLP**

                                         _/s/ Sharon P. Stiller_
                                        Sharon P. Stiller
                                        2280 East Avenue, First Floor
                                        Rochester, NY 14610
                                        Tel: (585) 218-9999
                                        Fax: (585) 218-0562
                                        Email: sstiller@abramslaw.com
                                        *Attorneys for Plaintiff*
                                        *Noelle Dunphy*

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------------X

NOELLE DUNPHY,                                          :
                                                       :        Index No.: 650033/2023
                              Plaintiff,               :
                                                       :
           -against-                                   :        **VERIFIED COMPLAINT**
                                                       :
RUDOLPH W. GIULIANI,                                   :
GIULIANI PARTNERS, LLC,                                :
GIULIANI GROUP, LLC,                                   :
GIULIANI SECURITY & SAFETY, LLC,                       :
JOHN and/or JANE DOES 1-10,                            :
                                                       :
                              Defendants.              :

----------------------------------------------------------------------X

Plaintiff Noelle Dunphy ("Ms. Dunphy"), by and through her undersigned attorneys,

Abrams Fensterman, LLP, brings this Verified Complaint against Defendants Rudolph W. Giuliani

("Giuliani"), Giuliani Partners, LLC ("GP"), Giuliani Group, LLC ("GG"), Giuliani Security &

Safety, LLC ("GSS") (collectively, the "Giuliani Companies"), and John and/or Jane Does 1-10,

and alleges as follows upon knowledge as to herself and her own actions, and otherwise upon

information and belief:

**INTRODUCTION**

1.      This lawsuit arises from unlawful abuses of power, wide-ranging sexual assault and

harassment, wage theft, and other misconduct by Rudolph W. Giuliani and his Companies.

2.      When Giuliani hired Ms. Dunphy in January 2019, he was at the height of his

influence, serving as the personal lawyer for then-President Donald Trump.  He had fashioned

himself publicly as a major player in American politics, a successful businessman, and an

important powerbroker who wielded enormous control over others.

3.      Giuliani worked aggressively to hire Ms. Dunphy, offering her what seemed like a

once-in-a-lifetime opportunity to work as his Director of Business Development with a salary of

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

$1 million per year plus expenses.  As an added inducement, Giuliani also offered to provide pro bono legal representation to Ms. Dunphy in connection with an ongoing dispute arising from an abusive ex-partner.  To Ms. Dunphy, the chance to work for an influential politician once dubbed "America's Mayor," combined with the prospect of free legal representation by a former United States Attorney for the Southern District of New York, was a rare opportunity that was simply too good to pass up.

4.      But Giuliani's offer came with a significant catch:  Giuliani was in the midst of an acrimonious divorce, and he told Ms. Dunphy that her pay would have to be deferred and her employment kept "secret" until the divorce proceedings finished.  He claimed that his "crazy" ex-wife and her lawyers were watching his cashflow, and that his ex-wife would "attack" and "retaliate" against any female employee that Giuliani hired.  Giuliani promised Ms. Dunphy that his divorce would be resolved "any day now," and therefore the deferral of her pay and the need to keep her employment secret would soon end.  Ms. Dunphy reluctantly agreed to defer her pay and not to publicize her employment because she viewed the job, the salary, and the free legal representation as being worth the wait.

5.      Unfortunately, Giuliani's seemingly generous offers were a sham motivated by his secret desire to pursue a sexual relationship with Ms. Dunphy—in total disregard for the restraints that should have protected her as his employee and client.  As Giuliani later admitted in a recorded statement, he "wanted [Ms. Dunphy] from the day [he] interviewed [her]."

6.      Giuliani began abusing Ms. Dunphy almost immediately after she started working for the Defendants.  He made clear that satisfying his sexual demands—which came virtually anytime, anywhere—was an absolute requirement of her employment and of his legal representation.  Giuliani began requiring Ms. Dunphy to work at his home and out of hotel rooms,

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

so that she would be at his beck and call.  He drank morning, noon, and night, and was frequently intoxicated, and therefore his behavior was always unpredictable.

7.      Giuliani also took Viagra constantly.  While working with Ms. Dunphy, Giuliani would look to Ms. Dunphy, point to his erect penis, and tell her that he could not do any work until "you take care of this."  Thus, Ms. Dunphy worked under the constant threat that Giuliani might demand sex from her at any moment.  Even when the Covid-19 pandemic halted Giuliani's ability to physically assault her, he demanded that she disrobe during their work-related videoconferences.

8.      Giuliani also abused his position as Ms. Dunphy's lawyer to pressure her into sex. In one instance, for example, Giuliani promised Ms. Dunphy that he would give her $300,000 if she would forgo her legal rights in connection with her pending case and "fuck me like crazy." This statement was recorded.[1]

9.      As Ms. Dunphy continued her work for Giuliani and the Giuliani Companies, the work environment became increasingly hostile.  In addition to his sexual demands, Giuliani went on alcohol-drenched rants that included sexist, racist, and antisemitic remarks, which made the work environment unbearable.  Many of these comments were recorded.

10.      Despite the horrible conditions that she endured, Ms. Dunphy excelled at work. She generated substantial business opportunities, was available around the clock, helped Giuliani maintain his public image, and diligently ensured that his day-to-day business needs were met. Ultimately, however, Giuliani and his Companies callously tossed Ms. Dunphy aside, never paying her for the work she performed, and leaving her traumatized by the abuse she had suffered.

---

[1]      As discussed further below, Giuliani gave Ms. Dunphy permission to record their interactions.

3

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

11.     Giuliani presented himself as a generous employer and a hero who would use his legal prowess to save Ms. Dunphy from a difficult situation.  But he was neither of those things. Giuliani assaulted and harassed Ms. Dunphy, forced her to work in a deplorable work environment, in secret, and robbed her of the pay she is owed.  Through this case, Ms. Dunphy seeks a measure of justice from a man who thought his power and connections rendered him untouchable.

## PARTIES

12.     Ms. Dunphy is an individual who resided in New York at certain times and Florida at other times during the relevant time periods.

13.     Defendant Rudolph W. Giuliani is an individual who at all relevant times was a resident of the State of New York, New York County.

14.     Defendant Giuliani Partners, LLC is a Delaware Limited Liability Company, with a principal place of business in New York, New York County.  Upon information and belief, Giuliani was and is the sole member of Giuliani Partners, and exercises operating control over the entity.

15.     Defendant Giuliani Group, LLC is a Delaware Limited Liability Company, with a principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Group, and exercises operating control over the entity.

16.     Defendant Giuliani Security & Safety LLC is a Delaware Limited Liability Company, with its principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Group, and exercises operating control over the entity.

17.     Upon information and belief, John and/or Jane Does 1-10 are individuals who reside in the State of New York.

4

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

18.     The Giuliani Companies comprise a "single employer" or "single integrated enterprise" since they share interrelated operations, centralized control of labor relations, common management, and common ownership or financial control.

19.     Upon information and belief, Giuliani owns a controlling interest in each of the Giuliani Companies, and he exercises complete dominion and control over the Giuliani Companies.

20.     Giuliani and the Giuliani Companies constitute "joint employers" with respect to Ms. Dunphy since they share authority to hire and fire employees such as Ms. Dunphy, determined rate, method, and timing of her pay, approved payment of business expenses, had authority to discipline her, controlled her work schedule and other terms and conditions of her employment, and directed and supervised her work.

21.     The work performed by Ms. Dunphy benefited all Defendants and/or directly or indirectly furthered their joint interests, and Defendants shared control of Ms. Dunphy's employment, either directly or indirectly, because Defendants either control, are controlled by, or are under common control with each other.   Defendants are therefore collectively Ms. Dunphy's "joint employers" under the New York Labor Law's broad definition of "employer." 29 C.F.R. § 791.2(b).

## JURISDICTION AND VENUE

22.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301 because, *inter alia*, Giuliani has resided in New York at all relevant times, and each of the Giuliani Companies had a principal place of business in New York at all relevant times.

23.     Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Ms. Dunphy's claims took place in New York County, where Giuliani resides, works, and maintains offices for the Giuliani Companies.

5

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

## FACTUAL ALLEGATIONS

**A.**     **Ms. Dunphy's Background**

24.     Ms. Dunphy is a Columbia University graduate and skilled businesswoman with 22 years of experience in business development, associate producing, and communications.

25.     Ms. Dunphy has owned her own consulting firm, Strategic Consulting, since 2001.

26.     Throughout her career, Ms. Dunphy has worked with companies to generate increased business, create new revenue streams, and promote positive brand images.

27.     Despite her professional successes, Ms. Dunphy has experienced substantial pain and hardship.  When she met Giuliani, Ms. Dunphy was highly vulnerable, having just begun the arduous process of recovering from severe domestic abuse.  She was involved in a difficult lawsuit arising from that situation,[2] and she was desperate for an opportunity to move forward in a positive direction.

**B.**     **Background of Giuliani and the Giuliani Companies**

28.     Giuliani is a lawyer,[3] former Mayor of New York City, and former United States Attorney for the Southern District of New York.

29.     Giuliani prides himself on being a well-connected political power broker.  When Ms. Dunphy met Giuliani, he was known as a longtime friend and close confidante of then-President Donald Trump, in addition to being a member of Trump's legal team.

30.     Giuliani also owns and manages several businesses, including the Giuliani Companies.

31.     Giuliani operated the Giuliani Companies as his personal fiefdoms, disregarding virtually all corporate formalities and blurring the boundaries between the Companies and their

---

[2]     Ms. Dunphy was granted permission to proceed under the pseudonym Jane Doe in that lawsuit.

[3]     Upon information and belief, Giuliani's law licenses have been suspended in New York and Washington, D.C.

6

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

personnel.  Upon information and belief, employees of the Giuliani Companies regularly acted and referred to themselves as working for Giuliani and did not maintain separation among the Giuliani Companies.  For example, Giuliani's former interim CEO, Maria Ryan, wrote in emails that GP and GSS "are one," meaning that they operate as a single company.  Upon information and belief, the Giuliani Companies had intermingled bank accounts, and Giuliani treated his corporate credit card as a personal credit card.

32.     Upon information and belief, Giuliani has a history of using his businesses— including, but not limited to the Giuliani Companies—to groom and aggressively pursue women for sexual relationships.

33.     For example, upon information and belief, Giuliani repeatedly agreed to give significant job titles and large salaries to women he found attractive, with the intention of having a sexual relationship with them.  Upon information and belief, Giuliani achieved this goal in several instances, and engaged in sexual relationships with women he had hired and whose employment he controlled completely.

34.     Upon information and belief, Giuliani had an affair with Maria Ryan, who was Giuliani Partners' interim CEO, although Giuliani claimed in the media that there was "no proof" that the two had sex.[4]  In addition, media reports note that Giuliani had an affair with his communications director in the 1990s.[5]  Media reports also reflect that Giuliani had an affair with Jennifer LeBlanc,[6] a GOP fundraiser who, upon information and belief, received indirect

---

[4]     https://www.dailymail.co.uk/news/article-5836499/Rudy-Giuliani-accused-having-affair-assistants-married-mother.html

[5]     https://abcnews.go.com/GMA/story?id=126961&page=1;  *see also* https://nypost.com/2000/05/11/former-rudy-aide-back-in-the-storm-is-lategano-the-one-donna-referred-to/

[6]     https://www.nydailynews.com/news/politics/ny-pol-rudy-giuliani-jennifer-leblanc-20180613-story.html

7

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

payments from Giuliani and who, upon information and belief, worked in Gracie Mansion when Giuliani was Mayor.   And, upon information and belief, Giuliani also hired 19-year-old Christianne Allen as the Communications Director for the Giuliani Companies because, as he told Ms. Dunphy, he had "a certain sexual attraction to" Ms. Allen.   In fact, Giuliani admitted to Ms. Dunphy that he kissed Ms. Allen.   These statements were recorded.

35.     Ms. Dunphy knew nothing about this predatory history until she became a victim of the same scheme.

**C.     Giuliani Tries To Hire Ms. Dunphy In 2016 And Then Again In 2019**

**i.     Giuliani's First Overture in September 2016**

36.     In September 2016, Giuliani met Ms. Dunphy while they both were waiting in the lobby of Trump Tower in Manhattan.

37.     Giuliani spoke to Ms. Dunphy and began asking for details about her work and life, and then indicated that he was interested in hiring her to work for him.

38.     Ms. Dunphy had no reason to believe that the interaction was anything other than business.

39.     Giuliani gave Ms. Dunphy his business card at the end of the interaction and asked that she contact him to talk further about working with him.

40.     Ms. Dunphy had no intention of working with Giuliani and did not contact him.

41.     Ms. Dunphy had no contact with Giuliani until he contacted her again in 2019.

**ii.     Giuliani's Second Overture in January 2019**

42.     On or about January 9, 2019, Giuliani sent Ms. Dunphy an unsolicited Facebook message and friend request.   A true and correct copy of the Facebook friend request is annexed hereto as Exhibit A.

8

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

43.     Ms. Dunphy was surprised that Giuliani had tracked her down years after their first interaction.  But the timing was fortuitous, as Ms. Dunphy was seeking new career opportunities, and she also needed legal advice.

44.     Ms. Dunphy accepted Giuliani's friend request and responded to his message. Giuliani invited her to a formal interview for a business development job with his organization.

45.     Ms. Dunphy agreed to meet Giuliani for a job interview in Florida, where she was living at the time.

**D.**     **Giuliani Hires Ms. Dunphy as Director of Business Development and Agrees to Represent Ms. Dunphy Pro Bono.**

46.     On January 21, 2019, Giuliani interviewed Ms. Dunphy at the Trump International Golf Club of West Palm Beach, Florida.  During the interview, they discussed Ms. Dunphy's career and experience, and her legal issues.  They also spoke about her ability to help Giuliani generate new revenue streams and to support him on a day-to-day basis, including by fielding media inquiries.

47.     The interview seemed to go well.  Giuliani told Ms. Dunphy that he was impressed by her experience, and he offered her a job as Director of Business Development for the Giuliani Companies, and also as his executive assistant for travel, communications, and public relations.

48.     Giuliani told Ms. Dunphy that her salary would be $1 million per year, and that any business expenses she incurred would be reimbursed.

49.     Upon information and belief, the salary that Giuliani offered Ms. Dunphy was within the same general range that Giuliani and the Giuliani Companies paid to other employees of Giuliani and the Giuliani Companies, when accounting for expenses and other benefits, including for example Maria Ryan (who served in various roles).

50.     During the job interview, Giuliani and Ms. Dunphy discussed that her responsibilities would include generating business opportunities, including speeches and clients

9

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

which Giuliani told her historically earned him approximately $10 million per year, public relations work (such as editing Giuliani's social media posts and ensuring that he was presentable to the public), monitoring his email, assisting him with responding to emails, making travel arrangements, scheduling meetings, and generally being "on call" for whatever Giuliani and his Companies needed. Giuliani told Ms. Dunphy that the job required her to be available "24/7."[7]

51.     As they talked, Ms. Dunphy suggested several ideas for ways in which Giuliani and his Companies could generate revenue. These included creating a podcast,[8] creating a Netflix series, documentaries, and other similar endeavors. Later, Giuliani took advantage of several of these suggestions, and Ms. Dunphy worked to develop some of these projects.

52.     Giuliani and Ms. Dunphy also discussed during the interview that she one day write a book on Giuliani and Trump.

53.     Giuliani gave Ms. Dunphy permission to record her interactions with Giuliani anytime, anywhere, as well as Giuliani's interactions with others. Giuliani thereafter continually permitted and authorized Ms. Dunphy to make such recordings. He never asked her to stop recording any interaction. At times, Giuliani pressed "record" himself on Ms. Dunphy's cell phone to record their conversations.

54.     As the parties reached agreement on the general terms of Ms. Dunphy's employment, Giuliani added a strange requirement: Ms. Dunphy's pay would have to be deferred and her employment kept "secret" until Giuliani's divorce proceedings finished. Giuliani claimed that this arrangement was necessary because his ex-wife and her lawyers were watching his

---

[7]     When Giuliani made this job offer to Ms. Dunphy, Giuliani understood that Ms. Dunphy would be financially reliant on him and the Giuliani Companies—particularly since Giuliani required that Ms. Dunphy be available 24/7, leaving no time for her to pursue any other source of employment or income.

[8]     Ms. Dunphy was surprised to learn during the discussion that Giuliani did not know what a podcast was, so she educated him about podcasts.

10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

cashflow and he was limited in what he could spend and who he could hire.  Giuliani also claimed

that his ex-wife would "attack" and "retaliate" against any female employee that Giuliani hired.

55.      Giuliani told Ms. Dunphy that his divorce would settle "any day now" and therefore

the need to keep her employment secret and her pay deferred would not last long.

56.      Giuliani promised Ms. Dunphy that in the meantime, he would pay her in cash

whenever he could so that she could support herself during the deferral period.

57.      During the interview, Giuliani offered Ms. Dunphy an additional inducement:  he

had learned that she was a survivor of domestic abuse and he offered to represent her pro bono in

connection with legal matters arising from those circumstances.  Giuliani later sent Ms. Dunphy

an email confirming this arrangement, a redacted copy of which follows:



**Legal Retainer**

**RUDOLPH GIULIANI** ███████████████████████        Mon, Feb 25, 2019 at 12:16 AM
To: Elle Ashley ██████████████, Elle Ashley █████████████

This is to acknowledge that I have been retained since January 21, 2019 by Noelle Ashley Dunphy as her attorney to
advise her on all legal matters and to analyze the legal issues presently pending.

Rudolph W. Giuliani

Sent from my iPhone

58.      Giuliani had served as the United States Attorney for the Southern District of New

York.  Thus, his offer of pro bono legal representation was an important inducement of seemingly

incalculable value due to his experience and recognition in New York legal circles.

59.      At the end of the interview, Ms. Dunphy accepted Giuliani's job offer and

reluctantly agreed to defer her pay and keep her employment non-public, based on: (i) Giuliani's

job offer (including the salary of $1 million per year and expenses); (ii) his claim that his divorce

would be finalized soon; and (iii) his promise that he would represent Ms. Dunphy pro bono.

11

60.     Ms. Dunphy was excited, and she called her parents soon after being hired to tell them about her new job and salary.

61.     But unbeknownst to Ms. Dunphy, Giuliani apparently decided during the interview that he would use the job offer and his representation as a pretext to develop a quid pro quo sexual relationship with Ms. Dunphy.  He was later recorded telling Ms. Dunphy, "I've wanted you from the day I interviewed you."

**E.      Ms. Dunphy Begins Working For The Giuliani Defendants.**

62.     Right after the job interview on January 21, 2019, Giuliani required that Ms. Dunphy attend a work-related meeting with his team and certain of Giuliani's Ukrainian associates to discuss her work for the Giuliani Companies.

63.     During this meeting, Giuliani drank to excess, and he pressured Ms. Dunphy to drink.

64.     After a long first day on the job, Giuliani told his bodyguard to take a separate car so he could have privacy in the back seat with Ms. Dunphy as his limo service drove her home in a black SUV.  Ms. Dunphy was surprised by this request from her new boss.

65.     After the bodyguard left, Giuliani kissed Ms. Dunphy and asked if he could enter her home.

66.     Ms. Dunphy was stunned and shaken.  She politely declined and thanked him for her new job and his legal representation.  As he was preparing to leave, Giuliani told Ms. Dunphy that since they would be working from different locations that week, he would like it if Ms. Dunphy sent him some flirtatious photos.  Giuliani's conduct seemed strange, but Ms. Dunphy still had no idea of what was to come.  After his car left, she went into her apartment, locked the door, and tried to make sense of what had just happened.

12

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

67.     After dropping Ms. Dunphy off, Giuliani called Ms. Dunphy five times that same evening.

**F.     Giuliani Begins Asking Ms. Dunphy Bizarre And Intrusive Sexual Questions Under The Guise Of Providing Legal Advice.**

68.     At around the same time that Ms. Dunphy began working for Giuliani and the Giuliani Companies, Giuliani and Ms. Dunphy began working together on her legal matters.

69.     Under the guise of providing Ms. Dunphy legal advice, Giuliani started asking Ms. Dunphy for extremely personal details relating to her past, including explicit details about prior sexual encounters.

70.     Ms. Dunphy was disturbed by these personal questions, but Giuliani claimed that this information was necessary for his "research" in connection with her case.

71.     As Ms. Dunphy would soon learn, Giuliani's probing questions were not designed to help him provide legal advice.  Rather, Ms. Dunphy would come to understand that Giuliani was aroused by discussing Ms. Dunphy's sexual history and violent relationships.  Ms. Dunphy did not know it yet, but Giuliani would force her to repeat the cycle of abuse she had suffered.

**G.     Giuliani Subjects Ms. Dunphy To A Sexually-Charged And Hostile Work Environment, Repeatedly Assaults Her, And Refuses To Pay Her Salary.**

72.     After Giuliani hired Ms. Dunphy on January 21, 2019, Giuliani called Ms. Dunphy almost daily, often repeatedly, to discuss current events and business-related issues.  For example, Giuliani called Ms. Dunphy 14 times on January 24, 2019.

73.     Giuliani often required that Ms. Dunphy discuss business and current events with him on the phone for eight to ten hours a day, sometimes late into the evening.  Thus, Ms. Dunphy began working long hours for Giuliani and his Companies.

74.     Because Giuliani was both her boss and her lawyer, she felt that she had to respond as he required.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

75.     On January 25, 2019, Giuliani paid to fly Ms. Dunphy to New York on a semi-private chartered plane.  Giuliani used an employee of the Giuliani Companies, JoAnne Zafonte, to make these travel arrangements.  Copies of records related to these travel arrangements are annexed hereto as Exhibit B.

76.     That evening, Giuliani, travelling with his security team, met Ms. Dunphy at the airport.  Giuliani smelled of alcohol.  They had a business dinner that night and planned to travel to the office for work that upcoming Monday.

77.     Giuliani insisted that Ms. Dunphy stay in a guest suite in his Upper East Side apartment.  Ms. Dunphy was surprised by this unusual request, but Giuliani assured her that employees often slept in his guest suite, which included a private bedroom and private bathroom.

78.     Ms. Dunphy was uncomfortable with this arrangement and tried to secure other accommodations.  She asked her family and friends for places to stay in New York.  But Giuliani insisted that she stay in his apartment.  Since Giuliani was her boss and attorney, she felt pressured to do as he asked and ultimately agreed to stay in his guest suite temporarily.

79.     Upon arrival at Giuliani's apartment, Ms. Dunphy was surprised to find that Giuliani had alcoholic beverages ready for them.

80.     Ms. Dunphy was not much of a drinker, but Giuliani pressured her to drink with him.  Giuliani offered Ms. Dunphy scotch, which she declined because she virtually never drank hard alcohol.  Undeterred, Giuliani poured them both glasses of red wine.  In an effort to be polite, Ms. Dunphy accepted the wine.  Giuliani and Ms. Dunphy each drank two or three glasses of wine.

81.     Giuliani was substantially larger than Ms. Dunphy, who was a women's size small or medium at the time.

82.     Ms. Dunphy became intoxicated more easily than Giuliani because of her smaller size and the fact that she rarely drank, while Giuliani often drank large quantities of alcohol.

14

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

83.     After finishing their drinks, Ms. Dunphy went to the guest suite alone.  She put her suitcase on the bed, closed the door to the room, and took a shower.

84.     When Ms. Dunphy got out of the shower, she was startled to see that Giuliani had entered the guest suite, uninvited.  She was still intoxicated.

85.     Ms. Dunphy was frightened.  She said she wanted to get dressed, unpack, and settle in.  She asked for privacy.  She said she would meet him in the living room when she was ready.  But Giuliani would not leave.  He sat on the bed and pulled down his pants.  The following screenshot from the film *Borat: Subsequent Moviefilm* depicts Giuliani acting in a similar manner to how he acted with Ms. Dunphy:



86.     Giuliani then pulled her head onto his penis, without asking for or obtaining any form of consent.  He held her by her hair.  It became clear to Ms. Dunphy that there was no way out of giving him oral sex.  She did so, against her will.

87.     Ms. Dunphy was shocked and saddened by what had happened.  She did not want to have any sexual encounter with Giuliani, of any kind.  But Ms. Dunphy felt extreme pressure to go along with Giuliani's demands because she could not lose her promised salary or her legal representation by the uniquely qualified and connected lawyer.

15

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

88.     After pressuring her into performing oral sex, Giuliani required Ms. Dunphy to accompany him to a late dinner with Giuliani's friend and business associate Lev Parnas. Ms. Dunphy asked Giuliani for the name of the Human Resources director, because she was considering reporting what had happened.  Giuliani said that he did not have a Human Resources department and bragged that no one would ever sue him because he was connected to President Trump, and he had private investigators who would punish anyone who complained.

89.     They went to the work dinner, which involved discussions about various matters including media relations, certain legal issues, and the political climate.

90.     Over the following two days (Saturday and Sunday), Giuliani and Ms. Dunphy worked from his residence.  They sat at the dining room table in his three-bedroom penthouse apartment, and sometimes worked from the living room couch.  Her tasks that weekend included bringing him scotch on demand and brainstorming ideas for interviews, shows, and Netflix series.

91.     She also reviewed her contacts with entertainment industry professionals, sought their advice, analyzed various options, and researched documentary makers and producers.  She later reached out to certain producers and had lengthy meetings with them about potential projects for Giuliani.

## H.    Giuliani Loads His Email Account Onto Ms. Dunphy's Computer.

92.     Giuliani told Ms. Dunphy that part of her duties would involve monitoring his email, notifying him about important emails, working with him to craft responses if needed, reminding him about scheduled meetings and appearances, and keeping track of files in case he needed them.

93.     Therefore, Giuliani added one of his work email accounts into Ms. Dunphy's email program on her computer, typing his password onto her computer.

16

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

94.     Once Giuliani's email account was loaded onto Ms. Dunphy's computer, at least 23,000 emails associated with the account, including many from before her employment with Giuliani, were stored on her computer.

95.     Since Giuliani gave Ms. Dunphy access to his email account, she had access to information that was, upon information and belief, privileged, confidential, and highly sensitive.

96.     For example, Ms. Dunphy was given access to emails from, to, or concerning President Trump, the Trump family (including emails from Donald Trump, Jr., Ivanka Trump, and Eric Trump), Trump's son-in-law Jared Kushner, former FBI director Louis Freeh, Trump lawyer Jay Sekulow, Secretaries of State, former aides to President Trump such as Steve Bannon, Reince Priebus, and Kellyanne Conway, former Attorneys General Michael Mukasey and Jeff Sessions, media figures such as Rupert Murdoch, Sean Hannity, and Tucker Carlson, and other notable figures including Newt Gingrich, presidential candidates for Ukraine, President Recep Tayyip Erdogan of Turkey, the Ailes family, the LeFrak family, Bernard Kerik, Igor Fruman, Lev Parnas, and attorneys Marc Mukasey, Robert Costello, Victoria Toensing, Fred Fielding, and Joe DeGenova.

97.     Ms. Dunphy understood that she was given access to these emails because she was employed by Giuliani and the Giuliani Companies.  Indeed, although Giuliani and his surrogates have argued that Ms. Dunphy was not an employee of Giuliani or the Giuliani Companies, it is impossible to understand Giuliani's decision to give Ms. Dunphy complete access to (and copies of) these sensitive emails in any other context.

98.     As a lawyer, Giuliani sent and received emails containing privileged information that could not legally be shared with Ms. Dunphy if she were not an employee or consultant. Likewise, Giuliani's business often involved highly confidential information, and upon information and belief, there were confidentiality and nondisclosure agreements governing access

17

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

to some of this information.  Upon information and belief, those agreements barred Giuliani from sharing covered confidential information with someone who was not an employee or consultant.

99.     Giuliani never asked Ms. Dunphy to sign a non-disclosure or confidentiality agreement.

100.     As part of her work, Ms. Dunphy warned Giuliani about the dangers of his use of a regular Gmail account for his work, and about his habit of logging in from unsecured Wi-Fi networks in foreign nations and hotel lobbies.  She researched additional security measures for him, recommended them to him, and recommended experts to review his practices.

I.     **Giuliani Takes Ms. Dunphy To The Giuliani Companies' Office And Introduces Her As A New Employee, And Ms. Dunphy Continues Working For Defendants.**

101.     On Monday, January 28, 2019, Giuliani took Ms. Dunphy to the Giuliani Companies' office at 445 Park Avenue, 18th floor, New York, New York.

102.     At the office, Ms. Dunphy met several employees of the Giuliani Companies, including Giuliani's office manager JoAnne Zafonte, CEO of GSS John Huvane, Giuliani's head of security and friend Beau Wagner, attorney and Giuliani friend Dennison Young, and other staff.

103.     Ms. Dunphy continued working for Defendants during the course of that week.  For example, she began to coordinate travel arrangements for Giuliani through JetSmarter and negotiated a better plan and travel membership for him.  A true and correct copy of an email chain between Ms. Dunphy and a representative from JetSmarter dated January 30, 2019 is annexed hereto as Exhibit C.

104.     Ms. Dunphy also helped Giuliani prepare for an upcoming interview about Roger Ailes, the former Chairman of Fox News.  Ms. Dunphy tried to discourage Giuliani from participating in the interview because an employee of Fox had publicly alleged that Mr. Ailes sexually abused her and blackmailed her into becoming his "sex slave."  But Giuliani insisted that Ailes, who had passed away, was a "good friend" and he decided to participate in the interview.

18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

Therefore, Ms. Dunphy prepared Giuliani to try to avoid or deflect from topics that could harm Giuliani's reputation, since part of her job was public relations for Giuliani.  Ms. Dunphy accompanied Giuliani to this interview on January 29, 2019, to ensure Giuliani would not embarrass himself.  This interview, including out-takes, was recorded.

105.    Giuliani kept working with Ms. Dunphy on her legal matters during this time.  He edited and drafted affidavits, drafted and revised agreements for her, and communicated with the attorney who was making court appearances on Ms. Dunphy's behalf, Christopher Mukon, Esq. ("Mr. Mukon").

**J.    Giuliani Moves Ms. Dunphy's Work Location From The Companies' Offices To His Apartment And Continues Forcing Ms. Dunphy To Satisfy His Sexual Demands.**

106.    Over the next few days, Giuliani grew obsessive and would not let Ms. Dunphy out of his sight.  He aggressively pursued a sexual relationship with Ms. Dunphy, and to facilitate this goal, he insisted that they work mostly at his apartment rather than the Giuliani Companies' offices.  Giuliani made clear that satisfying his sexual demands was a requirement of Ms. Dunphy's employment.

107.    Giuliani preferred working with Ms. Dunphy in his home (and later from hotels) so that he could easily transition from work, to demanding sexual gratification, and back to work. Thus, Ms. Dunphy worked under the virtually constant threat that Giuliani might initiate sexual contact at any moment.  Although Ms. Dunphy never knew when Giuliani might force sexual contact on her, upon information and belief, his actions were premeditated because, in many instances, he had taken Viagra or similar medication beforehand in preparation.

108.    Giuliani often demanded that she work naked, in a bikini, or in short shorts with an American flag on them that he bought for her.  When they were apart, they would often work remotely via videoconference, and during those conferences Giuliani almost always asked her to

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

remove her clothes on camera.  He often called from his bed, where he was visibly touching himself under a white sheet.

109.    Throughout the employment and attorney-client relationship, Giuliani forced Ms. Dunphy to perform oral sex on him.  He often demanded oral sex while he took phone calls on speaker phone from high-profile friends and clients, including then-President Trump.  Giuliani told Ms. Dunphy that he enjoyed engaging in this conduct while on the telephone because it made him "feel like Bill Clinton."

110.    Upon information and belief, some of the individuals who Giuliani spoke with on these calls were law clients of Giuliani (such as Mr. Trump), who were unaware that Ms. Dunphy was in the room and could overhear their conversations.  At certain times, Ms. Dunphy overheard discussions which contained, upon information and belief, privileged or confidential information. These discussions included, for example, strategies as to how to deal with the investigation being conducted by Robert Mueller, and whether it might be possible to distract, intimidate, or otherwise dissuade Mueller from proceeding against Trump.

111.    As part of her duties, Giuliani and Ms. Dunphy had discussions about documents that might help counteract the Mueller investigation, including reviewing documents labeled "Executive Privilege" and discussing potential legal arguments summarized in documents that Giuliani had received from another lawyer.

112.    During this time, the work environment was regularly affected by Giuliani's chronic alcoholism.  Giuliani was rarely sober around Ms. Dunphy.  Since he regularly drank all day and night, it became part of Ms. Dunphy's responsibilities to fetch his alcohol and make sure that he was a "functioning alcoholic."  She worked hard to ensure that despite Giuliani's excessive drinking, he did not appear drunk.  If Giuliani became too drunk, it was her job to remove him from the situation.  Ultimately, the most important and time-consuming aspect of Ms. Dunphy's

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

job became preventing Giuliani from creating media disasters.   During this time, when Ms. Dunphy was not by his side, he appeared with hair dye dripping from his forehead, appeared wearing excessive amounts of self-tanner, and hosted a press conference in the parking lot of Four Seasons Total Landscaping.

113.    Giuliani began to tell Ms. Dunphy that he loved her.   Often, this was while he was coercing her into performing oral sex on him.   He sometimes also referred to her as a "best friend" and he often told her that he "needed" her.   Due to Ms. Dunphy's vulnerable state, and the power imbalance between them as boss/employee and lawyer/client, she began to believe him.   And Giuliani engaged in a pattern of conduct that was designed to make her financially and emotionally dependent on him, and to coerce her to remain as his secret employee.

114.    Ms. Dunphy confided in a friend about the abuse she had experienced.   She told her friend that Giuliani acted like performing oral sex was a requirement of her job, and that he pressured her for oral sex constantly.   Ms. Dunphy also told the friend how she felt like she had no choice but to comply, given the circumstances.

**K.**    **Giuliani Keeps Refusing To Pay Ms. Dunphy The Salary She Is Owed, But Strings Her Along With Small Cash Payments.**

115.    All the while, Giuliani was telling Ms. Dunphy that he needed to keep deferring her pay and keep her employment secret, but he promised her that she would eventually be paid in full and receive credit for her work.

116.    Giuliani also continued to tell Ms. Dunphy that his divorce would settle "any day," and then he and his Companies would make her whole by paying what she was owed.

117.    To tide Ms. Dunphy over and keep her obedient to him, Giuliani sometimes paid Ms. Dunphy in increments of no more than $5,000 in cash, at random times.   For example, Giuliani paid Ms. Dunphy $4,000 in cash on February 1, 2019, before she traveled from New York to Florida, as part of her "deferred pay."

21

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

118.    Giuliani also authorized certain of Ms. Dunphy's business expenses to be paid by using a corporate credit card for one of the Companies.  These expenses included, for example, Uber and Lyft expenses for work-related travel.

119.    To bolster his claims about the need to keep Ms. Dunphy's employment "secret," Giuliani told Ms. Dunphy about other schemes he undertook to reduce the amounts he owed to his ex-wife.[9]  For example, Giuliani told Ms. Dunphy that someone owed him $1 million, but Giuliani hinted that instead of having the money paid to him, he had his friend, Robert Stryk, hold it for him.  He said, "Robert Stryk just got me a million-dollar payment."  This statement was recorded.

120.    Likewise, Giuliani told Ms. Dunphy about other instances in which he would have others receive and hold money that was due to him so that his ex-wife would not know that he received the money.  Upon information and belief, these individuals holding the money would give Giuliani cash from time to time so that the funds could not be traced to Giuliani.

**L.      Giuliani Continues Abusing Ms. Dunphy, While Also Continuing To Employ Her And Represent Her.**

121.    Starting around February 2019, Giuliani repeatedly demanded assurances from Ms. Dunphy of her loyalty, and began isolating her from others.  He forbade her from seeing or talking on the phone with anyone without his approval.

122.    During February 2019, Giuliani's habit of calling her obsessively continued, including approximately 34 calls on February 1, 2019, 19 calls on February 2, 2019, 44 calls on February 5, 2019, 32 calls on February 6, 2019, 28 calls on February 7, 2019, 36 calls on February 11, 2019, 50 calls on February 12, 2019, 53 calls on February 13, 2019, and 10 calls on February 14, 2019.

---

[9]    Giuliani stored emails relating to these schemes on Ms. Dunphy's computer.

22

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

123.    On February 6, 2019, Giuliani bought a smart battery case from Apple for Ms. Dunphy so that she could always be "on call" for him.  This ensured that Ms. Dunphy had no excuse not to respond to Giuliani, as her cellphone would constantly be charged.

124.    On February 7, 2019, Giuliani told Ms. Dunphy to take a note to remind him to pay taxes on a private jet ride he was gifted by a friend.  The same day, Giuliani told Ms. Dunphy, in her capacity as his employee, about a plan that had been prepared for if Trump lost the 2020 election.  Specifically, Giuliani told Ms. Dunphy that Trump's team would claim that there was "voter fraud" and that Trump had actually won the election.  This plan was discussed at several business meetings with Giuliani and Lev Parnas.

125.    That same day, Giuliani had Ms. Dunphy sit in on a speakerphone conversation about a potential business opportunity involving a $72 billion dollar gas deal in China.

126.    On February 9, 2019, as part of her job duties, Ms. Dunphy had a conversation with Giuliani about whether he should register under the Foreign Agents Registration Act ("FARA"), in anticipation of a meeting later that day with Lev Parnas to discuss a foreign business opportunity.  The following is a true and correct copy of a photo of Ms. Dunphy, Giuliani, and Mr. Parnas taken that day:



23

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

127.    On or about February 10, 2019, Giuliani reiterated his consent to audio recording of his conversations with Ms. Dunphy.  His consent was recorded.

128.    On February 11, 2019, Giuliani performed legal work for Ms. Dunphy, including talking with Mr. Mukon and discussing strategy related to her ongoing domestic violence litigation.  Despite holding himself out as Ms. Dunphy's attorney, upon information and belief, Giuliani never filed a notice of appearance on behalf of Ms. Dunphy in any of her ongoing matters.

129.    At the same time, Giuliani kept trying to control Ms. Dunphy.  On February 11, 2019, Giuliani texted Ms. Dunphy "you're mine" and "[n]obody will ever have you now":



130.    On February 14, 2019, Ms. Dunphy and Giuliani had a conversation via text message.  During the conversation, Giuliani referred to Ms. Dunphy as his "chief consultant," and he referred to her as his "chief consultant" when he introduced her around Miami's Trump Doral golf course.

131.    Around February 16, 2019, they reviewed Giuliani's emails with Ukrainian government officials, and again discussed the advisability of registering under FARA.  Ms. Dunphy offered to complete the registration for him.  Giuliani told her that he was able to break the laws because, he said: "I have immunity."

24

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

132.    He also asked Ms. Dunphy if she knew anyone in need of a pardon, telling her that he was selling pardons for $2 million, which he and President Trump would split.  He told Ms. Dunphy that she could refer individuals seeking pardons to him, so long as they did not go through "the normal channels" of the Office of the Pardon Attorney, because correspondence going to that office would be subject to disclosure under the Freedom of Information Act.

133.    On February 18, 2019, Giuliani requested bottles of alcohol around 10:00 a.m., and in her capacity as his assistant, Ms. Dunphy arranged to have it delivered to him.

134.    On February 18, 2019, Ms. Dunphy, in her capacity as Director of Business Development, told Giuliani that he should seek to remove certain Google search results that were unfavorable to him to help with his public relations and image.

135.    On February 19, 2019, Ms. Dunphy spoke with Giuliani about a proposal to provide paid presentations and speeches.

136.    On February 21, 2019, Giuliani called Ms. Dunphy 4 times, and he also texted her the following:



FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

137.     On February 21, 2019, Giuliani and Ms. Dunphy worked together on her domestic violence litigation, while he drank scotch and groped her until he eventually demanded sexual gratification.

138.     On February 23, 2019, Giuliani told Ms. Dunphy that he could "get in trouble with underage girls" if they were 16 but looked 20.  This conversation was recorded.  During the same conversation, Giuliani discussed work-related issues with Ms. Dunphy, including reimbursement of the hotels she booked on February 14, 2019.  As his assistant, she arranged for his dry-cleaning orders.

139.     On February 25, 2019, Giuliani forced Ms. Dunphy to have sexual intercourse with him for the first time.  Before this, Ms. Dunphy had refused and avoided having sex with Giuliani, although he had forced her to engage in other sexual contact.  But on February 25, Giuliani told Ms. Dunphy that he would not wait any longer to have sex with her.

140.     Ms. Dunphy objected and told Giuliani repeatedly that she did not want to have sex.  But Giuliani would not take "no" for an answer.  He eventually forced her into having sexual intercourse with him.  She never consented to intercourse, but she eventually stopped resisting because it was clear that he would not stop pressuring her.

141.     Beginning in March 2019, Giuliani became more abusive toward Ms. Dunphy.  He continually pressured her into sex, was unconcerned with obtaining Ms. Dunphy's consent, disregarded Ms. Dunphy's boundaries as a survivor of domestic violence and behaved in a hyperaggressive manner during sexual interactions.  Giuliani disregarded Ms. Dunphy's request that his conduct stop and her pleas that physical violence, domineering behavior, and abusive language was triggering and re-traumatizing for her.

142.     For example, during sex, he called her a "cunt," a "bitch," and "Rudy's slut," and discussed his interest in "BDSM" (which refers to bondage, dominance, sadism, and masochism)

26

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

with her.[10]  Ms. Dunphy repeatedly told Giuliani that she was not interested in participating in such conduct.  Indeed, Giuliani was well aware of Ms. Dunphy's aversion to physical violence or emotionally abusive language of any kind, real or simulated, because of his work as her attorney in connection with her domestic violence case.  Nevertheless, he continually talked about BDSM and violent sex, and demanded that she engage in such conduct.

143.    On March 3, 2019, Giuliani explained that he fantasized about Wendy Rhoades in the popular television show *Billions*, stating "she wears all that black shit, she's got a whip, and an electric prod."  Ms. Dunphy made it clear that she was not interested, and immediately changed the subject, commenting on the mosquitoes outside.  These statements were recorded.

144.    Giuliani previously tried to force her to watch BDSM scenes, and she refused.  Upon information and belief, Giuliani knew that his fixation on BDSM would make Ms. Dunphy uncomfortable because he had witnessed that Ms. Dunphy was unable to watch such scenes or other types of violence or degradation in films and television shows.  During such scenes, Giuliani watched Ms. Dunphy shake at the sounds, hide her eyes, and turn her head away.  In one incident, Ms. Dunphy refused to watch "The General's Daughter" with Giuliani, despite his claim that the film's violent sex that led to a female's death was "sexy."

145.    Giuliani's actions made Ms. Dunphy extremely uncomfortable, but because she had entrusted him with her case and because he was controlling her deferred pay, she felt she had no choice but to submit to his demands.

146.    On March 3, 2019, Giuliani and Ms. Dunphy spent the day working together on the Giuliani Companies' business, potential real estate investments, Giuliani's travel arrangements for

---

[10]  Giuliani often discussed this while comparing himself to Chuck Rhoades, the fictional U.S. Attorney for the Southern District of New York on the Showtime series *Billions*, who enjoyed such conduct.  Giuliani bragged that the character Chuck Rhoades—a deeply flawed character who wildly abuses his power—was inspired by him.

27

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

that week, and whether she would be traveling with him for their work.  In addition, Giuliani and Ms. Dunphy were working on contracts for Ms. Dunphy.  While discussing those documents, Giuliani initiated sex with Ms. Dunphy.

147.    On March 4, 2019, Giuliani and Ms. Dunphy again spent the day working together. Giuliani began that day by drinking Bloody Marys.  They both drank throughout the day while discussing business and Ms. Dunphy's ongoing case.  Giuliani became drunk, and fantasized about visiting a hotel with Ms. Dunphy, bizarrely saying during a recorded conversation that he would tell the doorman to wait outside with the luggage so that "we do it on the floor in the living room…we don't even make it to the bedroom.  All the clothes come off," and telling the doorman, "I need time alone with my girlfriend, with my daughter.  With my little girl."  This became part of a pattern in which Giuliani referenced Ms. Dunphy as his "daughter" in the context of sexual activity and made her extremely uncomfortable.

148.    During a discussion about Ms. Dunphy's case, Giuliani initiated sex with Ms. Dunphy.  While having sex, Giuliani kept talking about the case and told Ms. Dunphy that he would get the best settlement agreement for her.  Giuliani also smacked Ms. Dunphy in the face and then told her that the smack was "cute."  Since Ms. Dunphy and Giuliani had been drinking since the morning, Ms. Dunphy was intoxicated and could not have consented to sex with Giuliani.

149.    Giuliani told Ms. Dunphy that he wanted her to end her domestic violence litigation because he felt it was interfering with his sex life with her, and he did not want her to be "distracted" by it.  Giuliani promised Ms. Dunphy that he would give her $300,000 in exchange for her waiving her legal rights as against her abusive ex-boyfriend, and if she would "fuck me like crazy."  After realizing what he had said, Giuliani attempted to backtrack and stated, "we won't put that last part, we'll say for other consideration not appropriate [to] mention."  This conversation was recorded.

28

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

150.    On the same day, in anticipation of Trump being subpoenaed, Giuliani reviewed with Ms. Dunphy arguments about a sitting president's immunity from the criminal process. She worked to help organize his points as he talked out his theories on the standards that would govern judicial review if a grand jury subpoena were issued to Trump.

151.    The same day, Giuliani and Ms. Dunphy discussed a dinner that they would be attending that evening with the King of Spain, which was hosted at the home of José Francisco "Pepe" Fanjul. During the discussion, Ms. Dunphy referenced the fact that she was Giuliani's "employee," and Giuliani agreed. Giuliani explained that Ms. Dunphy was accompanying him as his employee-guest and his consultant. This conversation was recorded.

152.    Giuliani and Ms. Dunphy attended the dinner for the King of Spain later that night. At the dinner, Giuliani introduced Ms. Dunphy as his Director of Business Development to the Mayor of Palm Beach, various business executives, and other attendees.

153.    On March 5, 2019, Giuliani agreed to pay for Ms. Dunphy's rent since all of her income from Giuliani and the Giuliani Companies was deferred.[11]

154.    The same day, Giuliani reviewed with Ms. Dunphy his January 23, 2019 interview with Ukraine's former Prosecutor General Victor Shokin.

155.    Around March 9, 2019, Giuliani brought Ms. Dunphy to Mar-a-Lago where they had a friendly meeting with Trump, and Giuliani introduced Ms. Dunphy to Trump as Giuliani's employee. This encounter was fairly brief, since Giuliani expressed to Ms. Dunphy that he was concerned that Trump might try to poach her away from working for Giuliani.

156.    Later that day, Giuliani and Ms. Dunphy met with Newsmax CEO Chris Ruddy to discuss Giuliani potentially working to raise funds for the network.

---

[11]   Giuliani never made the promised payments.

29

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

157.    On March 10-11, 2019, Ms. Dunphy's job was to accompany Giuliani to a 2-day golf outing fundraiser for an autism-related charity at Old Palm Golf Club.  During the event, Giuliani and his security detail, Beau Wagner, were highly intoxicated and took an unprofessional and offensive video with an autistic young man.  Giuliani then drunkenly uploaded this video to Twitter.  Almost immediately and as part of her job duties, Ms. Dunphy deleted the video from Twitter, edited it to make it more presentable, and uploaded the new version.

158.    Throughout March 2019, Giuliani continued calling Ms. Dunphy constantly, often many times per day, to discuss work-related matters.  Ms. Dunphy kept working for Giuliani and his Companies in her business development and executive assistant roles.

159.    On March 13, 2019, she booked hotel rooms for him from March 15 to 19 at a Marriott Hotel for a business trip.

160.    On March 15, 2019, Giuliani again initiated sex with Ms. Dunphy while discussing her domestic violence case.

161.    On March 17, 2019, Giuliani and Ms. Dunphy worked together, discussed her domestic violence case, and Giuliani again initiated sex.  During their conversations that day, Ms. Dunphy and Giuliani discussed what her job title should be listed as in a forthcoming press release.  Giuliani told her that among other things, she should say "PR consultant to Rudy Giuliani."  Ms. Dunphy also worked to cancel and reschedule hotel reservations for Giuliani, and to coordinate flights with JetSmarter.  True and correct copies of Ms. Dunphy's correspondence with JetSmarter and Trump Hotels are annexed collectively hereto as Exhibit D.

162.    On March 17, 2019, after hours of drinking scotch, Giuliani told Ms. Dunphy that he had "an obsessive attraction" to Ms. Dunphy, and told her that "I'm Italian, remember? I'm extremely jealous and possessive."  These statements were recorded.

30

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

163.    The same day, Giuliani discussed private information about certain clients with Ms. Dunphy, discussed the Mueller Report with her, and discussed Mr. Trump's children Ivanka, Eric, and Donald Jr. and their spouses.

164.    On March 18, 2019, Giuliani purchased clothing for Ms. Dunphy from Neiman Marcus on his corporate American Express card, to control what Ms. Dunphy wore. This was part of a pattern in which Giuliani often demanded that Ms. Dunphy dress as conservatively as possible when out in public or at work events. He said that he did not want any other man looking at her, including his co-counsel and her attorney, Mr. Mukon. He even prevented Ms. Dunphy from ever speaking to Mr. Mukon in person.

165.    On March 19, 2019, Ms. Dunphy was beginning to struggle financially because Giuliani's divorce continued to drag on and therefore her salary continued to be deferred. Giuliani told her that he had to "straighten out his accounts" so that he could pay her in cash.

166.    On the same day, Giuliani told Ms. Dunphy that she could use his American Express card for a Lyft or Uber. Upon information and belief, the card used was a corporate credit card.

167.    Also on March 19, 2019, Giuliani told Ms. Dunphy that "I've wanted you from the day I interviewed you." This statement was recorded.

168.    The same day, Giuliani reiterated to Ms. Dunphy that he expected her to continue to be "at his beck and call." This statement was recorded.

169.    Throughout April 2019, Ms. Dunphy continued to monitor Giuliani's email and social media, and gathered press clippings, as part of her job. Giuliani and Ms. Dunphy remained in regular contact during this period, and Ms. Dunphy continued trying to find Giuliani lucrative business opportunities.

31

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

170.    Giuliani also sent Ms. Dunphy a written outline he prepared accusing U.S. Ambassador to Ukraine Marie Yovanovitch of corruption, and asked Ms. Dunphy for her thoughts on the outline.

171.    On April 9, 2019, Ms. Dunphy had a long phone call with a representative of JetSmarter, negotiating Giuliani's account with them.

172.    On April 23, 2019, Ms. Dunphy spoke with John Huvane, the CEO of Giuliani Partners, regarding potential clients for the Giuliani Defendants.  During this call, Ms. Dunphy and Mr. Huvane discussed Ms. Dunphy bringing in three high-paying clients for Giuliani, and an event for Giuliani in Washington, D.C.  Ms. Dunphy also mentioned that she had identified a healthcare firm that was looking to hire Giuliani as legal counsel and in an advisory role. Mr. Huvane instructed Ms. Dunphy to arrange for any meetings in New York, and that Giuliani could not lobby because he was not registered as a lobbyist, nor was he registered as required under FARA.[12]  Mr. Huvane also instructed her that Giuliani had the final word on any negotiations.

173.    On April 29, 2019, as Ms. Dunphy was monitoring Giuliani's email in accordance with her job, she discovered that Giuliani had emailed private information about her domestic violence case, which was protected by the attorney-client privilege, to Maria Ryan without Ms. Dunphy's consent.  Ms. Dunphy only learned this when Ryan responded to the email.

174.    This email upset Ms. Dunphy not only because she had trusted Giuliani as her attorney not to share her personal information, but also because it concerned a domestic violence matter, in which she was proceeding with court permission as a "Jane Doe."  It was therefore improper for Giuliani to reveal her identity to Maria Ryan, who had stopped working for him in 2018, and did not work on his legal matters.

---

[12]  Ms. Dunphy had encouraged him to register, but he refused because he claimed, "I have immunity."

32

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM INDEX NO. 650033/2023
NYSCEF DOC. NO. 10 RECEIVED NYSCEF: 05/15/2023

175.   In May 2019, Ms. Dunphy continued working in her role as Director of Business Development and as Giuliani's executive assistant, monitoring his email and social media.  During that time, Giuliani discussed with Ms. Dunphy his work to try to have Ambassador Yovanovitch removed from her position at the request of a foreign oligarch.

176.   As part of her job duties, on May 2, 2019, Ms. Dunphy had further communications with the potential healthcare client, Brighton Health Plan Solutions, that she had discussed with Mr. Huvane.

177.   The same day, Ms. Dunphy emailed Giuliani a list of questions for her domestic violence litigation.

178.   On May 14, 2019, Ms. Dunphy was increasingly worried about her deferred pay, and she requested a formal employment agreement from Giuliani via email.  Giuliani did not respond.

179.   On May 24, 2019, Ms. Dunphy continued working with the healthcare company that she was pursuing as a potential client for Giuliani.

180.   On May 27, 2019, Ms. Dunphy emailed Giuliani about her concerns that he permitted Mrs. Ryan to access her confidential legal files.

181.   On May 29, 2019, Ms. Dunphy spoke to Giuliani about her concerns over her deferred pay and inability to rent an apartment.  Giuliani responded, "let me think about it" and "let me have a little time to process."  These remarks were recorded.

182.   On May 31, 2019, Ms. Dunphy text messaged Giuliani asking for a reference letter regarding the "consulting work I've done for you/Giuliani Partners" because the condo and coop boards where she was applying would require one.  Giuliani responded, "I cannot do that now":

33

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM**
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023



183.    Ms. Dunphy and Giuliani continued to exchange text messages that day, including messages regarding the intrusion into her confidential communications about her domestic violence litigation.  Giuliani did not deny that her information had been compromised.  Instead, he said that "it's too confusing right now."

184.    At around the same time, Giuliani directed Ms. Dunphy to delete her messages with him.  He directed Ms. Dunphy not to talk to the FBI about him and about various matters that she had witnessed while working for him, and he threatened that he had access to professional investigators who could make her look bad even though, Giuliani admitted, she was "very innocent."  Giuliani continued, "You've got to be smart enough to know what I have just said."  Ms. Dunphy interpreted these statements as threats and an attempt to intimidate her.

185.    Throughout June and July 2019, Ms. Dunphy continued monitoring Giuliani's email account as she was directed by Giuliani to do.  Giuliani asked Ms. Dunphy for help in Googling information about obstruction of justice, among other topics.

34

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

186.    On June 7, 2019, Ms. Dunphy reminded Giuliani that she was still waiting to be reimbursed for the Doral Hotel where they stayed and worked in February 2019 in connection with Giuliani's work for President Trump.  She also requested reimbursement of $4,500 for another work-related hotel stay and for clothing from Neiman Marcus that he insisted she have.  He did not respond to those emails, but he text messaged Ms. Dunphy at 2:09 a.m. the next morning regarding an event he had attended:



187.    On June 17, 2019, Ms. Dunphy followed up with Giuliani again regarding reimbursement.  When she mentioned possibly asking JoAnne Zafonte to issue the reimbursement, Giuliani told her "do not ask JoAnn to do anything.  U just have to wait."



188.    On June 16, June 18, June 23, and July 4, 2019, Ms. Dunphy alerted Giuliani about major typos in his public statements, and they fixed them together.

35

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

189.   On June 29, 2019, Ms. Dunphy emailed Giuliani regarding an offer for a podcast, as they had discussed when she was hired.  She told Giuliani that she "met with David Spady, the owner of Salem Media Group, and his company is interested in making you an offer to do podcasts through them."  A true and correct copy of this email is annexed hereto as Exhibit E.

190.   On July 8, 2019, Ms. Dunphy continued corresponding with Brighton Health Plan Solutions about potential opportunities for the Giuliani Defendants.

191.   On August 9, 2019, Ms. Dunphy and Giuliani attended a Trump fundraiser at Joe Farrell's estate in Bridgehampton.  At one point, Giuliani drunkenly kissed Ms. Dunphy in front of hundreds of people, including a stranger who came over and asked if Ms. Dunphy felt sexually harassed, stating that he was not raised to treat women like that.

192.   On August 13, 2019, Ms. Dunphy edited, compiled and sent Giuliani key portions of his appearance on Fox News.  They also discussed a fundraiser for Mr. Trump.

193.   On August 15, 2019, Ms. Dunphy contacted Philip Boyce at Salem Media regarding the offer for Giuliani's potential new podcast.  Salem Media offered Giuliani 50% of all advertising revenue generated.  Salem Media would also negotiate on his behalf for advertisers and would pay him monthly.

194.   On August 16, 2019, Ms. Dunphy contacted Mr. Boyce about the payment structure for the potential podcast.

195.   On August 18, 2019, Ms. Dunphy and Mr. Giuliani were alone together at his home office.  Mr. Giuliani was continuously drinking, and he got Ms. Dunphy intoxicated.  While having a conversation about current events, as was required of Ms. Dunphy for her job with Giuliani, Giuliani attempted to initiate sex with Ms. Dunphy.  Ms. Dunphy resisted.  Giuliani agreed that they "don't have to do it tonight.  [They] could do it some other time."  This conversation was recorded.

36

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

196.    However, approximately half an hour later, while Giuliani was drinking, he suddenly reversed course and aggressively initiated sex with Ms. Dunphy.  She objected repeatedly and said "no" and that she was "not ready."  Giuliani begged her to "put it in there" while he was touching her.  Ms. Dunphy told Giuliani that she was "too scared," but that did not stop Mr. Giuliani.  Eventually, Giuliani put himself inside of Ms. Dunphy.  Ms. Dunphy was too intoxicated to consent to intercourse.

197.    After this encounter, Ms. Dunphy spoke with a friend and said that she felt violated by Giuliani's unwanted sexual advances to which she had repeatedly said "No."

198.    On August 20, 2019, Ms. Dunphy continued her efforts to secure a podcast and other paid work for Giuliani with Salem Media.  Mr. Boyce suggested that Giuliani conduct a tour of Jerusalem, Israel.  True and correct copies of these email exchanges are annexed hereto as Exhibit F.

199.    Giuliani and Ms. Dunphy often discussed how lucrative his business engagements were and how Ms. Dunphy's role could enhance those opportunities.

200.    Upon information and belief, at some point at the end of summer 2019, Ms. Dunphy's job of monitoring Giuliani's email was given to another employee.  Giuliani told Ms. Dunphy that her main priority was to safeguard files, monitor media and Tweets, and generate revenue for the Defendants, which he'd be able to accept when the divorce ended, purportedly "any day now."

201.    On September 4, 2019, Ms. Dunphy and Giuliani discussed a potential business opportunity that involved Giuliani giving a guided walking tour of monuments in and around New York City, which could be filmed and sold to a streaming platform.  Based on Ms. Dunphy's experience with Netflix streaming business projects, she believed that this would be a lucrative opportunity.

37

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

202.    On September 5, 2019, Ms. Dunphy memorialized this proposal in an email and a text message to Giuliani.  True and correct copies of the email and text messages dated September 5, 2019, are annexed collectively hereto as Exhibit G.

203.    On September 6, 2019, Ms. Dunphy and Giuliani discussed the tour again, but Giuliani confirmed that he did not want to "do anything new or big until his divorce was settled."

204.    On September 12, 2019, Ms. Dunphy emailed Giuliani, Ms. Zafonte, and Mr. Huvane regarding hiring movers to bring her items from the office to her parents' house on Long Island, which they did.

205.    The same day, Ms. Dunphy received an email from David Wilcox of Central American Nickel ("CAN") responding to a proposal by Ms. Dunphy about a meeting in Washington, D.C. to discuss the company.  Wilcox was seeking to discuss his business with politicians and other high-ranking officials, including Giuliani.

206.    Throughout September and October, 2019, Ms. Dunphy had further discussions with Mr. Wilcox on behalf of Giuliani.

207.    Between September and November 2019, Ms. Dunphy had a series of discussions with William Danzell, the Chief Financial Officer of a technology company, who sought to hire Giuliani Partners for consulting work.  She discussed this potential project with Giuliani via phone.

208.    On September 22, 2019, they spoke via phone to go over his upcoming schedule and the logistics of his meetings that week with the Prime Minister of Libya, the foreign minister of Morocco, the foreign minister of Bahrain, and Iranian clients.

209.    On October 22, 2019, Ms. Dunphy received a voicemail from the FBI regarding an investigation they were conducting into Giuliani.  The FBI was apparently aware that she was working for Giuliani and sought to interview her.  The FBI was clear that Ms. Dunphy was considered a witness and was not a target of the investigation.

38

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

210.   On November 19, 2019, Ms. Dunphy went to Giuliani's home office, and they speak.  Giuliani promised Ms. Dunphy that he would officially put Ms. Dunphy on the books and would "straighten it [*i.e.*, her employment situation] out."   Giuliani and Ms. Dunphy discussed Giuliani's increasing legal concerns, including his fear that Lev Parnas was "turning on him" in connection with the FBI investigation.  Ms. Dunphy told him that the FBI had come to her family's home in Florida that day seeking to question her.  Giuliani informed Ms. Dunphy that his friend and private detective, Bo Dietl, had already told him the specific FBI agents who were involved. Ms. Dunphy was concerned that Giuliani was apparently so powerful that his investigators had secret information, including the names of the FBI agents who had just appeared at her family's Florida home.  Giuliani demanded that Ms. Dunphy not talk to or cooperate with the FBI.  Giuliani told Ms. Dunphy that they are all "after him" and that one or two of them are "going to get totally destroyed."  This situation made Ms. Dunphy confused and fearful, and added another layer of tension to a work environment that was already outrageously hostile.[13]

211.   The same day, Giuliani told Ms. Dunphy that he was in love with three or four women.  He also told her that he was attracted to Christianne Allen, his 20-year-old employee who was more than 50 years his junior.  He told Ms. Dunphy that he had "a certain sexual attraction to" Ms. Allen, that he fantasized about her, and that he kissed Ms. Allen on the lips but did not "consummate" the relationship.  He said that his attraction to Ms. Allen was "different" from his attraction to Mrs. Ryan or Ms. Dunphy, whom he said he "just could not control" himself around. This conversation was recorded.

---

[13]   From this point on, Giuliani often spoke to Ms. Dunphy about he FBI's investigation of him, and Ms. Dunphy understood that participating in these discussions was part of her work for him. He told her that if the FBI sought to interview her, she should "not remember" anything, and should claim that she did not know Giuliani.  Ms. Dunphy refused to agree to lie to the FBI, which angered Giuliani.

39

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

212.   Giuliani also noted that Mrs. Ryan—who had sought to undermine Ms. Dunphy's employment with Defendants—had apparently blocked Ms. Dunphy's number in Giuliani's cell phone and changed the name of her contact to "fake."  During this conversation, Giuliani reentered Ms. Dunphy's number in his phone and told Ms. Dunphy that he would change the name for her contact from "fake" to "Faye" because "that'll screw her [*i.e.*, Mrs. Ryan] up."  This conversation was recorded.

213.   Throughout the workday on November 19, 2019, Giuliani insisted that Ms. Dunphy drink alcohol until she became intoxicated.  While Giuliani and Ms. Dunphy were working, he initiated aggressive sexual intercourse with Ms. Dunphy.  Ms. Dunphy was too intoxicated to consent to intercourse and did not consent to intercourse.  During this interaction, he made a comment that he thought of her as his daughter.  This comment was recorded.  Ms. Dunphy was extremely disturbed by this remark, which was eerily similar to the one he had made on March 4, 2019, as referenced above.

214.   During that interaction, Giuliani said to Ms. Dunphy, "You're my consultant.  Just go down on me."  This statement was recorded.

215.   On December 17, 2019, Ms. Dunphy and Giuliani again worked together.  Giuliani told Ms. Dunphy "You're so easy to take advantage of," that he was "crazy" but that he would "always take care of" her.  Even so, he warned Ms. Dunphy that Maria Ryan, with whom he was having an affair, "pushed her out."

216.   During the same conversation, Giuliani promised Ms. Dunphy he would get her "some cash."

217.   On January 20, 2020, Giuliani bragged to Ms. Dunphy that President Trump was "acting stupid" while looking at women that Giuliani brought around, and that Melania was so upset that she poked him.

40

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

218.    On January 22, 2020, Giuliani reiterated to Ms. Dunphy that he would figure out a way to pay her for her work, but that it would have to be in cash.

219.    The next day, Giuliani told Ms. Dunphy that he could not pay her in cash until the following week because his divorce was not finalized, and he did not want his ex-wife finding out about "any of this."

**M.    Ms. Dunphy Works For Giuliani Remotely In 2020 During The Covid-19 Pandemic, And Giuliani Demands That She Appear Naked During Videoconferences.**

220.    Starting in around March 2020, the Covid-19 pandemic forced Ms. Dunphy and Giuliani to work remotely.  They worked on many business-related matters, including, for example, his image, branding, and social media, and his concern that Maria Ryan was blackmailing him with respect to his conduct related to Ukraine and "paper trails" related to foreign money.

221.    During almost every videoconference, Giuliani directed Ms. Dunphy to take her clothes off in front of the camera.

222.    Throughout this period, Ms. Dunphy continued to analyze and compile Giuliani's press clippings and manage his social media pages, and continued working on generating new sources of business for him to pursue once his divorce was over.

223.    Giuliani also continued to provide legal advice to Ms. Dunphy.

**N.    Giuliani Terminates Ms. Dunphy Without Paying Her Promised Wages.**

224.    By January 2021, Ms. Dunphy still had not been paid what she was promised and owed for the work she had performed for Giuliani and the Giuliani Companies over the course of two years.

225.    Giuliani's failure to pay Ms. Dunphy had become increasingly concerning to her. While he claimed that money was tight, he continued to enjoy a lavish lifestyle that included, upon information and belief, memberships at approximately 16 private clubs, owning five

41

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

unencumbered homes, traveling by private plane, and spending extravagantly on personal items such as cigars and alcohol.

226.    Around this time, Giuliani stated, "When I walked out of the White House on the night before he was going to leave, I could feel pain" and thought, "Well, not gonna be back here for four years.  That's for sure."  Ms. Dunphy understood these comments as an acknowledgment by Giuliani that Donald Trump would be unable to prove that the election had been "stolen," despite what Giuliani and Trump had been claiming publicly.

227.    On January 7, 2021, the day after the January 6 insurrection in Washington, D.C., Ms. Dunphy contacted Giuliani, stating "I feel scared of you, and I don't want you trying to hurt me….  Now the country has just gone through chaos, and I pray I never see something like that again."

228.    On January 31, 2021, Ms. Dunphy's employment with the Giuliani Defendants was terminated as informally as it began, in retaliation for her having found the courage to express her fear of him.

229.    Giuliani sent Ms. Dunphy a text message stating, "It was a useless call if you write me things like you're afraid of me and you won't sue me.  There is simply no reason for you to do either and it's best if we not communicate.  You have nothing to be afraid of and nothing to sue me for.  I have no desire to be in communication with someone who thinks that.  I'm sorry you do, but I can't indulge your thinking which is totally unjustified.  I have no animosity to you.  You can feel safe that I would do nothing to hurt you and I feel sorry for you.  I had hoped you got over your unjust claims of being afraid and wanting to sue.  This is just not a basis for any form of communication.  Sorry, I tried to make it sensible."

230.    Giuliani terminated Ms. Dunphy's employment the same day his long-time mistress and former employee, Maria Ryan, quit her full-time job in New Hampshire.

42

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

231.    Ms. Dunphy has not performed any work for Giuliani or the Giuliani Companies since January 31, 2021, although she continues to store files, recordings, and information.

232.    Ms. Dunphy contacted Giuliani on May 20, 2022 via email to try to "resolve things."  Giuliani did not respond.

233.    Ms. Dunphy was extremely successful in her work for Defendants, having generated millions of dollars' worth of potential business, including from Salem Media, companies producing streaming television series, energy companies, Brighton Health Plan Solutions, insurance firms, Central America Nickel, film producers, and investors for potential litigation funding.  Likewise, Ms. Dunphy excelled at the other tasks that were required of her as Giuliani's assistant and in dealing with his media-related needs.  She also procured substantial savings for Defendants by negotiating business-related refunds and deals.

**O.    Throughout Ms. Dunphy's Tenure, Giuliani Made Sexist, Racist, And Other Highly Distressing And Offensive Comments Which Created And Added To The Hostile Work Environment.**

234.    During Ms. Dunphy's work for Defendants, Giuliani often made outrageous comments that created and added to the hostile work environment that Ms. Dunphy was forced to endure.  Ms. Dunphy found these comments revolting, but there was little she could do to stop them given the lack of any Human Resources personnel and the extraordinary degree of control that Giuliani had wielded over her as her boss and lawyer.

235.    For example, Giuliani made the comments described below, many of which were recorded:

       a.  Giuliani made derogatory comments about Jewish men and implied that their penises were inferior due to "natural selection."

       b.  Giuliani told Ms. Dunphy that "black guys hit women more than anybody else does… and so do Hispanic guys – it is in their culture."

43

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

c. Giuliani said, "Jews want to go through their freaking Passover all the time, man oh man.  Get over the Passover.  It was like 3,000 years ago.  The red sea parted, big deal.  It's not the first time that happened."

d. Giuliani made comments about "freakin Arabs" and Jews.

e. Giuliani demeaned and sexualized Hillary Clinton and mocked her body.

f. Giuliani demeaned and sexualized Margaret Thatcher and wondered about the effect she would have on his penis.

g. Giuliani said, "If my life depended on it, if I had to make love to Nancy Pelosi, I couldn't do it.  I'd have to die."

h. Giuliani referred to employee Vanessa Ryan, who is Maria Ryan's daughter, as "fat" and said that he felt bad for her because she was fat.  He further said he was "trying not to feed" her.

i. Giuliani disparaged a female lawyer because of her breast size.

j. Giuliani made a series of derogatory remarks about the LGBTQ community, including:

   i. Giuliani claimed that Mayor Michael Bloomberg "became gay" because his wife left him.

   ii. Giuliani named a prominent Republican as gay.

   iii. Giuliani used the word "fag" to refer to actor Matt Damon.

   iv. Giuliani mocked Senator Elizabeth Warren as "in search of a gender," stating:  "Pocahontas was a really hot babe, and Warren does not look like a babe.  She looks like a person in search of a gender."  Giuliani later said he was "very hot" for Warren.

44

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

    v. Giuliani named a prominent lawyer who he believed would require $10 million for gay sex. Giuliani then insisted that he was the only one of his male friends who would turn down any amount of money to have sex with a man.

k. Giuliani said to Ms. Dunphy, at various times, in statements that were recorded:

    i. "I'm gonna make it a little painful."

    ii. "Stick it up your ass."

    iii. "You're a fucking slut."

    iv. You're my bitch.

    v. "I'm gonna get my cock in there."

    vi. "Be a slut! Be Rudy's slut!"

    vii. Giuliani called Ms. Dunphy a "whore."

    viii. Giuliani said, "I want to own you officially. Legally. With a document."

    ix. "I can't control myself. I lose control. I think of you all the time. I'm unable to control it. I'm addicted."

    x. "I can't think about you without getting hard. Even when I think about how smart you are, I get hard."

    xi. Giuliani stated that he would "get in trouble with underage girls" if they were 16 but looked 20.

    xii. "I think of you as my daughter. Is that weird?"—which Giuliani said while engaging in sexual contact with Ms. Dunphy.

45

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

xiii.    Giuliani told Ms. Dunphy that she was "his" and he had purportedly

"been too easy on [her]."

236.    These statements are just some examples of the inappropriate comments that

Giuliani made to Ms. Dunphy while she worked for Defendants.  There are many others.  These

types of comments made Ms. Dunphy extremely uncomfortable and contributed to a hostile work

environment.

237.    Giuliani's constant fear of the FBI also contributed to inappropriate demands on

Ms. Dunphy as his employee.  As discussed above, he demanded that she falsely tell the FBI that

she did not know him if they interviewed her.  Her refusal to mislead the FBI angered Giuliani and

added to the already-hostile working environment in which she was forced to operate.

## P.    Ms. Dunphy Has Suffered Substantial Damages Due To Giuliani's And His Companies' Misconduct.

238.    As discussed above, throughout Ms. Dunphy's employment, she was continually

subjected by Giuliani to a hostile work environment, misogynistic, racist and antisemitic

communications, constant sexual attacks, threats when she brought up the salary she was owed,

and threats when she finally found the courage to confront him with her fears and the possibility

of legal action.  She had kept her job (and the prospect of being paid) while she was "obedient,"

but when she finally protested Giuliani's mistreatment of her, Giuliani terminated her without

notice, without pay, and without discussion.

239.    While Ms. Dunphy was working for Defendants, Giuliani's conduct in isolating her

and keeping her employment secret discouraged her from reporting Giuliani's on-the-job abuses.

240.    Ms. Dunphy continues to believe that Giuliani's network, cronies, and henchmen

are vast and powerful, and Ms. Dunphy remains fearful of additional retribution from the

Defendants.

46

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

241.    As a direct result of Defendants' misconduct as set forth above, Ms. Dunphy has suffered, and continues to suffer severe emotional distress, humiliation, anxiety, and post-traumatic stress disorder, along with irreparable damage to her career.

242.    Ms. Dunphy has also been deprived of her lawful wages.  She worked for Giuliani and the Giuliani Companies as Director of Business Development and as executive assistant to Giuliani from January 2019 until her termination on January 31, 2021.  At the promised salary of $1 million per year, she should have been paid approximately $2 million during her tenure with Giuliani and the Giuliani Companies.  But Giuliani only paid her approximately $12,000 in cash and reimbursed some (but not all) of her business expenses, leaving unpaid wages in the amount of approximately $1,988,000.

243.    Upon information and belief, Giuliani made small cash payments to Ms. Dunphy to entice her to keep working for him and remain obedient to him in the hopes that she would one day be paid in full, and continue acceding to his demands.

244.    As a direct result of Defendants' wrongful conduct, Ms. Dunphy has been deprived of her wages, and is entitled to liquidated damages, punitive damages, attorneys' fees, and statutory damages, together with reimbursement for business expenses.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Crime of Violence Motivated by Gender – New York City Victims of Gender-Motivated Violence Protection Act, N.Y.C. Admin Code § 10-1101 *et seq.* As Against Giuliani)**

245.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

246.    Giuliani's conduct, including but not limited to, sexual and other assaults (including forcing Ms. Dunphy to perform oral sex on him and forcing Ms. Dunphy to have sexual intercourse with him), constitute "crimes of violence" and "crimes of violence motivated by gender" against

47

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

Ms. Dunphy as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 10-1101 *et seq.* (2017).

247.    Giuliani's conduct constitutes crimes of violence against Ms. Dunphy motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

248.    Giuliani's gender-motivated animus towards women is demonstrated by, among other things, his sexually abusive treatment of Ms. Dunphy and his comments about women.

249.    As a direct and proximate result of the aforementioned conduct, Ms. Dunphy has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Battery As Against Giuliani)

250.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

251.    Giuliani engaged in intentional, and nonconsensual touching and committed battery against Ms. Dunphy by: (i) forcing her to perform oral sex on him; (ii) forcing her to have sexual intercourse with him; and (iii) otherwise touching her without her consent.

252.    Giuliani's physical contact with Ms. Dunphy was offensive, harmful and wrongful.

253.    Giuliani's conduct directly and proximately caused harm to Ms. Dunphy, including but not limited to pain and suffering, lasting psychological harm, loss of dignity, and humiliation.

254.    Giuliani's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.25) sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

48

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

255.    Ms. Dunphy's claim for battery is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

256.    As a direct and proximate result of the aforementioned conduct, Ms. Dunphy has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Assault As Against Giuliani)

257.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

258.    Giuliani committed assault against Ms. Dunphy by intentionally threatening or attempting to engage in battery which caused her to apprehend and fear bodily harm or offensive contact of her by Giuliani.  Giuliani engaged in imminent physical gestures signifying a threat.

259.    Giuliani knew that these acts would cause Ms. Dunphy to apprehend harmful or offensive conduct, and she reasonably apprehended that harmful or offensive conduct would occur. Giuliani was capable of carrying out the attempted or threatened conduct.

260.    Giuliani's conduct caused Ms. Dunphy to live in fear of physical and sexual violence.

261.    As a direct and proximate result of the aforementioned acts, Ms. Dunphy has sustained, and will continue to sustain, *inter alia*, pain and suffering, psychological and emotional distress, humiliation and loss of career fulfillment.

262.    Giuliani's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.55) sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).  Ms. Dunphy's claim for assault is thus timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

49

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

263.   As a direct and proximate result of the aforementioned conduct, Ms. Dunphy has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

## AS AND FOR A FOURTH CAUSE OF ACTION
**(Gender Discrimination and Sexual Harassment Under the New York State Human Rights Law as Against all Defendants)**

264.   Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

265.   New York Executive law Section 296(1)(a) provides that: "It shall be an unlawful discriminatory practice… [f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex… to refuse to hire or employ or to bar or discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

266.   Giuliani and the Giuliani Companies, jointly and severally, were Ms. Dunphy's employer and Ms. Dunphy was employed by some or all of the Giuliani Companies.  Defendants suffered and permitted Ms. Dunphy to perform work for them.

267.   Giuliani had the power to control Ms. Dunphy's work assignments.  He directed her to perform work for him and the Giuliani Companies.

268.    Among other matters, Giuliani instructed Ms. Dunphy to: 1) work on developing prospective business opportunities for him and the Giuliani Companies, 2) monitor his email account, 3) monitor his social media accounts, 4) handle his travel arrangements, and 5) handle his public relations.

269.   Giuliani had the power to hire Ms. Dunphy and terminate Ms. Dunphy's employment.  Giuliani terminated Ms. Dunphy's employment on or about January 31, 2021.

50

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

270.    Defendants discriminated against Ms. Dunphy in the terms and conditions of her employment on the basis of her gender in violation of the NYSHRL by subjecting Ms. Dunphy to disparate treatment based upon her gender including, but not limited to, subjecting her to assault, battery, sexual harassment, and a hostile work environment.

271.    Ms. Dunphy was subjected to inferior treatment and terms and conditions of her employment because of her gender. Defendants' conduct altered the condition of Ms. Dunphy's employment and created an offensive and abusive work environment.

272.    Giuliani engaged in sexual and other harassment of Ms. Dunphy and the Giuliani Companies failed to comply with New York State requirements and to prevent sexual harassment by, among other matters, failing to have a compliant non-discrimination policy, failing to train employees such as Giuliani, failing to provide a viable complaint procedure and failing to take preventive action despite Giuliani's known conduct.

273.    Defendants engaged in discriminatory and harassing conduct by creating and permitting the hostile, intolerable, offensive and abusive workplace and permitting Giuliani's acts.

274.    As a direct and proximate result of the discriminatory, harassing, and abusive conduct of the Giuliani Companies, Ms. Dunphy is entitled to compensatory damages including but not limited to future wages, and emoluments of employment, as well as damages for mental anguish and humiliation.

275.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights, entitling her to an award of punitive damages.

276.    Defendants are jointly and severally liable for damages including but not limited to compensatory and punitive damages, interest, attorneys' fees and civil penalties.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Hostile Work Environment Animated by Discrimination Under the New York State Human Rights Law as Against all Defendants)**

277.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

278.    New York State Executive Law § 296, *et seq.* prohibits discrimination and harassment based on protected categories, including but not limited to being a victim of domestic violence, race, religion, national origin and gender.

279.    Throughout her employment, Giuliani subjected Ms. Dunphy to harassing comments based on protected categories.  As a result, she was subjected to a pervasively and severely offensive work environment.

280.    Along with being subjected to verbal and other sexually abusive conduct, comments and slurs based on gender, she was subjected to a harassing environment based on other protected categories. Throughout her employment, Giuliani continually directed comments to her, including but not limited to offensive racial, antisemitic, and misogynistic slurs, all of which are unquestionably offensive to a reasonable person.

281.    As a direct result of this improper hostile and abusive work environment, Ms. Dunphy has suffered and will continue to suffer injury and harm in an amount to be determined at trial, including compensatory and punitive damages, interest, reasonable costs and attorneys' fees and Defendants are liable, jointly and severally, not only for her damages but also for civil penalties.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Retaliatory Discharge Under the New York State Human Rights Law as Against All Defendants)**

282.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

283.   Defendants, jointly and severally, discriminated against Ms. Dunphy because of her vocal opposition to gender harassment and discrimination.

284.   Defendants retaliated against Ms. Dunphy by engaging in adverse employment action against her in retaliation for her complaints, including but not limited to terminating her employment.

285.   Defendants' termination of Ms. Dunphy's employment followed her statements that she would sue Giuliani and the Giuliani Companies for their treatment of her, including but not limited to based on sexual harassment and gender discrimination.

286.   As a result, Ms. Dunphy is entitled to damages, including but not limited to compensatory and punitive damages in an amount to be determined at trial with costs and attorneys' fees.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Aiding and Abetting Sexual Harassment and Gender Discrimination under the New York State Human Rights Law as Against all Defendants)

287.   Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

288.   New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

289.   Giuliani aided and abetted gender discrimination by conditioning Ms. Dunphy's continued employment upon her being "obedient" and engaging in sex acts with him.

290.   Giuliani made threats that private investigators would retaliate against any woman who tried to report sexual harassment.

291.   Giuliani aided and abetted sexual harassment and gender discrimination by his conduct, including but not limited to subjecting Ms. Dunphy to inappropriate sexual touching,

53

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

making sexual comments about her and about other prominent females, by forcing himself onto Ms. Dunphy when she rebuffed his sexual advances, and by intimidating and threatening her to prevent her from reporting his harassment.

292.    The Giuliani Companies had actual knowledge or should have known of the sexual harassment and gender discrimination.

293.    The Giuliani Companies aided and abetted gender discrimination by, among other things, failing to comply with their obligations under New York law.  These obligations include but not limited to failing to : 1) adopting and/or maintaining and/or distributing and posting and/or follow, required policies and practices for reporting and investigating instances of gender discrimination and harassment, including but not limited to distributing the Giuliani Companies' sexual harassment policy, 2) requiring all employees (including Giuliani) to complete New York State's required sexual harassment training, and 3) posting required notices in all work location and regarding reporting sexual harassment.  Defendants were legally required to comply with New York requirements concerning discrimination and sexual harassment and, upon information and belief,  they had the authority to implement such practices and procedures.

294.    As a direct and proximate result of the discriminatory conduct of Defendants, Ms. Dunphy has suffered mental anguish and humiliation, as well as damages from adverse employment actions, including but not limited to loss of future wages, professional opportunities, and other valuable benefits and emoluments of employment.

295.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights, entitling her to an award of punitive damages.

296.    Based on the foregoing, Ms. Dunphy is entitled to compensatory and punitive damages together with costs and attorneys' fees in an amount to be determined at trial, together with interest, and Defendants are liable for civil penalties.

54

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

## AS AND FOR AN EIGHTH CAUSE OF ACTION
**(Sexual Harassment and Gender Discrimination Against a Contractor or Consultant under the New York State Human Rights Law as Against all Defendants)**

297.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

298.     In the alternative to being an employee, Ms. Dunphy was a contractor or consultant within the meaning of the N.Y.S. Human Rights Law, performing a contract in Defendants' workplace.

299.     Pursuant to N.Y.S. Human Rights Law §296-d, it is an unlawful discriminatory practice for an employer to permit unlawful discrimination upon non-employees in its workplace.

300.     Defendants knew or should have known that Ms. Dunphy was subjected to the aforesaid harassment and discrimination in the workplace.  Nonetheless, Defendants failed to take immediate and appropriate corrective action.

301.     As a result of Defendants' conduct, Defendants are jointly and severally liable to Ms. Dunphy for monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, as well as attorneys' fees and expenses.

## AS AND FOR A NINTH CAUSE OF ACTION
**(Gender Discrimination and Sexual Harassment Under the New York City Human Rights Law as Against All Defendants)**

302.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

303.     New York City Administrative Code Section 8-107(1)(a) provides that: "It shall be unlawful discriminatory practice… [f]or an employer or an employee or agent thereof because of the actual or perceived… gender… to refuse to hire or employ or to bar or to discharge from

55

employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

304.     Defendants, jointly and severally, were Ms. Dunphy's employer and Ms. Dunphy was employed by some or all of the Giuliani Companies.

305.     A substantial part of the work Ms. Dunphy performed for Defendants took place in New York, New York.

306.     Giuliani controlled Ms. Dunphy's work assignments and directed her to perform work for him and the Giuliani Companies.  Among other matters, this work included:  1) securing prospective business ventures for him and the Giuliani Companies, monitoring his email account, 3) monitoring his social media accounts, handling his travel arrangements, and handling his public relations.

307.     Giuliani had the power to terminate Ms. Dunphy's employment and did terminate Ms. Dunphy's employment on or about January 31, 2021.

308.     Giuliani sexually harassed Ms. Dunphy and by his conduct, created a hostile work environment.

309.     Defendants discriminated against Ms. Dunphy by treating her less well than male employees on the basis of her sex, including but not limited to by subjecting her to sexual harassment and a hostile work environment and failing to take reasonable measures to prevent sexual harassment and sexual discrimination.

310.     Upon information and belief, the Giuliani Companies did not engage in conduct to prevent discriminatory and harassing behavior, including but not limited to complying with legal requirements to avert discriminatory conduct in the workplace.

311.     Upon information and belief, Giuliani did not make sexual advances against male employees, or talk with them in a demeaning or derogatory manner.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

312.    Defendants acquiesced in the discriminatory and harassing conduct by creating and allowing a hostile, intolerable, offensive, and abusive workplace that a reasonable person would consider intimidating, hostile, and abusive.

313.    The Giuliani Companies condoned the discriminatory and harassing conduct and did not promptly correct the discriminatory, harassing, and abusive behavior.  They were or should have been aware of Giuliani's misconduct, and the damage it caused to Ms. Dunphy.

314.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights entitling her to an award of punitive damages.

315.    As a direct and proximate result of the discriminatory, harassing, and abusive conduct by Defendants, Ms. Dunphy suffered monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, as well as attorneys' fees and expenses.

### AS AND FOR A TENTH CAUSE OF ACTION
**(Hostile Work Environment Animated by Discrimination Under the New York City Human Rights Law as Against all Defendants)**

316.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

317.    New York City Admin. Code § 8-107, *et seq.* prohibits a hostile work environment.

318.    Ms. Dunphy was subjected to a severe and pervasive discriminatory work environment where she was not only abused based on her gender, but was also forced to endure offensive racial, antisemitic, and misogynistic slurs directed towards women, including herself and other women.

319.    As a direct result of this improper hostile and abusive work environment, Ms. Dunphy has suffered and will continue to suffer injury and harm in an amount to be determined at trial, including reasonable costs and attorneys' fees and compensatory and punitive damages.

57

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM          INDEX NO. 650033/2023
NYSCEF DOC. NO. 10                                       RECEIVED NYSCEF: 05/15/2023

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Retaliatory Discharge Under the New York City Human Rights Law as Against All Defendants)

320.   Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

321.   Defendants, jointly and severally, discriminated against Ms. Dunphy because of her vocal opposition to gender harassment and discrimination.

322.   Defendants retaliated against Ms. Dunphy by engaging in adverse employment action against her in retaliation for her complaints, including but not limited to terminating her employment.

323.   As a result, Ms. Dunphy has suffered and will continue to suffer injury and harm in an amount to be determined at trial, including reasonable costs and attorneys' fees and compensatory and punitive damages.

## AS AND FOR AN TWELFTH CAUSE OF ACTION
### (Aiding and Abetting Gender Discrimination and Sexual Harassment Under the New York City Human Rights Law as Against All Defendants)

324.   Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

325.   New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

326.   Giuliani aided and abetted gender discrimination by conditioning Ms. Dunphy's continued employment upon her being "obedient" and engaging in sex acts with him.

327.   Defendants have a policy of intimidating and ignoring female employees' concern about sexual harassment.  Giuliani made threats that private investigators would go after any woman who tried to report sexual harassment.

58

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

328.    Giuliani aided and abetted sexual harassment and gender discrimination by subjecting Ms. Dunphy to inappropriate sexual touching and sexual comments about her and about other prominent females, by forcing himself onto Ms. Dunphy when she rebuffed his sexual advances, and by making intimidating comments to prevent reporting or correcting the harassing environment.

329.    The Giuliani Companies knew or should have known of the illegal conduct, sexual harassment and gender discrimination.

330.    The Giuliani Companies aided and abetted gender discrimination by, among other things, failing to adopt and/or maintain and/or publish or post the legally required policies and practices for reporting and investigating instances of gender discrimination and harassment.  These include but not limited to providing legally required sexual harassment training to employees, enacting and distributing a legally required sexual harassment policy, and posting a legally required notice in all workspaces including office locations and Giuliani's apartment.

331.    As a direct and proximate result of Defendants' discriminatory conduct, Ms. Dunphy has suffered mental anguish and humiliation, as well as adverse employment consequences, including loss of future wages, professional opportunities, and other valuable benefits and emoluments of employment.

332.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights, entitling her to an award of punitive damages.

333.    As a result of the foregoing, Ms. Dunphy is entitled to compensatory and punitive damages together with reasonable costs and attorneys' fees in an amount to be determined at trial.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

## AS AND FOR AN THIRTEENTH CAUSE OF ACTION
**(Sexual Harassment and Gender Discrimination Relating to Freelancers and Contractors under the New York City Human Rights Law as Against all Defendants)**

334.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

335.     In the alternative to being an employee, Ms. Dunphy was a contractor or freelancer within the meaning of the N.Y.C. Human Rights Law, performing a contract in Defendants' workplace.

336.     Pursuant to NYC. Human Rights Law § 8-107 (23), it is an unlawful discriminatory practice for an employer to permit discrimination against freelancers and contractors.

337.     Defendants knew or should have known that Ms. Dunphy was subjected to the aforesaid harassment and discrimination in the workplace.  Nonetheless, Defendants failed to take appropriate corrective action.

338.     As a result of Defendants' conduct, Defendants are jointly and severally liable to Ms. Dunphy for monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, as well as attorneys' fees and expenses.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
**(Breach of Contract as Against All Defendants)**

339.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

340.     Giuliani and Ms. Dunphy formed an oral agreement that, *inter alia*, provided that Ms. Dunphy would receive a salary of $1 million per year from Giuliani and the Giuliani Companies for her role as Director of Business development and executive assistant to Giuliani, together with reimbursement for her business-related expenses.

60

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

341.     Giuliani and Ms. Dunphy agreed that Ms. Dunphy's salary would be deferred until Giuliani's divorce was finalized, which Giuliani told Ms. Dunphy would be "any day."

342.     This agreement constitutes an enforceable contract.

343.     Ms. Dunphy performed under the contract, including, without limitation, by investing substantial time into developing business revenue sources for the Giuliani Companies, managing Giuliani's personal travel, public relations, email account, social media, and more.

344.     Upon information and belief, Mr. Giuliani's divorce is and has been finalized.

345.     Defendants reimbursed Ms. Dunphy for some but not all of her business-related expenses.

346.     Ms. Dunphy duly demanded payment, but Defendants failed to pay her salary.

347.     Defendants, jointly and severally, breached the contract by failing and refusing to pay Ms. Dunphy the salary that she is owed after two years of work for Giuliani and the Giuliani Companies, together with her expenses.

348.     In view of the foregoing, Ms. Dunphy is entitled to damages in an amount to be determined at trial.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### (Violation of New York Labor Law – Minimum Wage As Against All Defendants)

349.     Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

350.     Defendants suffered and permitted Ms. Dunphy to perform work on their behalf from January 21, 2019 through January 31, 2021.

351.     Ms. Dunphy performed work for Defendants for no less than forty hours per week from the date of her hire to the date of her termination.

352.     Defendants failed to keep records of the hours that Ms. Dunphy worked for the Defendants.

61

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

353.    Defendants failed to pay Ms. Dunphy wages for the hours she worked at the minimum wage required under New York's Labor laws.

354.    Pursuant to New York Labor Law §§ 198 and 663, Defendants are jointly and severally liable to Ms. Dunphy in the amount of minimum wage compensation she was due under New York Labor Law § 652 and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.1, for all hours she worked, together with liquidated damages equal to 100% of the total amount of the wages found to be due, together with attorneys' fees and costs, and interest.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### (Violation of New York Labor Law – Overtime Claim As Against All Defendants)

355.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

356.    New York Labor Law § 160 and 12 NYCRR § 142-2.2 require employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per workweek.

357.    Defendants suffered and permitted Ms. Dunphy to perform work on their behalf which regularly totaled more than 40 hours per week.

358.    Defendants failed to pay Ms. Dunphy overtime pay for the hours that Ms. Dunphy worked over 40 per week.

359.    Defendants failed to keep records of the hours that Ms. Dunphy worked for the Defendants.

360.    Ms. Dunphy is entitled to her overtime pay for all hours worked in excess of forty per week at one and one-half times her regular rate.

361.    Ms. Dunphy is also entitled to liquidated damages, interest, and attorneys' fees for Defendants' violations of the New York Labor Law.

62

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### (Violation of New York Labor Law for Failure to Provide Notice and Acknowledgement of Wage Rate As Against All Defendants)

362.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

363.    Defendants failed to provide Ms. Dunphy with an accurate Notice and Acknowledgement of Wage Rate as required by New York Labor Law § 195(1) and (2).

364.    As a result, Defendants are liable for statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### (Violation of New York Labor Law for Failure to Provide Wage Statements As Against All Defendants)

365.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

366.    Defendants failed to provide accurate and timely wage statements as required by New York Labor Law § 195(3).

367.    As a result, Defendants are liable for statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### (Unjust Enrichment As Against All Defendants)

368.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

369.    As discussed in detail above, Ms. Dunphy performed work for Giuliani and the Giuliani Companies from January 21, 2019 through January 31, 2021.

370.    Ms. Dunphy invested substantial time and effort to create new streams of revenue for the Giuliani Companies as Director of Business Development.

63

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

371.    Ms. Dunphy also invested substantial time and effort into arranging Giuliani's travel, managing his email account and schedule, managing his social media accounts, obtaining new business opportunities for him and managing his public relations as Giuliani's personal executive assistant.

372.    Ms. Dunphy's work for and on behalf of Giuliani and the Giuliani Companies resulted in the Defendants obtaining significant and valuable benefits.

373.    Giuliani and the Giuliani Companies have failed to compensate Ms. Dunphy for her work for and on behalf of Giuliani and the Giuliani Companies.

374.    It would be against equity and good conscience to permit Giuliani and the Giuliani Companies to retain the benefits of Ms. Dunphy's labor, while failing to compensate Ms. Dunphy.

375.    In view of the foregoing, Ms. Dunphy is entitled to actual, presumed, punitive, and other damages in an amount to be determined at trial.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
**(Quantum Meruit As Against All Defendants)**

376.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

377.    Relying on Giuliani's promise to pay $1 million per year in deferred payments, Ms. Dunphy performed substantial services for Giuliani and the Giuliani Companies, several examples of which are detailed above.

378.    Giuliani and the Giuliani Companies knowingly accepted Ms. Dunphy's services.

379.    Ms. Dunphy had a reasonable expectation that she would be compensated for the services she provided to the Giuliani Companies including, but without limitation, her deferred pay as Director of Business Development and executive assistant to Giuliani.

380.    Giuliani and the Giuliani Companies have failed and refused to pay Ms. Dunphy for her services rendered.

64

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

381.    In view of the foregoing, Ms. Dunphy is entitled to actual, presumed, punitive, and other damages in an amount to be determined at trial.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**(Violation of the Freelance Isn't Free Act As Against All Defendants)**

382.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

383.    N.Y.C. Admin. Code § 20-928 provides that "[w]henever a hiring party retains the services of a freelance worker and the contract between them has a value of $800 or more, either by itself or when aggregated with all contracts for services between the same hiring party and freelance worker during the immediately preceding 120 days, the contract shall be reduced to writing."

384.    NYC Admin. Code § 20-927 defines "freelance worker" as "any neutral person or organization composed of no more than one natural person, whether or not incorporated or employing a trade name, that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation."

385.    In the event that Ms. Dunphy is found to not have been an employee and, in the alternative, pursuant to N.Y.C. Admin. Code § 20-927, Ms. Dunphy was a freelance worker in that she was hired or retained by Giuliani and the Giuliani Companies to provide services in exchange for compensation.

386.    N.Y.C. Admin Code 20-927 defines "hiring party" as "any person who retains a freelance worker to provide any service…"

387.    Giuliani and the Giuliani Companies were hiring parties within the meaning of the statute because they retained and received Ms. Dunphy's services.

388.    Giuliani and the Giuliani Companies agreed to pay Ms. Dunphy $1 million per year for her work.

65

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

389.    Giuliani and the Giuliani Companies failed to provide Ms. Dunphy with a written contract despite their agreement to pay her more than $800 for her work.

390.    Ms. Dunphy performed the work she agreed to perform but was not paid by Defendants for her work.

391.    Pursuant to N.Y.C. Admin. Code § 20-933(2)(b) Ms. Dunphy is entitled to double damages and payment of attorneys' fees.

## AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty as Against Giuliani)

392.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

393.    A relationship of trust and confidence existed between Ms. Dunphy and Giuliani as a result of their attorney-client relationship.

394.    A relationship of trust and confidence existed between Ms. Dunphy and Giuliani as a result of their employer-employee relationship.

395.    Giuliani owed Ms. Dunphy fiduciary duties of good faith, fidelity and undivided loyalty, and knew and was aware that Ms. Dunphy was relying on him to represent her interests, to pay her deferred salary, that Giuliani was in a superior position, and that Ms. Dunphy depended upon him to treat her fairly and disinterestedly.

396.    Giuliani took advantage of Ms. Dunphy's reliance on him to manipulate her into an unwanted sexual relationship.

397.    Giuliani also neglected his duties of good faith, fidelity, and undivided loyalty by acting in his own self-interest while rendering Ms. Dunphy's personal needs and interest subservient.

398.    As a direct and proximate result of Giuliani's breach of his fiduciary duties, Ms. Dunphy has been damaged in an amount to be determined at trial.  Moreover, Giuliani's

66

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

actions were willful and wanton and constituted a public wrong sufficient to warrant punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Ms. Dunphy respectfully requests that the Court enter judgment in her favor, and against Defendants, in an amount not less than ten million dollars ($10,000,000.00), as follows:

(1)     On the First Cause of Action, compensatory and punitive damages, as well as attorneys' fees and expenses, in an amount to be determined at trial.

(2)     On the Second Cause of Action, an award of compensatory and punitive damages, in an amount to be determined at trial.

(3)     On the Third Cause of Action, an award of compensatory and punitive damages, in an amount to be determined at trial.

(4)     On the Fourth Cause of Action, an award of compensatory and punitive damages, as well as attorneys' fees and expenses in an amount to be determined at trial, together with civil penalties.

(5)     On the Fifth Cause of Action, an award of compensatory and punitive damages, as well as attorneys' fees and expenses in an amount to be determined at trial, together with civil penalties.

(6)     On the Sixth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(7)     On the Seventh Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(8)     On the Eighth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(9)     On the Ninth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

67

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

(10)     On the Tenth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(11)     On the Eleventh Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(12)     On the Twelfth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(13)     On the Thirteenth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(14)     On the Fourteenth Cause of Action, an award to be determined at trial of not less than Two Million Dollars, plus interest, less minimal cash payments, plus expenses.

(15)     On the Fifteenth Cause of Action an award of minimum wage compensation she was due under New York Labor Law § 652 and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.1, together with liquidated damages equal to 100% of the total amount of the wages found to be due, together with attorneys' fees and costs, and interest in an amount to be determined at trial.

(16)     On the Sixteenth Cause of Action an award of overtime pay for all hours worked in excess of forty per week at one and one-half times her regular rate, together with liquidated damages, interest, and attorneys' fees in an amount to be determined at trial;

(17)     On the Seventeenth Cause of Action, an award of statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

(18)     On the Eighteenth Cause of Action, an award of statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

(19)     On the Nineteenth Cause of Action, an award of actual, presumed, punitive, and other damages in an amount to be determined at trial.

(20)     On the Twentieth Cause of Action, an award of actual, presumed, punitive, and other damages in an amount to be determined at trial.

(21)     On the Twenty-First Cause of Action, an award to be determined at trial of not less than Two Million Dollars, plus interest, less minimal cash payments, plus expenses.

(22)     On the Twenty-Second Cause of Action, an award of compensatory and punitive damages, in an amount to be determined at trial.

68

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

(23)   Awarding to Ms. Dunphy all costs, disbursements, fees, and interest as authorized by applicable law; and

(24)   Awarding to Ms. Dunphy such other and additional remedies as the Court may deem just and proper.


Dated:   Brooklyn, New York
          May 15, 2023

                                            **ABRAMS FENSTERMAN, LLP**

                                             */s/ Justin T. Kelton*
                                            Justin T. Kelton
                                            Sharon P. Stiller
                                            Amanda P. Small
                                            1 MetroTech Center, Suite 1701
                                            Brooklyn, NY 11201
                                            Tel: (718) 215-5300 x 501
                                            Fax: (718) 215-5304
                                            Email:  jkelton@abramslaw.com
                                            Email:  sstiller@abramslaw.com
                                            Email:  asmall@abramslaw.com
                                            *Attorneys for Plaintiff Noelle Dunphy*

69

# <u>VERIFICATION</u>

State of Florida            )
County of _Palm Beach_  ) Ss.:



MARIE DYNA CIDERA
Notary Public - State of Florida
Commission # GG 979765
My Comm. Expires Apr 19, 2024

Noelle Dunphy, being duly sworn, deposes and says:  I am the plaintiff herein.  I have read

the foregoing Verified Complaint and know the contents thereof, and the same is true to the best

of my knowledge, except as to those matters which are alleged on information and belief, and as

to those matters, I believe them to be true.

_____
NOELLE DUNPHY

On the __11th__ day of __May__ 2023, before me, the undersigned, personally appeared
Noelle Dunphy, personally known to me or proved to me on the basis of satisfactory evidence to
be the individual whose name is subscribed to the within instrument and acknowledged to me that
he executed the same in his capacity as Plaintiff, and that by her signature on the instrument, the
individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 11

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

**Subject:** Ridolph Giuliani wants to be friends on Facebook
**Date:** Wednesday, January 9, 2019 at 3:00:37 PM Central Standard Time
**From:** Facebook
**To:** Elle Ashley

 Facebook

Ridolph Giuliani wants to be friends with you on Facebook. ◇



**Ridolph Giuliani**
4 friends

**Confirm Request**     See All Requests

This message was sent to ████████████. If you don't want to receive these emails from Facebook in the future, please
unsubscribe.
Facebook, Inc., Attention: Community Support, 1 Facebook Way, Menlo Park, CA 94025
To help keep your account secure, please don't forward this email. Learn more.

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM**
NYSCEF DOC. NO. 12

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

**From:** JetSmarter | Client Services ████████████████████████
**Sent:** Thu, 24 Jan 2019 18:10:59 +0000
**To:** ████████████████████████
**CC:** ███████████████████████████████████████████ JetSmarter |
Client Services ██████
**Subject:** JetSmarter Itinerary 1/25/19 FLL → HPN 2:00pm

Hi Mayor Giuliani and JoAnn,

It was a pleasure speaking and assisting you today. I have confirmed and booked the flight for Ms. Dunphy's tomorrow afternoon from FLL to HPN. Please see the below link for Noelle's itinerary.

https://jetsmarter.com/forms/legitinerary/?
QTQxNTEyNWE2NjBjMWFkQWRmNjIwZTQwMzU2MThjM2Q6MTIzQTE0QDk

My team will be in contact later this afternoon for your seating arrangements.

Please let us know if we can assist you with anything else.

All the best,
Stephanie

Client Services Team

█████████████████████ +1 (888) 9 VIP JET   +1 (954) 315 - 0088
JetSmarter.com
Twitter | Facebook | Linkedin | Instagram

This message and any attachments are solely intended for the use of the individual or entity to which it is addressed and may contain information that is confidential or privileged and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Any unauthorized review, use, disclosure, or distribution of the material in this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email or by telephone at +1 844-359-2297 and immediately delete this message and all its attachments. Nothing in this message should be interpreted as a digital or electronic signature.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM
NYSCEF DOC. NO. 13

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

**From:** Elle Ashley ██████████████████
**Subject:** Re: JetSmarter Book ng
**Date:** Wed January 30 2019 at 10:41 AM
**To:** Shane McQua d ██████████████████
**Bcc:** ██████████████████

EA

Hi Shane!  How are you?

Thank you for your time.

Before we plan flights via email, please would you explain his perks?

Often, I look at the app on his phone, & I saw his account had no flight credits or perks... all the other sophisticate members, smart members, & signature members got perks and flight credits and bonuses.  The current offers are generous for new customers.

Not sure why Rudy got nothing from JS except the basic sophisticated & 4 tokens for $50k.

Rudy Giuliani is an American hero and protected our country after September 11.

Please help us understand his current plan if you can email us some details.  Thank you!
Chris, the new President, is wonderful by the way.  What a pleasure to sit with him on the plane!

On Jan 29, 2019, at 4:48 PM, Shane McQuaid ██████████████████ wrote:

> Good Afternoon Ms. Dunphy,
>
> It was a pleasure to speak with you briefly today.
>
> Please let me know when would be a good time to speak regarding the bookings for Rudy.
>
> Thank you!
>
> **Shane McQuaid** Sr. Manager | Client Services
>
> ██████████████████
> +1 (888) 9 VIP JET  +1 954-939-2845
> JetSmarter.com
> Twitter | Facebook | Linkedin | Instagram

This message and any attachments are solely intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  f the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden. If you have received this communication in error, please notify us immediately by reply email or by telephone at +1 (888) 984-7538 and immediately delete this message and all its attachments. Nothing in this message should be interpreted as a digital or electronic signature.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM        INDEX NO. 650033/2023
NYSCEF DOC. NO. 14                                       RECEIVED NYSCEF: 05/15/2023

From: **Shane McQuaid** ██████████████
Subject: Re: JetSmarter charter quote FL-DC
Date: March 17, 2019 at 11:40 AM
To: E e Ash ey ████████████████    Jordan A ███████████



Good Morning Elle,

The resolution for the Class is yet to be confirmed and it is still too early to know what this is going to be.

Jordan has the best pricing available for Charters, we may not be able to meet the 6k price cap with what is currently available in the market. If a better option become available we will be sure to inform you immediately.

-Shane



**From:** Elle Ashley ██████████████████
**Date:** Sunday, March 17, 2019 at 8:26 AM
**To:** Jordan Ali ██████████████, Shane McQuaid ████████████████
**Subject:** Re: JetSmarter charter quote FL-DC

Jordan/Shane, Mayor Giuliani's budget for this is approximately $6k to get 3 people from any area near Palm Beach FL to the DC area for tomorrow, early Mon morning...I realize this may not be possible but thank you for checking...any options that meet this criteria are appreciated.
Email is best due to being in membership clubs that allow email but prohibit phone calls. Shane has mentioned applying some tokens or vouchers. I also read that a class action resulted in Sophisticated members (such as the Mayor) being offered a 50% refund or more of the $50k annual fee they paid recently, as well as a bunch of flight credits. Can these be applied or is it too early?
Many thanks,
Noelle

On Mar 16, 2019, at 6:15 PM, Jordan Ali ████████████████ wrote:

> Hi Ella,
>
> I would be happy to assist you with your charter request. I received the below details from Shane. Would you prefer to fly tomorrow night or Monday morning? Also, did you have a budget you were trying to be at? We have our light jet instant booking offered at $11,995.00 with tax currently.
>
> **Charter Details**
> PBI-IAD - 3/17 - 3 passengers
>
> Best Regards,

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

**Jordan Ali**  Charter Sales Manager

+1 (888) 9 VIP JET   +1 954-939-2069

JetSmarter.com

Twitter  I  Facebook  I  Linkedin  I  Instagram

This message and any attachments are solely intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  f the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.  f you have received this communication in error, please notify us immediately by reply email or by telephone at +1 954-939-2069 and immediately delete this message and all its attachments. Nothing in this message should be interpreted as a digital or electronic signature.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

**From:** Heidi Kirby ▮▮▮▮▮▮
**Subject:** Trump Hote s Reservat on Confirmat on for Rudo ph G u an - ▮▮▮▮ (1 OF 2)
**Date:** March 17, 2019 at 8:43 PM
**To:** G r Exp or ng the G obe ▮▮▮▮▮

TK



### THANK YOU RUDOLPH GIULIANI FOR BOOKING AT
### TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.

| | |
|---|---|
| **CONFIRMATION NUMBER** | ▮▮▮▮▮ |
| **GUEST NAME** | RUDOLPH GIULIANI |
| **TRUMP CARD** | JOIN NOW |
| **ARRIVAL DATE** | MONDAY MARCH 17 2019 |
| **DEPARTURE DATE** | TUESDAY MARCH 18 2019 |
| **NO. OF NIGHTS** | 1 NIGHT |
| **NO. OF PERSONS** | 1 ADULT |

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM
NYSCEF DOC. NO. 14

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

| | |
|---|---|
| **ROOM DESCRIPTION** | JUNIOR SUITE |
| **RATE NAME** | TRUMP CARD EXCLUSIVE |
| **RATE BY DAY** | USD 858.00 |
| **RATE INCLUSIONS** | ACCOMMODATION ONLY |

**TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.**

1100 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20004

PHONE: 202.695.1100

TOLL-FREE: 866.660.9426

EMAIL: WASHINGTON.RESERVATIONS@TRUMPHOTELS.COM

AREA MAP | DIRECTIONS

*Should you plan to have guests visit during your stay, the hotel observes a maximum occupancy of (3) people in our king bedrooms, (4) people in our one-bedroom suites, and (6) people in our two-bedroom suites and penthouses.*



## TRUMP CARD

We invite you to *enroll* in our Trump Card Privileges Program. Members enjoy customized stays while earning valuable room upgrades and complimentary stays.

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM**

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

## TRUMP WELLNESS

We want to help you maintain your healthy lifestyle when traveling. With our Trump Wellness program we can help you achieve just that.

LEARN MORE

## The SPA BY IVANKA TRUMP™

We welcome you to unwind and enjoy refreshing customized level of service in a haven of relaxation and well-being. The Spa by IVANKA TRUMP™ seeks to create pathways for you through inner health and external beauty.

LEARN MORE

## BLT PRIME BY DAVID BURKE

Helmed by celebrated chef David Burke, we invite you to indulge in our Five Star Diamond awarded signature steakhouse, renowned for the highest-quality, dry-aged steaks and seafood dishes complemented by savory sides.

LEARN MORE

## PARKING

*Valet Parking is available 24 hours a day for $56 per day with unlimited in/out privileges.*

## POLICIES

*100% Smoke-Free*
*Check-in Time: 4:00 PM*
*Check-out Time: 12:00 PM*

## ADDITIONAL TAX & SERVICES

*Rates are subject to the following:*
*14.95% Room Tax*

*INCIDENTAL CHARGES For all reservations, the Hotel requires a deposit of $150 per day for incidental charges upon check-in. This deposit may be made by cash, credit card or debit card. Your bank will release the hold after check-out.*

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

## CANCELLATION POLICY

*Cancellations must be received 48 hours prior to 3PM local time day of arrival.*



You are receiving this message because you provided your email address to Trump Hotels™.

Manage Email Subscriptions | Privacy & Cookie Policy | Contact

© 2019 Trump International Hotels Management LLC, 725 Fifth Avenue, New York, NY 10022

HEIDI KIRBY
*Director of Transient Sales*

**FIRST AND ONLY FORBES FIVE-STAR HOTEL
IN DOWNTOWN WASHINGTON, D.C.**

**TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.**
Old Post Office Building

1100 Pennsylvania Avenue, N.W. Washington D.C. 20004
T: +1 202.868.5013 | M: +1 202.431.2517

EXPLORE OUR DESTINATIONS



*First and Only Forbes 5-Star Hotel
in Downtown Washington, D.C.*

Forbes
TRAVEL GUIDE

TRUMP®
INTERNATIONAL HOTEL
WASHINGTON, D.C.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

**From:** **Heidi Kirby** 
**Subject:** Trump Hote s Reservat on Confirmat on for Rudo ph G u an - ███████ (2 OF 2)
**Date:** March 17, 2019 at 8:44 PM
**To:** G r Exp or ng the G obe ███████

TK



THANK YOU RUDOLPH GIULIANI FOR BOOKING AT
TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.



| | |
|---|---|
| **CONFIRMATION NUMBER** | ███████ |
| **GUEST NAME** | RUDOLPH GIULIANI |
| **TRUMP CARD** | JOIN NOW |
| **ARRIVAL DATE** | MONDAY MARCH 17 2019 |
| **DEPARTURE DATE** | TUESDAY MARCH 18 2019 |
| **NO. OF NIGHTS** | 1 NIGHT |

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

| | |
|---|---|
| **NO. OF NIGHTS** | 1 NIGHT |
| **NO. OF PERSONS** | 1 ADULT |
| **ROOM DESCRIPTION** | DELUXE KING ROOM |
| **RATE NAME** | TRUMP CARD EXCLUSIVE |
| **RATE BY DAY** | USD 420.00 |
| **RATE INCLUSIONS** | ACCOMMODATION ONLY |

**TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.**

1100 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20004

PHONE: 202.695.1100

TOLL-FREE: 866.660.9426

EMAIL: WASHINGTON.RESERVATIONS@TRUMPHOTELS.COM

AREA MAP | DIRECTIONS

*Should you plan to have guests visit during your stay, the hotel observes a maximum occupancy of (3) people in our king bedrooms, (4) people in our one-bedroom suites, and (6) people in our two-bedroom suites and penthouses.*

TRUMP CARD

We invite you to *enroll* in our Trump Card Privileges Program. Members enjoy customized stays while earning valuable room upgrades and complimentary stays.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023



### TRUMP WELLNESS

We want to help you maintain your healthy lifestyle when traveling. With our Trump Wellness program we can help you achieve just that.

LEARN MORE

### The SPA BY IVANKA TRUMP™

We welcome you to unwind and enjoy refreshing customized level of service in a haven of relaxation and well-being. The Spa by IVANKA TRUMP™ seeks to create pathways for you through inner health and external beauty.

LEARN MORE

### BLT PRIME BY DAVID BURKE

Helmed by celebrated chef David Burke, we invite you to indulge in our Five Star Diamond awarded signature steakhouse, renowned for the highest-quality, dry-aged steaks and seafood dishes complemented by savory sides.

LEARN MORE

### PARKING

*Valet Parking is available 24 hours a day for $56 per day with unlimited in/out privileges.*

### POLICIES

*100% Smoke-Free*
*Check-in Time: 4:00 PM*
*Check-out Time: 12:00 PM*

### ADDITIONAL TAX & SERVICES

*Rates are subject to the following:*
*14.95% Room Tax*

*INCIDENTAL CHARGES For all reservations, the Hotel requires a deposit of $150 per day for incidental charges upon check-in. This*

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

*deposit may be made by cash, credit card or debit card. Your bank will release the hold after check-out.*

## CANCELLATION POLICY

*Cancellations must be received 48 hours prior to 3PM local time day of arrival.*



You are receiving this message because you provided your email address to Trump Hotels™.

Manage Email Subscriptions | Privacy & Cookie Policy | Contact

© 2019 Trump International Hotels Management LLC, 725 Fifth Avenue, New York, NY 10022

HEIDI KIRBY
*Director of Transient Sales*

**FIRST AND ONLY FORBES FIVE-STAR HOTEL
IN DOWNTOWN WASHINGTON, D.C.**

**TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.**
Old Post Office Building
 1100 Pennsylvania Avenue, N.W. Washington D.C. 20004
T: +1 202.868.5013 | M: +1 202.431.2517

EXPLORE OUR DEST NAT ONS



First and Only Forbes 5-Star Hotel
in Downtown Washington, D.C.

TRUMP®
INTERNATIONAL HOTEL
WASHINGTON, D.C.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

**From:** **Girl Exploring the Globe** ▇▇▇▇▇▇▇▇▇▇
**Subject:** Re: p ease postpone/cance
**Date:** March 17, 2019 at 9:07 PM
**To:** He d K rby ▇▇▇▇▇▇▇▇▇

TE

We probably need the same 2 rooms for Tuesday until Wed  Will update ASAP  probably tomorrow morning

On Mar 17  2019  at 8 52 PM  Girl Exploring the Globe ▇▇▇▇▇▇▇▇▇▇▇ wrote

Heidi  both rooms must be canceled again for the Mayor until further notice  Suddenly  the situation has changed
Thank you for your patience

On Mar 17  2019  at 8 43 PM  Heidi Kirby ▇▇▇▇▇▇▇▇▇ wrote

THANK YOU RUDOLPH GIULIANI FOR BOOKING AT
TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.

**CONFIRMATION NUMBER**                              ▇▇▇▇▇▇

**GUEST NAME**                                        RUDOLPH GIULIANI

**TRUMP CARD**                                        JOIN NOW

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

| **ARRIVAL DATE** | MONDAY MARCH 17 2019 |
|---|---|
| **DEPARTURE DATE** | TUESDAY MARCH 18 2019 |
| **NO. OF NIGHTS** | 1 NIGHT |
| **NO. OF PERSONS** | 1 ADULT |
| **ROOM DESCRIPTION** | DELUXE KING ROOM |
| **RATE NAME** | TRUMP CARD EXCLUSIVE |
| **RATE BY DAY** | USD 420.00 |
| **RATE INCLUSIONS** | ACCOMMODATION ONLY |

**TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.**

1100 PENNSYLVANIA AVENUE NW, WASHINGTON, DC 20004

PHONE: 202.695.1100

TOLL-FREE: 866.660.9426

EMAIL: WASHINGTON.RESERVATIONS@TRUMPHOTELS.COM

AREA MAP | DIRECTIONS

*Should you plan to have guests visit during your stay, the hotel observes a maximum occupancy of (3) people in our king bedrooms, (4) people in our one-bedroom suites, and (6) people in our two-bedroom suites and penthouses.*



## TRUMP CARD

We invite you to *enroll* in our Trump Card Privileges Program. Members enjoy customized stays while earning valuable room upgrades and complimentary stays.

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM

NYSCEF DOC. NO. 14

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023







## TRUMP WELLNESS

We want to help you maintain your healthy lifestyle when traveling. With our Trump Wellness program we can help you achieve just that.

LEARN MORE

## The SPA BY IVANKA TRUMP™

We welcome you to unwind and enjoy refreshing customized level of service in a haven of relaxation and well-being. The Spa by IVANKA TRUMP™ seeks to create pathways for you through inner health and external beauty.

LEARN MORE

## BLT PRIME BY DAVID BURKE

Helmed by celebrated chef David Burke, we invite you to indulge in our Five Star Diamond awarded signature steakhouse, renowned for the highest-quality, dry-aged steaks and seafood dishes complemented by savory sides.

LEARN MORE

## PARKING

*Valet Parking is available 24 hours a day for $56 per day with unlimited in/out privileges.*

## POLICIES

*100% Smoke-Free*
*Check-in Time: 4:00 PM*
*Check-out Time: 12:00 PM*

## ADDITIONAL TAX & SERVICES

*Rates are subject to the following:*
*14.95% Room Tax*

*INCIDENTAL CHARGES For all reservations, the Hotel requires a*

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:56 AM
NYSCEF DOC. NO. 14

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

*deposit of $150 per day for incidental charges upon check-in. This deposit may be made by cash, credit card or debit card. Your bank will release the hold after check-out.*

## CANCELLATION POLICY

*Cancellations must be received 48 hours prior to 3PM local time day of arrival.*



You are receiving this message because you provided your email address to Trump Hotels™.

Manage Email Subscriptions | Privacy & Cookie Policy | Contact

© 2019 Trump International Hotels Management LLC, 725 Fifth Avenue, New York, NY 10022

HEIDI KIRBY
*Director of Transient Sales*

**FIRST AND ONLY FORBES FIVE-STAR HOTEL
IN DOWNTOWN WASHINGTON, D.C.**

**TRUMP INTERNATIONAL HOTEL WASHINGTON, D.C.**
Old Post Office Building
1100 Pennsylvania Avenue, N.W. Washington D.C. 20004
T +1 202.868.5013 | M +1 202.431.2517

EXPLORE OUR DEST NAT ONS





**From:**

**Subject:** Good news: Podcast Offer

**Date:** Sat June 29 2019 at 1:54 PM

**To:** Rudolph W. Giuliani

Hi Rudy,

Good news regarding the podcast idea from January: I met with David Spady, the owner of Salem Media Group, and his company is interested in making you an offer to do podcasts through them. I believe you are one of the most dynamic storytellers in the world, who should be taping weekly podcasts that people will talk about, learn from and enjoy. It will give you a greater platform than Twitter can, and you can support President Trump's re-election to a large audience.

David said to discuss terms with Phil Boise in his New York office, and the offer can be structured in one of the following ways:

Option 1. with **upfront pay**, plus a percentage of revenue generated from subscribers who would pay $19.95/month for access to your podcasts. The advantage of sharing subscriber revenue with Salem Media Group is that they promote your podcast on their other channels and media outlets, which reach millions of conservative voters;

or

Option 2. **no upfront pay**, but a larger percentage of revenue generated

or

Option 3. I can **set up the podcast channel for you independently**, so you own it, and Salem Media does not own or manage it. The advantage is **you keep 100% of the revenue** from both subscribers and ads. Most podcasts are free to subscribers, but even unknown podcast hosts can earn $200,000 a year simply from ads. With your legacy, you can command subscriber fees on top of ad revenue. You don't necessarily need Salem Media to promote you, but you may prefer upfront pay (Option 1) rather than waiting for advertisers and subscribers to sign up.

What do you think? Are you interested in a meeting in New York with Phil Boise, who is in charge of content for Salem Media?

Best regards,
Noelle Ashley Dunphy

INDEX NO. 650033/2023

NYSCEF DOC. NO. 16                                      RECEIVED NYSCEF: 06/02/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------- x

NOELLE DUNPHY ,

                         Plaintiff,           Index No.:  650033/2023

           -against-                  **NOTICE OF MOTION**

RUDOLPH W. GIULIANI, GIULIANI PARTNERS,
LLC, GIULIANI GROUP, LLC, GIULIANI             Motion Sequence #001
SECURITY & SAFETY, LLC, JOHN and/or JANE
DOES 1-10,

                         Defendants.

-------------------------------------------------------------------- x

      **PLEASE TAKE NOTICE**, that upon the annexed affirmation of Adam Katz Esq., dated

June 2, 2023 and the exhibits annexed thereto; the accompanying memorandum of law, and upon

all prior pleadings and proceedings previously had herein, the undersigned will move this Court at

the Supreme Court, New York County, 60 Centre Street, New York, NY 10007, on the 19th day

of July, 2023, or as soon thereafter as counsel may be heard, seeking an Order:

      (1) Striking the complaint in this action, dated May 15, 2023 (the "Complaint") in its

entirety, as a sanction;

      (2) In the alternative, pursuant to CPLR § 3024(b), striking unnecessary, inflammatory,

scandalous, and unduly prejudicial allegations contained in the Plaintiff's Complaint at paragraphs

9, 33-36, 76, 79, 80-82, 85, 112, 132-133, 142-144, 147-148, 213, 215, 235-237, and Footnote 10

of the Complaint;

      (3) Pursuant to CPLR § 3013, striking paragraphs 35 and 215 of the Complaint;

      (4) Pursuant to 22 NYCRR 130-1.1, awarding sanctions and costs against Plaintiff, Noelle

Dunphy, for frivolous and malicious conduct, evidenced by the irrelevant and prejudicial language

INDEX NO. 650033/2023
NYSCEF DOC. NO. 16                                    RECEIVED NYSCEF: 06/02/2023

of the Complaint filed and attachments thereto, to Defendants in the instant action in an amount to

be determined at a later date by the Court but not less than the costs of filing the instant motion;

     (5) dismissing the complaint in its entirety; and/or

     (6) mandating that Plaintiff file a new Complaint; and

     (7) for such other and further relief as this Court deems just and proper.

     **PLEASE TAKE FURTHER NOTICE**, that answering papers, if any, must be served at

least seven (7) days prior to the return date of this motion, pursuant to CPLR § 2214(b).

Dated: New York, NY
      June 2, 2023

                /s/*Rudolph Giuliani* (by AK)
                Rudolph Giuliani
                *Defendant Pro Se*

                GOLDBERG SEGALLA LLP

                Adam S. Katz, Esq.
                *Attorneys for Defendants*
                *Giuliani Group, LLC, Giuliani Partners,*
                *LLC, Giuliani Security & Safety, LLC*
                711 Third Avenue, 19th Floor
                New York, New York 10017
                Tel.: (646) 292-8700
                akatz@goldbergsegalla.com

                **Mailing Address:**
                P.O. Box 880
                Buffalo, NY 14201

To:    *Justin Kelton, Esq., Plaintiff's attorney, via NYSCEF*

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 17

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------- x

NOELLE DUNPHY ,

                              Plaintiff,                              Index No.:  650033/2023

            -against-                                   **AFFIRMATION OF**
                                                        **ADAM S. KATZ, ESQ. IN**
RUDOLPH W. GIULIANI, GIULIANI PARTNERS,                 **SUPPORT OF MOTION TO**
LLC, GIULIANI GROUP, LLC, GIULIANI                      **STRIKE PURSUANT TO**
SECURITY & SAFETY, LLC, JOHN and/or JANE                **CPLR 3024(b)**
DOES 1-10,
                                                        Motion Sequence #001
                              Defendants.

------------------------------------------------------------------- x

        Adam S. Katz, an attorney duly admitted to practice in the Courts of the State of New York,

under penalty of perjury, affirms and states:

        1.      I am a partner at the law firm of Goldberg Segalla LLP, attorneys for Defendants

Giuliani Group, LLC, Giuliani Partners, LLC, and Giuliani Security & Safety, LLC in the above-

captioned action (collectively, "Defendants"). As such, I am fully familiar with the facts and

circumstances of this matter.

        2.      I submit this Affirmation, together with the accompanying exhibits, in support of

Defendants' motion to strike, dated June 2, 2023 pursuant to CPLR § 3024(b), CPLR § 3013,  and

22 NYCRR 130-1.1.

        3.      Attached hereto, as **Exhibit A,** is a true and correct copy of the instant Complaint,

dated May 15, 2023.

        4.      Attached hereto, as **Exhibit B**, is a true and correct New York Post article, dated

October 4, 2016, which can be found at Real estate mogul says ex behind rape claim is a hooker

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 17

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

(nypost.com). It contains relevant information concerning Mr. Kogut's lawsuit and Ms. Dunphy's claims regarding Mr. Gabelli.

5.      Attached hereto, as **Exhibit C,** is true a correct copy of a "so ordered" letter from the Kogut-Dunphy dispute, dated October 2016, from Mr. Kogut's counsel, in which Judge Furman of the SDNY sanctioned Ms. Dunphy and called her antics, which included surreptitiously wiretapping Mr. Kogut and his counsel and then calling the police on Mr. Kogut's attorney, "disturbing."  The letter can be found at Dkt. No. 85 of Case No. 1:15-cv-07726.

6.      Based upon the foregoing, as well as the reasons set forth in the accompanying memorandum of law, Defendants' motion to strike should be granted.

Dated: June 2, 2023

Adam S. Katz, Esq.

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023



FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------X

NOELLE DUNPHY,

          Plaintiff,

    -against-

RUDOLPH W. GIULIANI,
GIULIANI PARTNERS, LLC,
GIULIANI GROUP, LLC,
GIULIANI SECURITY & SAFETY, LLC,
JOHN and/or JANE DOES 1-10,

          Defendants.

------------------------------------------------------------------------X

Index No.: 650033/2023

**VERIFIED COMPLAINT**

Plaintiff Noelle Dunphy ("Ms. Dunphy"), by and through her undersigned attorneys, Abrams Fensterman, LLP, brings this Verified Complaint against Defendants Rudolph W. Giuliani ("Giuliani"), Giuliani Partners, LLC ("GP"), Giuliani Group, LLC ("GG"), Giuliani Security & Safety, LLC ("GSS") (collectively, the "Giuliani Companies"), and John and/or Jane Does 1-10, and alleges as follows upon knowledge as to herself and her own actions, and otherwise upon information and belief:

## INTRODUCTION

1.    This lawsuit arises from unlawful abuses of power, wide-ranging sexual assault and harassment, wage theft, and other misconduct by Rudolph W. Giuliani and his Companies.

2.    When Giuliani hired Ms. Dunphy in January 2019, he was at the height of his influence, serving as the personal lawyer for then-President Donald Trump.  He had fashioned himself publicly as a major player in American politics, a successful businessman, and an important powerbroker who wielded enormous control over others.

3.    Giuliani worked aggressively to hire Ms. Dunphy, offering her what seemed like a once-in-a-lifetime opportunity to work as his Director of Business Development with a salary of

1

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

$1 million per year plus expenses.  As an added inducement, Giuliani also offered to provide pro bono legal representation to Ms. Dunphy in connection with an ongoing dispute arising from an abusive ex-partner.  To Ms. Dunphy, the chance to work for an influential politician once dubbed "America's Mayor," combined with the prospect of free legal representation by a former United States Attorney for the Southern District of New York, was a rare opportunity that was simply too good to pass up.

4.       But Giuliani's offer came with a significant catch:  Giuliani was in the midst of an acrimonious divorce, and he told Ms. Dunphy that her pay would have to be deferred and her employment kept "secret" until the divorce proceedings finished.  He claimed that his "crazy" ex-wife and her lawyers were watching his cashflow, and that his ex-wife would "attack" and "retaliate" against any female employee that Giuliani hired.  Giuliani promised Ms. Dunphy that his divorce would be resolved "any day now," and therefore the deferral of her pay and the need to keep her employment secret would soon end.  Ms. Dunphy reluctantly agreed to defer her pay and not to publicize her employment because she viewed the job, the salary, and the free legal representation as being worth the wait.

5.       Unfortunately, Giuliani's seemingly generous offers were a sham motivated by his secret desire to pursue a sexual relationship with Ms. Dunphy—in total disregard for the restraints that should have protected her as his employee and client.  As Giuliani later admitted in a recorded statement, he "wanted [Ms. Dunphy] from the day [he] interviewed [her]."

6.       Giuliani began abusing Ms. Dunphy almost immediately after she started working for the Defendants.  He made clear that satisfying his sexual demands—which came virtually anytime, anywhere—was an absolute requirement of her employment and of his legal representation.  Giuliani began requiring Ms. Dunphy to work at his home and out of hotel rooms,

2

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

so that she would be at his beck and call.  He drank morning, noon, and night, and was frequently intoxicated, and therefore his behavior was always unpredictable.

7.     Giuliani also took Viagra constantly.  While working with Ms. Dunphy, Giuliani would look to Ms. Dunphy, point to his erect penis, and tell her that he could not do any work until "you take care of this."  Thus, Ms. Dunphy worked under the constant threat that Giuliani might demand sex from her at any moment.  Even when the Covid-19 pandemic halted Giuliani's ability to physically assault her, he demanded that she disrobe during their work-related videoconferences.

8.     Giuliani also abused his position as Ms. Dunphy's lawyer to pressure her into sex. In one instance, for example, Giuliani promised Ms. Dunphy that he would give her $300,000 if she would forgo her legal rights in connection with her pending case and "fuck me like crazy." This statement was recorded.[1]

9.     As Ms. Dunphy continued her work for Giuliani and the Giuliani Companies, the work environment became increasingly hostile.  In addition to his sexual demands, Giuliani went on alcohol-drenched rants that included sexist, racist, and antisemitic remarks, which made the work environment unbearable.  Many of these comments were recorded.

10.     Despite the horrible conditions that she endured, Ms. Dunphy excelled at work. She generated substantial business opportunities, was available around the clock, helped Giuliani maintain his public image, and diligently ensured that his day-to-day business needs were met. Ultimately, however, Giuliani and his Companies callously tossed Ms. Dunphy aside, never paying her for the work she performed, and leaving her traumatized by the abuse she had suffered.

---

[1]     As discussed further below, Giuliani gave Ms. Dunphy permission to record their interactions.

3

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

11.     Giuliani presented himself as a generous employer and a hero who would use his legal prowess to save Ms. Dunphy from a difficult situation.  But he was neither of those things. Giuliani assaulted and harassed Ms. Dunphy, forced her to work in a deplorable work environment, in secret, and robbed her of the pay she is owed.  Through this case, Ms. Dunphy seeks a measure of justice from a man who thought his power and connections rendered him untouchable.

**PARTIES**

12.     Ms. Dunphy is an individual who resided in New York at certain times and Florida at other times during the relevant time periods.

13.     Defendant Rudolph W. Giuliani is an individual who at all relevant times was a resident of the State of New York, New York County.

14.     Defendant Giuliani Partners, LLC is a Delaware Limited Liability Company, with a principal place of business in New York, New York County.  Upon information and belief, Giuliani was and is the sole member of Giuliani Partners, and exercises operating control over the entity.

15.     Defendant Giuliani Group, LLC is a Delaware Limited Liability Company, with a principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Group, and exercises operating control over the entity.

16.     Defendant Giuliani Security & Safety LLC is a Delaware Limited Liability Company, with its principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Group, and exercises operating control over the entity.

17.     Upon information and belief, John and/or Jane Does 1-10 are individuals who reside in the State of New York.

4

**FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM**
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM**
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

18.     The Giuliani Companies comprise a "single employer" or "single integrated enterprise" since they share interrelated operations, centralized control of labor relations, common management, and common ownership or financial control.

19.     Upon information and belief, Giuliani owns a controlling interest in each of the Giuliani Companies, and he exercises complete dominion and control over the Giuliani Companies.

20.     Giuliani and the Giuliani Companies constitute "joint employers" with respect to Ms. Dunphy since they share authority to hire and fire employees such as Ms. Dunphy, determined rate, method, and timing of her pay, approved payment of business expenses, had authority to discipline her, controlled her work schedule and other terms and conditions of her employment, and directed and supervised her work.

21.     The work performed by Ms. Dunphy benefited all Defendants and/or directly or indirectly furthered their joint interests, and Defendants shared control of Ms. Dunphy's employment, either directly or indirectly, because Defendants either control, are controlled by, or are under common control with each other.   Defendants are therefore collectively Ms. Dunphy's "joint employers" under the New York Labor Law's broad definition of "employer." 29 C.F.R. § 791.2(b).

## JURISDICTION AND VENUE

22.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301 because, *inter alia*, Giuliani has resided in New York at all relevant times, and each of the Giuliani Companies had a principal place of business in New York at all relevant times.

23.     Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Ms. Dunphy's claims took place in New York County, where Giuliani resides, works, and maintains offices for the Giuliani Companies.

5

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

## FACTUAL ALLEGATIONS

**A.    Ms. Dunphy's Background**

24.    Ms. Dunphy is a Columbia University graduate and skilled businesswoman with 22 years of experience in business development, associate producing, and communications.

25.    Ms. Dunphy has owned her own consulting firm, Strategic Consulting, since 2001.

26.    Throughout her career, Ms. Dunphy has worked with companies to generate increased business, create new revenue streams, and promote positive brand images.

27.    Despite her professional successes, Ms. Dunphy has experienced substantial pain and hardship.  When she met Giuliani, Ms. Dunphy was highly vulnerable, having just begun the arduous process of recovering from severe domestic abuse.  She was involved in a difficult lawsuit arising from that situation,[2] and she was desperate for an opportunity to move forward in a positive direction.

**B.    Background of Giuliani and the Giuliani Companies**

28.    Giuliani is a lawyer,[3] former Mayor of New York City, and former United States Attorney for the Southern District of New York.

29.    Giuliani prides himself on being a well-connected political power broker.  When Ms. Dunphy met Giuliani, he was known as a longtime friend and close confidante of then-President Donald Trump, in addition to being a member of Trump's legal team.

30.    Giuliani also owns and manages several businesses, including the Giuliani Companies.

31.    Giuliani operated the Giuliani Companies as his personal fiefdoms, disregarding virtually all corporate formalities and blurring the boundaries between the Companies and their

---

[2]    Ms. Dunphy was granted permission to proceed under the pseudonym Jane Doe in that lawsuit.

[3]    Upon information and belief, Giuliani's law licenses have been suspended in New York and Washington, D.C.

6

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

personnel.  Upon information and belief, employees of the Giuliani Companies regularly acted and referred to themselves as working for Giuliani and did not maintain separation among the Giuliani Companies.  For example, Giuliani's former interim CEO, Maria Ryan, wrote in emails that GP and GSS "are one," meaning that they operate as a single company.  Upon information and belief, the Giuliani Companies had intermingled bank accounts, and Giuliani treated his corporate credit card as a personal credit card.

32.     Upon information and belief, Giuliani has a history of using his businesses—including, but not limited to the Giuliani Companies—to groom and aggressively pursue women for sexual relationships.

33.     For example, upon information and belief, Giuliani repeatedly agreed to give significant job titles and large salaries to women he found attractive, with the intention of having a sexual relationship with them.  Upon information and belief, Giuliani achieved this goal in several instances, and engaged in sexual relationships with women he had hired and whose employment he controlled completely.

34.     Upon information and belief, Giuliani had an affair with Maria Ryan, who was Giuliani Partners' interim CEO, although Giuliani claimed in the media that there was "no proof" that the two had sex.[4]  In addition, media reports note that Giuliani had an affair with his communications director in the 1990s.[5]  Media reports also reflect that Giuliani had an affair with Jennifer LeBlanc,[6] a GOP fundraiser who, upon information and belief, received indirect

---

[4]     https://www.dailymail.co.uk/news/article-5836499/Rudy-Giuliani-accused-having-affair-assistants-married-mother.html

[5]     https://abcnews.go.com/GMA/story?id=126961&page=1; *see also* https://nypost.com/2000/05/11/former-rudy-aide-back-in-the-storm-is-lategano-the-one-donna-referred-to/

[6]     https://www.nydailynews.com/news/politics/ny-pol-rudy-giuliani-jennifer-leblanc-20180613-story.html

7

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

payments from Giuliani and who, upon information and belief, worked in Gracie Mansion when Giuliani was Mayor.  And, upon information and belief, Giuliani also hired 19-year-old Christianne Allen as the Communications Director for the Giuliani Companies because, as he told Ms. Dunphy, he had "a certain sexual attraction to" Ms. Allen.  In fact, Giuliani admitted to Ms. Dunphy that he kissed Ms. Allen.  These statements were recorded.

35.    Ms. Dunphy knew nothing about this predatory history until she became a victim of the same scheme.

**C.    Giuliani Tries To Hire Ms. Dunphy In 2016 And Then Again In 2019**

**i.    Giuliani's First Overture in September 2016**

36.    In September 2016, Giuliani met Ms. Dunphy while they both were waiting in the lobby of Trump Tower in Manhattan.

37.    Giuliani spoke to Ms. Dunphy and began asking for details about her work and life, and then indicated that he was interested in hiring her to work for him.

38.    Ms. Dunphy had no reason to believe that the interaction was anything other than business.

39.    Giuliani gave Ms. Dunphy his business card at the end of the interaction and asked that she contact him to talk further about working with him.

40.    Ms. Dunphy had no intention of working with Giuliani and did not contact him.

41.    Ms. Dunphy had no contact with Giuliani until he contacted her again in 2019.

**ii.    Giuliani's Second Overture in January 2019**

42.    On or about January 9, 2019, Giuliani sent Ms. Dunphy an unsolicited Facebook message and friend request.  A true and correct copy of the Facebook friend request is annexed hereto as Exhibit A.

8

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

43.     Ms. Dunphy was surprised that Giuliani had tracked her down years after their first interaction.  But the timing was fortuitous, as Ms. Dunphy was seeking new career opportunities, and she also needed legal advice.

44.     Ms. Dunphy accepted Giuliani's friend request and responded to his message. Giuliani invited her to a formal interview for a business development job with his organization.

45.     Ms. Dunphy agreed to meet Giuliani for a job interview in Florida, where she was living at the time.

**D.    Giuliani Hires Ms. Dunphy as Director of Business Development and Agrees to Represent Ms. Dunphy Pro Bono.**

46.     On January 21, 2019, Giuliani interviewed Ms. Dunphy at the Trump International Golf Club of West Palm Beach, Florida.  During the interview, they discussed Ms. Dunphy's career and experience, and her legal issues.  They also spoke about her ability to help Giuliani generate new revenue streams and to support him on a day-to-day basis, including by fielding media inquiries.

47.     The interview seemed to go well.  Giuliani told Ms. Dunphy that he was impressed by her experience, and he offered her a job as Director of Business Development for the Giuliani Companies, and also as his executive assistant for travel, communications, and public relations.

48.     Giuliani told Ms. Dunphy that her salary would be $1 million per year, and that any business expenses she incurred would be reimbursed.

49.     Upon information and belief, the salary that Giuliani offered Ms. Dunphy was within the same general range that Giuliani and the Giuliani Companies paid to other employees of Giuliani and the Giuliani Companies, when accounting for expenses and other benefits, including for example Maria Ryan (who served in various roles).

50.     During the job interview, Giuliani and Ms. Dunphy discussed that her responsibilities would include generating business opportunities, including speeches and clients

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

which Giuliani told her historically earned him approximately $10 million per year, public relations work (such as editing Giuliani's social media posts and ensuring that he was presentable to the public), monitoring his email, assisting him with responding to emails, making travel arrangements, scheduling meetings, and generally being "on call" for whatever Giuliani and his Companies needed.  Giuliani told Ms. Dunphy that the job required her to be available "24/7."[7]

51.    As they talked, Ms. Dunphy suggested several ideas for ways in which Giuliani and his Companies could generate revenue.  These included creating a podcast,[8] creating a Netflix series, documentaries, and other similar endeavors.  Later, Giuliani took advantage of several of these suggestions, and Ms. Dunphy worked to develop some of these projects.

52.    Giuliani and Ms. Dunphy also discussed during the interview that she one day write a book on Giuliani and Trump.

53.    Giuliani gave Ms. Dunphy permission to record her interactions with Giuliani anytime, anywhere, as well as Giuliani's interactions with others.  Giuliani thereafter continually permitted and authorized Ms. Dunphy to make such recordings.  He never asked her to stop recording any interaction.  At times, Giuliani pressed "record" himself on Ms. Dunphy's cell phone to record their conversations.

54.    As the parties reached agreement on the general terms of Ms. Dunphy's employment, Giuliani added a strange requirement:  Ms. Dunphy's pay would have to be deferred and her employment kept "secret" until Giuliani's divorce proceedings finished.  Giuliani claimed that this arrangement was necessary because his ex-wife and her lawyers were watching his

---

[7]    When Giuliani made this job offer to Ms. Dunphy, Giuliani understood that Ms. Dunphy would be financially reliant on him and the Giuliani Companies—particularly since Giuliani required that Ms. Dunphy be available 24/7, leaving no time for her to pursue any other source of employment or income.

[8]    Ms. Dunphy was surprised to learn during the discussion that Giuliani did not know what a podcast was, so she educated him about podcasts.

10

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

cashflow and he was limited in what he could spend and who he could hire.  Giuliani also claimed that his ex-wife would "attack" and "retaliate" against any female employee that Giuliani hired.

55.     Giuliani told Ms. Dunphy that his divorce would settle "any day now" and therefore the need to keep her employment secret and her pay deferred would not last long.

56.     Giuliani promised Ms. Dunphy that in the meantime, he would pay her in cash whenever he could so that she could support herself during the deferral period.

57.     During the interview, Giuliani offered Ms. Dunphy an additional inducement:  he had learned that she was a survivor of domestic abuse and he offered to represent her pro bono in connection with legal matters arising from those circumstances.  Giuliani later sent Ms. Dunphy an email confirming this arrangement, a redacted copy of which follows:



**Legal Retainer**

RUDOLPH GIULIANI                                                    Mon, Feb 25, 2019 at 12:16 AM
To: Elle Ashley ███████████████, Elle Ashley ███████████

This is to acknowledge that I have been retained since January 21, 2019 by Noelle Ashley Dunphy as her attorney to advise her on all legal matters and to analyze the legal issues presently pending.

Rudolph W. Giuliani

Sent from my iPhone

58.     Giuliani had served as the United States Attorney for the Southern District of New York.  Thus, his offer of pro bono legal representation was an important inducement of seemingly incalculable value due to his experience and recognition in New York legal circles.

59.     At the end of the interview, Ms. Dunphy accepted Giuliani's job offer and reluctantly agreed to defer her pay and keep her employment non-public, based on: (i) Giuliani's job offer (including the salary of $1 million per year and expenses); (ii) his claim that his divorce would be finalized soon; and (iii) his promise that he would represent Ms. Dunphy pro bono.

11

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

60.     Ms. Dunphy was excited, and she called her parents soon after being hired to tell them about her new job and salary.

61.     But unbeknownst to Ms. Dunphy, Giuliani apparently decided during the interview that he would use the job offer and his representation as a pretext to develop a quid pro quo sexual relationship with Ms. Dunphy.  He was later recorded telling Ms. Dunphy, "I've wanted you from the day I interviewed you."

**E.     Ms. Dunphy Begins Working For The Giuliani Defendants.**

62.     Right after the job interview on January 21, 2019, Giuliani required that Ms. Dunphy attend a work-related meeting with his team and certain of Giuliani's Ukrainian associates to discuss her work for the Giuliani Companies.

63.     During this meeting, Giuliani drank to excess, and he pressured Ms. Dunphy to drink.

64.     After a long first day on the job, Giuliani told his bodyguard to take a separate car so he could have privacy in the back seat with Ms. Dunphy as his limo service drove her home in a black SUV.  Ms. Dunphy was surprised by this request from her new boss.

65.     After the bodyguard left, Giuliani kissed Ms. Dunphy and asked if he could enter her home.

66.     Ms. Dunphy was stunned and shaken.  She politely declined and thanked him for her new job and his legal representation.  As he was preparing to leave, Giuliani told Ms. Dunphy that since they would be working from different locations that week, he would like it if Ms. Dunphy sent him some flirtatious photos.  Giuliani's conduct seemed strange, but Ms. Dunphy still had no idea of what was to come.  After his car left, she went into her apartment, locked the door, and tried to make sense of what had just happened.

12

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

67.     After dropping Ms. Dunphy off, Giuliani called Ms. Dunphy five times that same evening.

**F.**     **Giuliani Begins Asking Ms. Dunphy Bizarre And Intrusive Sexual Questions Under The Guise Of Providing Legal Advice.**

68.     At around the same time that Ms. Dunphy began working for Giuliani and the Giuliani Companies, Giuliani and Ms. Dunphy began working together on her legal matters.

69.     Under the guise of providing Ms. Dunphy legal advice, Giuliani started asking Ms. Dunphy for extremely personal details relating to her past, including explicit details about prior sexual encounters.

70.     Ms. Dunphy was disturbed by these personal questions, but Giuliani claimed that this information was necessary for his "research" in connection with her case.

71.     As Ms. Dunphy would soon learn, Giuliani's probing questions were not designed to help him provide legal advice.  Rather, Ms. Dunphy would come to understand that Giuliani was aroused by discussing Ms. Dunphy's sexual history and violent relationships.  Ms. Dunphy did not know it yet, but Giuliani would force her to repeat the cycle of abuse she had suffered.

**G.**     **Giuliani Subjects Ms. Dunphy To A Sexually-Charged And Hostile Work Environment, Repeatedly Assaults Her, And Refuses To Pay Her Salary.**

72.     After Giuliani hired Ms. Dunphy on January 21, 2019, Giuliani called Ms. Dunphy almost daily, often repeatedly, to discuss current events and business-related issues.  For example, Giuliani called Ms. Dunphy 14 times on January 24, 2019.

73.     Giuliani often required that Ms. Dunphy discuss business and current events with him on the phone for eight to ten hours a day, sometimes late into the evening.  Thus, Ms. Dunphy began working long hours for Giuliani and his Companies.

74.     Because Giuliani was both her boss and her lawyer, she felt that she had to respond as he required.

13

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

75.    On January 25, 2019, Giuliani paid to fly Ms. Dunphy to New York on a semi-private chartered plane.  Giuliani used an employee of the Giuliani Companies, JoAnne Zafonte, to make these travel arrangements.  Copies of records related to these travel arrangements are annexed hereto as Exhibit B.

76.    That evening, Giuliani, travelling with his security team, met Ms. Dunphy at the airport.  Giuliani smelled of alcohol.  They had a business dinner that night and planned to travel to the office for work that upcoming Monday.

77.    Giuliani insisted that Ms. Dunphy stay in a guest suite in his Upper East Side apartment.  Ms. Dunphy was surprised by this unusual request, but Giuliani assured her that employees often slept in his guest suite, which included a private bedroom and private bathroom.

78.    Ms. Dunphy was uncomfortable with this arrangement and tried to secure other accommodations.  She asked her family and friends for places to stay in New York.  But Giuliani insisted that she stay in his apartment.  Since Giuliani was her boss and attorney, she felt pressured to do as he asked and ultimately agreed to stay in his guest suite temporarily.

79.    Upon arrival at Giuliani's apartment, Ms. Dunphy was surprised to find that Giuliani had alcoholic beverages ready for them.

80.    Ms. Dunphy was not much of a drinker, but Giuliani pressured her to drink with him.  Giuliani offered Ms. Dunphy scotch, which she declined because she virtually never drank hard alcohol.  Undeterred, Giuliani poured them both glasses of red wine.  In an effort to be polite, Ms. Dunphy accepted the wine.  Giuliani and Ms. Dunphy each drank two or three glasses of wine.

81.    Giuliani was substantially larger than Ms. Dunphy, who was a women's size small or medium at the time.

82.    Ms. Dunphy became intoxicated more easily than Giuliani because of her smaller size and the fact that she rarely drank, while Giuliani often drank large quantities of alcohol.

14

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

83.   After finishing their drinks, Ms. Dunphy went to the guest suite alone.  She put her suitcase on the bed, closed the door to the room, and took a shower.

84.   When Ms. Dunphy got out of the shower, she was startled to see that Giuliani had entered the guest suite, uninvited.  She was still intoxicated.

85.   Ms. Dunphy was frightened.  She said she wanted to get dressed, unpack, and settle in.  She asked for privacy.  She said she would meet him in the living room when she was ready.  But Giuliani would not leave.  He sat on the bed and pulled down his pants.  The following screenshot from the film *Borat: Subsequent Moviefilm* depicts Giuliani acting in a similar manner to how he acted with Ms. Dunphy:



86.   Giuliani then pulled her head onto his penis, without asking for or obtaining any form of consent.  He held her by her hair.  It became clear to Ms. Dunphy that there was no way out of giving him oral sex.  She did so, against her will.

87.   Ms. Dunphy was shocked and saddened by what had happened.  She did not want to have any sexual encounter with Giuliani, of any kind.  But Ms. Dunphy felt extreme pressure to go along with Giuliani's demands because she could not lose her promised salary or her legal representation by the uniquely qualified and connected lawyer.

15

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

88.    After pressuring her into performing oral sex, Giuliani required Ms. Dunphy to accompany him to a late dinner with Giuliani's friend and business associate Lev Parnas. Ms. Dunphy asked Giuliani for the name of the Human Resources director, because she was considering reporting what had happened.  Giuliani said that he did not have a Human Resources department and bragged that no one would ever sue him because he was connected to President Trump, and he had private investigators who would punish anyone who complained.

89.    They went to the work dinner, which involved discussions about various matters including media relations, certain legal issues, and the political climate.

90.    Over the following two days (Saturday and Sunday), Giuliani and Ms. Dunphy worked from his residence.  They sat at the dining room table in his three-bedroom penthouse apartment, and sometimes worked from the living room couch.  Her tasks that weekend included bringing him scotch on demand and brainstorming ideas for interviews, shows, and Netflix series.

91.    She also reviewed her contacts with entertainment industry professionals, sought their advice, analyzed various options, and researched documentary makers and producers.  She later reached out to certain producers and had lengthy meetings with them about potential projects for Giuliani.

**H.    Giuliani Loads His Email Account Onto Ms. Dunphy's Computer.**

92.    Giuliani told Ms. Dunphy that part of her duties would involve monitoring his email, notifying him about important emails, working with him to craft responses if needed, reminding him about scheduled meetings and appearances, and keeping track of files in case he needed them.

93.    Therefore, Giuliani added one of his work email accounts into Ms. Dunphy's email program on her computer, typing his password onto her computer.

16

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

94.    Once Giuliani's email account was loaded onto Ms. Dunphy's computer, at least 23,000 emails associated with the account, including many from before her employment with Giuliani, were stored on her computer.

95.    Since Giuliani gave Ms. Dunphy access to his email account, she had access to information that was, upon information and belief, privileged, confidential, and highly sensitive.

96.    For example, Ms. Dunphy was given access to emails from, to, or concerning President Trump, the Trump family (including emails from Donald Trump, Jr., Ivanka Trump, and Eric Trump), Trump's son-in-law Jared Kushner, former FBI director Louis Freeh, Trump lawyer Jay Sekulow, Secretaries of State, former aides to President Trump such as Steve Bannon, Reince Priebus, and Kellyanne Conway, former Attorneys General Michael Mukasey and Jeff Sessions, media figures such as Rupert Murdoch, Sean Hannity, and Tucker Carlson, and other notable figures including Newt Gingrich, presidential candidates for Ukraine, President Recep Tayyip Erdogan of Turkey, the Ailes family, the LeFrak family, Bernard Kerik, Igor Fruman, Lev Parnas, and attorneys Marc Mukasey, Robert Costello, Victoria Toensing, Fred Fielding, and Joe DeGenova.

97.    Ms. Dunphy understood that she was given access to these emails because she was employed by Giuliani and the Giuliani Companies. Indeed, although Giuliani and his surrogates have argued that Ms. Dunphy was not an employee of Giuliani or the Giuliani Companies, it is impossible to understand Giuliani's decision to give Ms. Dunphy complete access to (and copies of) these sensitive emails in any other context.

98.    As a lawyer, Giuliani sent and received emails containing privileged information that could not legally be shared with Ms. Dunphy if she were not an employee or consultant. Likewise, Giuliani's business often involved highly confidential information, and upon information and belief, there were confidentiality and nondisclosure agreements governing access

17

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

to some of this information.  Upon information and belief, those agreements barred Giuliani from sharing covered confidential information with someone who was not an employee or consultant.

99.    Giuliani never asked Ms. Dunphy to sign a non-disclosure or confidentiality agreement.

100.    As part of her work, Ms. Dunphy warned Giuliani about the dangers of his use of a regular Gmail account for his work, and about his habit of logging in from unsecured Wi-Fi networks in foreign nations and hotel lobbies.  She researched additional security measures for him, recommended them to him, and recommended experts to review his practices.

**I.    Giuliani Takes Ms. Dunphy To The Giuliani Companies' Office And Introduces Her As A New Employee, And Ms. Dunphy Continues Working For Defendants.**

101.    On Monday, January 28, 2019, Giuliani took Ms. Dunphy to the Giuliani Companies' office at 445 Park Avenue, 18th floor, New York, New York.

102.    At the office, Ms. Dunphy met several employees of the Giuliani Companies, including Giuliani's office manager JoAnne Zafonte, CEO of GSS John Huvane, Giuliani's head of security and friend Beau Wagner, attorney and Giuliani friend Dennison Young, and other staff.

103.    Ms. Dunphy continued working for Defendants during the course of that week.  For example, she began to coordinate travel arrangements for Giuliani through JetSmarter and negotiated a better plan and travel membership for him.  A true and correct copy of an email chain between Ms. Dunphy and a representative from JetSmarter dated January 30, 2019 is annexed hereto as Exhibit C.

104.    Ms. Dunphy also helped Giuliani prepare for an upcoming interview about Roger Ailes, the former Chairman of Fox News.  Ms. Dunphy tried to discourage Giuliani from participating in the interview because an employee of Fox had publicly alleged that Mr. Ailes sexually abused her and blackmailed her into becoming his "sex slave."  But Giuliani insisted that Ailes, who had passed away, was a "good friend" and he decided to participate in the interview.

18

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

Therefore, Ms. Dunphy prepared Giuliani to try to avoid or deflect from topics that could harm Giuliani's reputation, since part of her job was public relations for Giuliani. Ms. Dunphy accompanied Giuliani to this interview on January 29, 2019, to ensure Giuliani would not embarrass himself. This interview, including out-takes, was recorded.

105.   Giuliani kept working with Ms. Dunphy on her legal matters during this time. He edited and drafted affidavits, drafted and revised agreements for her, and communicated with the attorney who was making court appearances on Ms. Dunphy's behalf, Christopher Mukon, Esq. ("Mr. Mukon").

**J.     Giuliani Moves Ms. Dunphy's Work Location From The Companies' Offices To His Apartment And Continues Forcing Ms. Dunphy To Satisfy His Sexual Demands.**

106.   Over the next few days, Giuliani grew obsessive and would not let Ms. Dunphy out of his sight. He aggressively pursued a sexual relationship with Ms. Dunphy, and to facilitate this goal, he insisted that they work mostly at his apartment rather than the Giuliani Companies' offices. Giuliani made clear that satisfying his sexual demands was a requirement of Ms. Dunphy's employment.

107.   Giuliani preferred working with Ms. Dunphy in his home (and later from hotels) so that he could easily transition from work, to demanding sexual gratification, and back to work. Thus, Ms. Dunphy worked under the virtually constant threat that Giuliani might initiate sexual contact at any moment. Although Ms. Dunphy never knew when Giuliani might force sexual contact on her, upon information and belief, his actions were premeditated because, in many instances, he had taken Viagra or similar medication beforehand in preparation.

108.   Giuliani often demanded that she work naked, in a bikini, or in short shorts with an American flag on them that he bought for her. When they were apart, they would often work remotely via videoconference, and during those conferences Giuliani almost always asked her to

19

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

remove her clothes on camera. He often called from his bed, where he was visibly touching himself under a white sheet.

109. Throughout the employment and attorney-client relationship, Giuliani forced Ms. Dunphy to perform oral sex on him. He often demanded oral sex while he took phone calls on speaker phone from high-profile friends and clients, including then-President Trump. Giuliani told Ms. Dunphy that he enjoyed engaging in this conduct while on the telephone because it made him "feel like Bill Clinton."

110. Upon information and belief, some of the individuals who Giuliani spoke with on these calls were law clients of Giuliani (such as Mr. Trump), who were unaware that Ms. Dunphy was in the room and could overhear their conversations. At certain times, Ms. Dunphy overheard discussions which contained, upon information and belief, privileged or confidential information. These discussions included, for example, strategies as to how to deal with the investigation being conducted by Robert Mueller, and whether it might be possible to distract, intimidate, or otherwise dissuade Mueller from proceeding against Trump.

111. As part of her duties, Giuliani and Ms. Dunphy had discussions about documents that might help counteract the Mueller investigation, including reviewing documents labeled "Executive Privilege" and discussing potential legal arguments summarized in documents that Giuliani had received from another lawyer.

112. During this time, the work environment was regularly affected by Giuliani's chronic alcoholism. Giuliani was rarely sober around Ms. Dunphy. Since he regularly drank all day and night, it became part of Ms. Dunphy's responsibilities to fetch his alcohol and make sure that he was a "functioning alcoholic." She worked hard to ensure that despite Giuliani's excessive drinking, he did not appear drunk. If Giuliani became too drunk, it was her job to remove him from the situation. Ultimately, the most important and time-consuming aspect of Ms. Dunphy's

20

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

job became preventing Giuliani from creating media disasters. During this time, when Ms. Dunphy was not by his side, he appeared with hair dye dripping from his forehead, appeared wearing excessive amounts of self-tanner, and hosted a press conference in the parking lot of Four Seasons Total Landscaping.

113. Giuliani began to tell Ms. Dunphy that he loved her. Often, this was while he was coercing her into performing oral sex on him. He sometimes also referred to her as a "best friend" and he often told her that he "needed" her. Due to Ms. Dunphy's vulnerable state, and the power imbalance between them as boss/employee and lawyer/client, she began to believe him. And Giuliani engaged in a pattern of conduct that was designed to make her financially and emotionally dependent on him, and to coerce her to remain as his secret employee.

114. Ms. Dunphy confided in a friend about the abuse she had experienced. She told her friend that Giuliani acted like performing oral sex was a requirement of her job, and that he pressured her for oral sex constantly. Ms. Dunphy also told the friend how she felt like she had no choice but to comply, given the circumstances.

**K.** **Giuliani Keeps Refusing To Pay Ms. Dunphy The Salary She Is Owed, But Strings Her Along With Small Cash Payments.**

115. All the while, Giuliani was telling Ms. Dunphy that he needed to keep deferring her pay and keep her employment secret, but he promised her that she would eventually be paid in full and receive credit for her work.

116. Giuliani also continued to tell Ms. Dunphy that his divorce would settle "any day," and then he and his Companies would make her whole by paying what she was owed.

117. To tide Ms. Dunphy over and keep her obedient to him, Giuliani sometimes paid Ms. Dunphy in increments of no more than $5,000 in cash, at random times. For example, Giuliani paid Ms. Dunphy $4,000 in cash on February 1, 2019, before she traveled from New York to Florida, as part of her "deferred pay."

21

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

118.    Giuliani also authorized certain of Ms. Dunphy's business expenses to be paid by using a corporate credit card for one of the Companies.  These expenses included, for example, Uber and Lyft expenses for work-related travel.

119.    To bolster his claims about the need to keep Ms. Dunphy's employment "secret," Giuliani told Ms. Dunphy about other schemes he undertook to reduce the amounts he owed to his ex-wife.[9]  For example, Giuliani told Ms. Dunphy that someone owed him $1 million, but Giuliani hinted that instead of having the money paid to him, he had his friend, Robert Stryk, hold it for him.  He said, "Robert Stryk just got me a million-dollar payment."  This statement was recorded.

120.    Likewise, Giuliani told Ms. Dunphy about other instances in which he would have others receive and hold money that was due to him so that his ex-wife would not know that he received the money.  Upon information and belief, these individuals holding the money would give Giuliani cash from time to time so that the funds could not be traced to Giuliani.

**L.    Giuliani Continues Abusing Ms. Dunphy, While Also Continuing To Employ Her And Represent Her.**

121.    Starting around February 2019, Giuliani repeatedly demanded assurances from Ms. Dunphy of her loyalty, and began isolating her from others.  He forbade her from seeing or talking on the phone with anyone without his approval.

122.    During February 2019, Giuliani's habit of calling her obsessively continued, including approximately 34 calls on February 1, 2019, 19 calls on February 2, 2019, 44 calls on February 5, 2019, 32 calls on February 6, 2019, 28 calls on February 7, 2019, 36 calls on February 11, 2019, 50 calls on February 12, 2019, 53 calls on February 13, 2019, and 10 calls on February 14, 2019.

---

[9]    Giuliani stored emails relating to these schemes on Ms. Dunphy's computer.

22

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

123.    On February 6, 2019, Giuliani bought a smart battery case from Apple for Ms. Dunphy so that she could always be "on call" for him.  This ensured that Ms. Dunphy had no excuse not to respond to Giuliani, as her cellphone would constantly be charged.

124.    On February 7, 2019, Giuliani told Ms. Dunphy to take a note to remind him to pay taxes on a private jet ride he was gifted by a friend.  The same day, Giuliani told Ms. Dunphy, in her capacity as his employee, about a plan that had been prepared for if Trump lost the 2020 election.  Specifically, Giuliani told Ms. Dunphy that Trump's team would claim that there was "voter fraud" and that Trump had actually won the election.  This plan was discussed at several business meetings with Giuliani and Lev Parnas.

125.    That same day, Giuliani had Ms. Dunphy sit in on a speakerphone conversation about a potential business opportunity involving a $72 billion dollar gas deal in China.

126.    On February 9, 2019, as part of her job duties, Ms. Dunphy had a conversation with Giuliani about whether he should register under the Foreign Agents Registration Act ("FARA"), in anticipation of a meeting later that day with Lev Parnas to discuss a foreign business opportunity.  The following is a true and correct copy of a photo of Ms. Dunphy, Giuliani, and Mr. Parnas taken that day:



23

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

127.    On or about February 10, 2019, Giuliani reiterated his consent to audio recording of his conversations with Ms. Dunphy.  His consent was recorded.

128.    On February 11, 2019, Giuliani performed legal work for Ms. Dunphy, including talking with Mr. Mukon and discussing strategy related to her ongoing domestic violence litigation.  Despite holding himself out as Ms. Dunphy's attorney, upon information and belief, Giuliani never filed a notice of appearance on behalf of Ms. Dunphy in any of her ongoing matters.

129.    At the same time, Giuliani kept trying to control Ms. Dunphy.  On February 11, 2019, Giuliani texted Ms. Dunphy "you're mine" and "[n]obody will ever have you now":



130.    On February 14, 2019, Ms. Dunphy and Giuliani had a conversation via text message.  During the conversation, Giuliani referred to Ms. Dunphy as his "chief consultant," and he referred to her as his "chief consultant" when he introduced her around Miami's Trump Doral golf course.

131.    Around February 16, 2019, they reviewed Giuliani's emails with Ukrainian government officials, and again discussed the advisability of registering under FARA.  Ms. Dunphy offered to complete the registration for him.  Giuliani told her that he was able to break the laws because, he said: "I have immunity."

24

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

132.    He also asked Ms. Dunphy if she knew anyone in need of a pardon, telling her that he was selling pardons for $2 million, which he and President Trump would split.  He told Ms. Dunphy that she could refer individuals seeking pardons to him, so long as they did not go through "the normal channels" of the Office of the Pardon Attorney, because correspondence going to that office would be subject to disclosure under the Freedom of Information Act.

133.    On February 18, 2019, Giuliani requested bottles of alcohol around 10:00 a.m., and in her capacity as his assistant, Ms. Dunphy arranged to have it delivered to him.

134.    On February 18, 2019, Ms. Dunphy, in her capacity as Director of Business Development, told Giuliani that he should seek to remove certain Google search results that were unfavorable to him to help with his public relations and image.

135.    On February 19, 2019, Ms. Dunphy spoke with Giuliani about a proposal to provide paid presentations and speeches.

136.    On February 21, 2019, Giuliani called Ms. Dunphy 4 times, and he also texted her the following:



FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

137. On February 21, 2019, Giuliani and Ms. Dunphy worked together on her domestic violence litigation, while he drank scotch and groped her until he eventually demanded sexual gratification.

138. On February 23, 2019, Giuliani told Ms. Dunphy that he could "get in trouble with underage girls" if they were 16 but looked 20. This conversation was recorded. During the same conversation, Giuliani discussed work-related issues with Ms. Dunphy, including reimbursement of the hotels she booked on February 14, 2019. As his assistant, she arranged for his dry-cleaning orders.

139. On February 25, 2019, Giuliani forced Ms. Dunphy to have sexual intercourse with him for the first time. Before this, Ms. Dunphy had refused and avoided having sex with Giuliani, although he had forced her to engage in other sexual contact. But on February 25, Giuliani told Ms. Dunphy that he would not wait any longer to have sex with her.

140. Ms. Dunphy objected and told Giuliani repeatedly that she did not want to have sex. But Giuliani would not take "no" for an answer. He eventually forced her into having sexual intercourse with him. She never consented to intercourse, but she eventually stopped resisting because it was clear that he would not stop pressuring her.

141. Beginning in March 2019, Giuliani became more abusive toward Ms. Dunphy. He continually pressured her into sex, was unconcerned with obtaining Ms. Dunphy's consent, disregarded Ms. Dunphy's boundaries as a survivor of domestic violence and behaved in a hyperaggressive manner during sexual interactions. Giuliani disregarded Ms. Dunphy's request that his conduct stop and her pleas that physical violence, domineering behavior, and abusive language was triggering and re-traumatizing for her.

142. For example, during sex, he called her a "cunt," a "bitch," and "Rudy's slut," and discussed his interest in "BDSM" (which refers to bondage, dominance, sadism, and masochism)

26

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

with her.[10]  Ms. Dunphy repeatedly told Giuliani that she was not interested in participating in such conduct.  Indeed, Giuliani was well aware of Ms. Dunphy's aversion to physical violence or emotionally abusive language of any kind, real or simulated, because of his work as her attorney in connection with her domestic violence case.  Nevertheless, he continually talked about BDSM and violent sex, and demanded that she engage in such conduct.

143.   On March 3, 2019, Giuliani explained that he fantasized about Wendy Rhoades in the popular television show *Billions*, stating "she wears all that black shit, she's got a whip, and an electric prod."  Ms. Dunphy made it clear that she was not interested, and immediately changed the subject, commenting on the mosquitoes outside.  These statements were recorded.

144.   Giuliani previously tried to force her to watch BDSM scenes, and she refused.  Upon information and belief, Giuliani knew that his fixation on BDSM would make Ms. Dunphy uncomfortable because he had witnessed that Ms. Dunphy was unable to watch such scenes or other types of violence or degradation in films and television shows.  During such scenes, Giuliani watched Ms. Dunphy shake at the sounds, hide her eyes, and turn her head away.  In one incident, Ms. Dunphy refused to watch "The General's Daughter" with Giuliani, despite his claim that the film's violent sex that led to a female's death was "sexy."

145.   Giuliani's actions made Ms. Dunphy extremely uncomfortable, but because she had entrusted him with her case and because he was controlling her deferred pay, she felt she had no choice but to submit to his demands.

146.   On March 3, 2019, Giuliani and Ms. Dunphy spent the day working together on the Giuliani Companies' business, potential real estate investments, Giuliani's travel arrangements for

---

[10]   Giuliani often discussed this while comparing himself to Chuck Rhoades, the fictional U.S. Attorney for the Southern District of New York on the Showtime series *Billions*, who enjoyed such conduct.  Giuliani bragged that the character Chuck Rhoades—a deeply flawed character who wildly abuses his power—was inspired by him.

27

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

that week, and whether she would be traveling with him for their work.  In addition, Giuliani and Ms. Dunphy were working on contracts for Ms. Dunphy.  While discussing those documents, Giuliani initiated sex with Ms. Dunphy.

147.    On March 4, 2019, Giuliani and Ms. Dunphy again spent the day working together. Giuliani began that day by drinking Bloody Marys.  They both drank throughout the day while discussing business and Ms. Dunphy's ongoing case.  Giuliani became drunk, and fantasized about visiting a hotel with Ms. Dunphy, bizarrely saying during a recorded conversation that he would tell the doorman to wait outside with the luggage so that "we do it on the floor in the living room…we don't even make it to the bedroom.  All the clothes come off," and telling the doorman, "I need time alone with my girlfriend, with my daughter.  With my little girl."  This became part of a pattern in which Giuliani referenced Ms. Dunphy as his "daughter" in the context of sexual activity and made her extremely uncomfortable.

148.    During a discussion about Ms. Dunphy's case, Giuliani initiated sex with Ms. Dunphy.  While having sex, Giuliani kept talking about the case and told Ms. Dunphy that he would get the best settlement agreement for her.  Giuliani also smacked Ms. Dunphy in the face and then told her that the smack was "cute."  Since Ms. Dunphy and Giuliani had been drinking since the morning, Ms. Dunphy was intoxicated and could not have consented to sex with Giuliani.

149.    Giuliani told Ms. Dunphy that he wanted her to end her domestic violence litigation because he felt it was interfering with his sex life with her, and he did not want her to be "distracted" by it.  Giuliani promised Ms. Dunphy that he would give her $300,000 in exchange for her waiving her legal rights as against her abusive ex-boyfriend, and if she would "fuck me like crazy."  After realizing what he had said, Giuliani attempted to backtrack and stated, "we won't put that last part, we'll say for other consideration not appropriate [to] mention."  This conversation was recorded.

28

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

150.    On the same day, in anticipation of Trump being subpoenaed, Giuliani reviewed with Ms. Dunphy arguments about a sitting president's immunity from the criminal process. She worked to help organize his points as he talked out his theories on the standards that would govern judicial review if a grand jury subpoena were issued to Trump.

151.    The same day, Giuliani and Ms. Dunphy discussed a dinner that they would be attending that evening with the King of Spain, which was hosted at the home of José Francisco "Pepe" Fanjul. During the discussion, Ms. Dunphy referenced the fact that she was Giuliani's "employee," and Giuliani agreed. Giuliani explained that Ms. Dunphy was accompanying him as his employee-guest and his consultant. This conversation was recorded.

152.    Giuliani and Ms. Dunphy attended the dinner for the King of Spain later that night. At the dinner, Giuliani introduced Ms. Dunphy as his Director of Business Development to the Mayor of Palm Beach, various business executives, and other attendees.

153.    On March 5, 2019, Giuliani agreed to pay for Ms. Dunphy's rent since all of her income from Giuliani and the Giuliani Companies was deferred.[11]

154.    The same day, Giuliani reviewed with Ms. Dunphy his January 23, 2019 interview with Ukraine's former Prosecutor General Victor Shokin.

155.    Around March 9, 2019, Giuliani brought Ms. Dunphy to Mar-a-Lago where they had a friendly meeting with Trump, and Giuliani introduced Ms. Dunphy to Trump as Giuliani's employee. This encounter was fairly brief, since Giuliani expressed to Ms. Dunphy that he was concerned that Trump might try to poach her away from working for Giuliani.

156.    Later that day, Giuliani and Ms. Dunphy met with Newsmax CEO Chris Ruddy to discuss Giuliani potentially working to raise funds for the network.

---

[11]    Giuliani never made the promised payments.

29

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

157.    On March 10-11, 2019, Ms. Dunphy's job was to accompany Giuliani to a 2-day golf outing fundraiser for an autism-related charity at Old Palm Golf Club.  During the event, Giuliani and his security detail, Beau Wagner, were highly intoxicated and took an unprofessional and offensive video with an autistic young man.  Giuliani then drunkenly uploaded this video to Twitter.  Almost immediately and as part of her job duties, Ms. Dunphy deleted the video from Twitter, edited it to make it more presentable, and uploaded the new version.

158.    Throughout March 2019, Giuliani continued calling Ms. Dunphy constantly, often many times per day, to discuss work-related matters.  Ms. Dunphy kept working for Giuliani and his Companies in her business development and executive assistant roles.

159.    On March 13, 2019, she booked hotel rooms for him from March 15 to 19 at a Marriott Hotel for a business trip.

160.    On March 15, 2019, Giuliani again initiated sex with Ms. Dunphy while discussing her domestic violence case.

161.    On March 17, 2019, Giuliani and Ms. Dunphy worked together, discussed her domestic violence case, and Giuliani again initiated sex.  During their conversations that day, Ms. Dunphy and Giuliani discussed what her job title should be listed as in a forthcoming press release.  Giuliani told her that among other things, she should say "PR consultant to Rudy Giuliani."  Ms. Dunphy also worked to cancel and reschedule hotel reservations for Giuliani, and to coordinate flights with JetSmarter.  True and correct copies of Ms. Dunphy's correspondence with JetSmarter and Trump Hotels are annexed collectively hereto as Exhibit D.

162.    On March 17, 2019, after hours of drinking scotch, Giuliani told Ms. Dunphy that he had "an obsessive attraction" to Ms. Dunphy, and told her that "I'm Italian, remember? I'm extremely jealous and possessive."  These statements were recorded.

30

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

163.    The same day, Giuliani discussed private information about certain clients with Ms. Dunphy, discussed the Mueller Report with her, and discussed Mr. Trump's children Ivanka, Eric, and Donald Jr. and their spouses.

164.    On March 18, 2019, Giuliani purchased clothing for Ms. Dunphy from Neiman Marcus on his corporate American Express card, to control what Ms. Dunphy wore. This was part of a pattern in which Giuliani often demanded that Ms. Dunphy dress as conservatively as possible when out in public or at work events. He said that he did not want any other man looking at her, including his co-counsel and her attorney, Mr. Mukon. He even prevented Ms. Dunphy from ever speaking to Mr. Mukon in person.

165.    On March 19, 2019, Ms. Dunphy was beginning to struggle financially because Giuliani's divorce continued to drag on and therefore her salary continued to be deferred. Giuliani told her that he had to "straighten out his accounts" so that he could pay her in cash.

166.    On the same day, Giuliani told Ms. Dunphy that she could use his American Express card for a Lyft or Uber. Upon information and belief, the card used was a corporate credit card.

167.    Also on March 19, 2019, Giuliani told Ms. Dunphy that "I've wanted you from the day I interviewed you." This statement was recorded.

168.    The same day, Giuliani reiterated to Ms. Dunphy that he expected her to continue to be "at his beck and call." This statement was recorded.

169.    Throughout April 2019, Ms. Dunphy continued to monitor Giuliani's email and social media, and gathered press clippings, as part of her job. Giuliani and Ms. Dunphy remained in regular contact during this period, and Ms. Dunphy continued trying to find Giuliani lucrative business opportunities.

31

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

170.    Giuliani also sent Ms. Dunphy a written outline he prepared accusing U.S. Ambassador to Ukraine Marie Yovanovitch of corruption, and asked Ms. Dunphy for her thoughts on the outline.

171.    On April 9, 2019, Ms. Dunphy had a long phone call with a representative of JetSmarter, negotiating Giuliani's account with them.

172.    On April 23, 2019, Ms. Dunphy spoke with John Huvane, the CEO of Giuliani Partners, regarding potential clients for the Giuliani Defendants.  During this call, Ms. Dunphy and Mr. Huvane discussed Ms. Dunphy bringing in three high-paying clients for Giuliani, and an event for Giuliani in Washington, D.C.  Ms. Dunphy also mentioned that she had identified a healthcare firm that was looking to hire Giuliani as legal counsel and in an advisory role. Mr. Huvane instructed Ms. Dunphy to arrange for any meetings in New York, and that Giuliani could not lobby because he was not registered as a lobbyist, nor was he registered as required under FARA.[12]  Mr. Huvane also instructed her that Giuliani had the final word on any negotiations.

173.    On April 29, 2019, as Ms. Dunphy was monitoring Giuliani's email in accordance with her job, she discovered that Giuliani had emailed private information about her domestic violence case, which was protected by the attorney-client privilege, to Maria Ryan without Ms. Dunphy's consent.  Ms. Dunphy only learned this when Ryan responded to the email.

174.    This email upset Ms. Dunphy not only because she had trusted Giuliani as her attorney not to share her personal information, but also because it concerned a domestic violence matter, in which she was proceeding with court permission as a "Jane Doe."  It was therefore improper for Giuliani to reveal her identity to Maria Ryan, who had stopped working for him in 2018, and did not work on his legal matters.

---

[12]   Ms. Dunphy had encouraged him to register, but he refused because he claimed, "I have immunity."

32

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

175.     In May 2019, Ms. Dunphy continued working in her role as Director of Business Development and as Giuliani's executive assistant, monitoring his email and social media.  During that time, Giuliani discussed with Ms. Dunphy his work to try to have Ambassador Yovanovitch removed from her position at the request of a foreign oligarch.

176.     As part of her job duties, on May 2, 2019, Ms. Dunphy had further communications with the potential healthcare client, Brighton Health Plan Solutions, that she had discussed with Mr. Huvane.

177.     The same day, Ms. Dunphy emailed Giuliani a list of questions for her domestic violence litigation.

178.     On May 14, 2019, Ms. Dunphy was increasingly worried about her deferred pay, and she requested a formal employment agreement from Giuliani via email.  Giuliani did not respond.

179.     On May 24, 2019, Ms. Dunphy continued working with the healthcare company that she was pursuing as a potential client for Giuliani.

180.     On May 27, 2019, Ms. Dunphy emailed Giuliani about her concerns that he permitted Mrs. Ryan to access her confidential legal files.

181.     On May 29, 2019, Ms. Dunphy spoke to Giuliani about her concerns over her deferred pay and inability to rent an apartment.  Giuliani responded, "let me think about it" and "let me have a little time to process."  These remarks were recorded.

182.     On May 31, 2019, Ms. Dunphy text messaged Giuliani asking for a reference letter regarding the "consulting work I've done for you/Giuliani Partners" because the condo and coop boards where she was applying would require one.  Giuliani responded, "I cannot do that now":

33

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023



183.    Ms. Dunphy and Giuliani continued to exchange text messages that day, including messages regarding the intrusion into her confidential communications about her domestic violence litigation.  Giuliani did not deny that her information had been compromised.  Instead, he said that "it's too confusing right now."

184.    At around the same time, Giuliani directed Ms. Dunphy to delete her messages with him.  He directed Ms. Dunphy not to talk to the FBI about him and about various matters that she had witnessed while working for him, and he threatened that he had access to professional investigators who could make her look bad even though, Giuliani admitted, she was "very innocent."  Giuliani continued, "You've got to be smart enough to know what I have just said."  Ms. Dunphy interpreted these statements as threats and an attempt to intimidate her.

185.    Throughout June and July 2019, Ms. Dunphy continued monitoring Giuliani's email account as she was directed by Giuliani to do.  Giuliani asked Ms. Dunphy for help in Googling information about obstruction of justice, among other topics.

34

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

186.   On June 7, 2019, Ms. Dunphy reminded Giuliani that she was still waiting to be reimbursed for the Doral Hotel where they stayed and worked in February 2019 in connection with Giuliani's work for President Trump.  She also requested reimbursement of $4,500 for another work-related hotel stay and for clothing from Neiman Marcus that he insisted she have.  He did not respond to those emails, but he text messaged Ms. Dunphy at 2:09 a.m. the next morning regarding an event he had attended:



187.   On June 17, 2019, Ms. Dunphy followed up with Giuliani again regarding reimbursement.  When she mentioned possibly asking JoAnne Zafonte to issue the reimbursement, Giuliani told her "do not ask JoAnn to do anything.  U just have to wait."



188.   On June 16, June 18, June 23, and July 4, 2019, Ms. Dunphy alerted Giuliani about major typos in his public statements, and they fixed them together.

35

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

189.     On June 29, 2019, Ms. Dunphy emailed Giuliani regarding an offer for a podcast, as they had discussed when she was hired.  She told Giuliani that she "met with David Spady, the owner of Salem Media Group, and his company is interested in making you an offer to do podcasts through them."  A true and correct copy of this email is annexed hereto as Exhibit E.

190.     On July 8, 2019, Ms. Dunphy continued corresponding with Brighton Health Plan Solutions about potential opportunities for the Giuliani Defendants.

191.     On August 9, 2019, Ms. Dunphy and Giuliani attended a Trump fundraiser at Joe Farrell's estate in Bridgehampton.  At one point, Giuliani drunkenly kissed Ms. Dunphy in front of hundreds of people, including a stranger who came over and asked if Ms. Dunphy felt sexually harassed, stating that he was not raised to treat women like that.

192.     On August 13, 2019, Ms. Dunphy edited, compiled and sent Giuliani key portions of his appearance on Fox News.  They also discussed a fundraiser for Mr. Trump.

193.     On August 15, 2019, Ms. Dunphy contacted Philip Boyce at Salem Media regarding the offer for Giuliani's potential new podcast.  Salem Media offered Giuliani 50% of all advertising revenue generated.  Salem Media would also negotiate on his behalf for advertisers and would pay him monthly.

194.     On August 16, 2019, Ms. Dunphy contacted Mr. Boyce about the payment structure for the potential podcast.

195.     On August 18, 2019, Ms. Dunphy and Mr. Giuliani were alone together at his home office.  Mr. Giuliani was continuously drinking, and he got Ms. Dunphy intoxicated.  While having a conversation about current events, as was required of Ms. Dunphy for her job with Giuliani, Giuliani attempted to initiate sex with Ms. Dunphy.  Ms. Dunphy resisted.  Giuliani agreed that they "don't have to do it tonight.  [They] could do it some other time."  This conversation was recorded.

36

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

196.    However, approximately half an hour later, while Giuliani was drinking, he suddenly reversed course and aggressively initiated sex with Ms. Dunphy.  She objected repeatedly and said "no" and that she was "not ready."  Giuliani begged her to "put it in there" while he was touching her.  Ms. Dunphy told Giuliani that she was "too scared," but that did not stop Mr. Giuliani.  Eventually, Giuliani put himself inside of Ms. Dunphy.  Ms. Dunphy was too intoxicated to consent to intercourse.

197.    After this encounter, Ms. Dunphy spoke with a friend and said that she felt violated by Giuliani's unwanted sexual advances to which she had repeatedly said "No."

198.    On August 20, 2019, Ms. Dunphy continued her efforts to secure a podcast and other paid work for Giuliani with Salem Media.  Mr. Boyce suggested that Giuliani conduct a tour of Jerusalem, Israel.  True and correct copies of these email exchanges are annexed hereto as Exhibit F.

199.    Giuliani and Ms. Dunphy often discussed how lucrative his business engagements were and how Ms. Dunphy's role could enhance those opportunities.

200.    Upon information and belief, at some point at the end of summer 2019, Ms. Dunphy's job of monitoring Giuliani's email was given to another employee.  Giuliani told Ms. Dunphy that her main priority was to safeguard files, monitor media and Tweets, and generate revenue for the Defendants, which he'd be able to accept when the divorce ended, purportedly "any day now."

201.    On September 4, 2019, Ms. Dunphy and Giuliani discussed a potential business opportunity that involved Giuliani giving a guided walking tour of monuments in and around New York City, which could be filmed and sold to a streaming platform.  Based on Ms. Dunphy's experience with Netflix streaming business projects, she believed that this would be a lucrative opportunity.

37

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

202.    On September 5, 2019, Ms. Dunphy memorialized this proposal in an email and a text message to Giuliani.  True and correct copies of the email and text messages dated September 5, 2019, are annexed collectively hereto as <u>Exhibit</u> G.

203.    On September 6, 2019, Ms. Dunphy and Giuliani discussed the tour again, but Giuliani confirmed that he did not want to "do anything new or big until his divorce was settled."

204.    On September 12, 2019, Ms. Dunphy emailed Giuliani, Ms. Zafonte, and Mr. Huvane regarding hiring movers to bring her items from the office to her parents' house on Long Island, which they did.

205.    The same day, Ms. Dunphy received an email from David Wilcox of Central American Nickel ("CAN") responding to a proposal by Ms. Dunphy about a meeting in Washington, D.C. to discuss the company.  Wilcox was seeking to discuss his business with politicians and other high-ranking officials, including Giuliani.

206.    Throughout September and October, 2019, Ms. Dunphy had further discussions with Mr. Wilcox on behalf of Giuliani.

207.    Between September and November 2019, Ms. Dunphy had a series of discussions with William Danzell, the Chief Financial Officer of a technology company, who sought to hire Giuliani Partners for consulting work.  She discussed this potential project with Giuliani via phone.

208.    On September 22, 2019, they spoke via phone to go over his upcoming schedule and the logistics of his meetings that week with the Prime Minister of Libya, the foreign minister of Morocco, the foreign minister of Bahrain, and Iranian clients.

209.    On October 22, 2019, Ms. Dunphy received a voicemail from the FBI regarding an investigation they were conducting into Giuliani.  The FBI was apparently aware that she was working for Giuliani and sought to interview her.  The FBI was clear that Ms. Dunphy was considered a witness and was not a target of the investigation.

38

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

210.    On November 19, 2019, Ms. Dunphy went to Giuliani's home office, and they spoke.  Giuliani promised Ms. Dunphy that he would officially put Ms. Dunphy on the books and would "straighten it [*i.e.*, her employment situation] out."  Giuliani and Ms. Dunphy discussed Giuliani's increasing legal concerns, including his fear that Lev Parnas was "turning on him" in connection with the FBI investigation.  Ms. Dunphy told him that the FBI had come to her family's home in Florida that day seeking to question her.  Giuliani informed Ms. Dunphy that his friend and private detective, Bo Dietl, had already told him the specific FBI agents who were involved.  Ms. Dunphy was concerned that Giuliani was apparently so powerful that his investigators had secret information, including the names of the FBI agents who had just appeared at her family's Florida home.  Giuliani demanded that Ms. Dunphy not talk to or cooperate with the FBI.  Giuliani told Ms. Dunphy that they are all "after him" and that one or two of them are "going to get totally destroyed."  This situation made Ms. Dunphy confused and fearful, and added another layer of tension to a work environment that was already outrageously hostile.[13]

211.    The same day, Giuliani told Ms. Dunphy that he was in love with three or four women.  He also told her that he was attracted to Christianne Allen, his 20-year-old employee who was more than 50 years his junior.  He told Ms. Dunphy that he had "a certain sexual attraction to" Ms. Allen, that he fantasized about her, and that he kissed Ms. Allen on the lips but did not "consummate" the relationship.  He said that his attraction to Ms. Allen was "different" from his attraction to Mrs. Ryan or Ms. Dunphy, whom he said he "just could not control" himself around. This conversation was recorded.

---

[13]    From this point on, Giuliani often spoke to Ms. Dunphy about he FBI's investigation of him, and Ms. Dunphy understood that participating in these discussions was part of her work for him. He told her that if the FBI sought to interview her, she should "not remember" anything, and should claim that she did not know Giuliani.  Ms. Dunphy refused to agree to lie to the FBI, which angered Giuliani.

39

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

212. Giuliani also noted that Mrs. Ryan—who had sought to undermine Ms. Dunphy's employment with Defendants—had apparently blocked Ms. Dunphy's number in Giuliani's cell phone and changed the name of her contact to "fake." During this conversation, Giuliani reentered Ms. Dunphy's number in his phone and told Ms. Dunphy that he would change the name for her contact from "fake" to "Faye" because "that'll screw her [*i.e.*, Mrs. Ryan] up." This conversation was recorded.

213. Throughout the workday on November 19, 2019, Giuliani insisted that Ms. Dunphy drink alcohol until she became intoxicated. While Giuliani and Ms. Dunphy were working, he initiated aggressive sexual intercourse with Ms. Dunphy. Ms. Dunphy was too intoxicated to consent to intercourse and did not consent to intercourse. During this interaction, he made a comment that he thought of her as his daughter. This comment was recorded. Ms. Dunphy was extremely disturbed by this remark, which was eerily similar to the one he had made on March 4, 2019, as referenced above.

214. During that interaction, Giuliani said to Ms. Dunphy, "You're my consultant. Just go down on me." This statement was recorded.

215. On December 17, 2019, Ms. Dunphy and Giuliani again worked together. Giuliani told Ms. Dunphy "You're so easy to take advantage of," that he was "crazy" but that he would "always take care of" her. Even so, he warned Ms. Dunphy that Maria Ryan, with whom he was having an affair, "pushed her out."

216. During the same conversation, Giuliani promised Ms. Dunphy he would get her "some cash."

217. On January 20, 2020, Giuliani bragged to Ms. Dunphy that President Trump was "acting stupid" while looking at women that Giuliani brought around, and that Melania was so upset that she poked him.

40

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

218.    On January 22, 2020, Giuliani reiterated to Ms. Dunphy that he would figure out a way to pay her for her work, but that it would have to be in cash.

219.    The next day, Giuliani told Ms. Dunphy that he could not pay her in cash until the following week because his divorce was not finalized, and he did not want his ex-wife finding out about "any of this."

**M.      Ms. Dunphy Works For Giuliani Remotely In 2020 During The Covid-19 Pandemic, And Giuliani Demands That She Appear Naked During Videoconferences.**

220.    Starting in around March 2020, the Covid-19 pandemic forced Ms. Dunphy and Giuliani to work remotely.  They worked on many business-related matters, including, for example, his image, branding, and social media, and his concern that Maria Ryan was blackmailing him with respect to his conduct related to Ukraine and "paper trails" related to foreign money.

221.    During almost every videoconference, Giuliani directed Ms. Dunphy to take her clothes off in front of the camera.

222.    Throughout this period, Ms. Dunphy continued to analyze and compile Giuliani's press clippings and manage his social media pages, and continued working on generating new sources of business for him to pursue once his divorce was over.

223.    Giuliani also continued to provide legal advice to Ms. Dunphy.

**N.      Giuliani Terminates Ms. Dunphy Without Paying Her Promised Wages.**

224.    By January 2021, Ms. Dunphy still had not been paid what she was promised and owed for the work she had performed for Giuliani and the Giuliani Companies over the course of two years.

225.    Giuliani's failure to pay Ms. Dunphy had become increasingly concerning to her. While he claimed that money was tight, he continued to enjoy a lavish lifestyle that included, upon information and belief, memberships at approximately 16 private clubs, owning five

41

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM    INDEX NO. 650033/2023
NYSCEF DOC. NO. 18                                  RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM    INDEX NO. 650033/2023
NYSCEF DOC. NO. 10                                  RECEIVED NYSCEF: 05/15/2023

unencumbered homes, traveling by private plane, and spending extravagantly on personal items such as cigars and alcohol.

226.    Around this time, Giuliani stated, "When I walked out of the White House on the night before he was going to leave, I could feel pain" and thought, "Well, not gonna be back here for four years.  That's for sure."  Ms. Dunphy understood these comments as an acknowledgment by Giuliani that Donald Trump would be unable to prove that the election had been "stolen," despite what Giuliani and Trump had been claiming publicly.

227.    On January 7, 2021, the day after the January 6 insurrection in Washington, D.C., Ms. Dunphy contacted Giuliani, stating "I feel scared of you, and I don't want you trying to hurt me….  Now the country has just gone through chaos, and I pray I never see something like that again."

228.    On January 31, 2021, Ms. Dunphy's employment with the Giuliani Defendants was terminated as informally as it began, in retaliation for her having found the courage to express her fear of him.

229.    Giuliani sent Ms. Dunphy a text message stating, "It was a useless call if you write me things like you're afraid of me and you won't sue me.  There is simply no reason for you to do either and it's best if we not communicate.  You have nothing to be afraid of and nothing to sue me for.  I have no desire to be in communication with someone who thinks that.  I'm sorry you do, but I can't indulge your thinking which is totally unjustified.  I have no animosity to you.  You can feel safe that I would do nothing to hurt you and I feel sorry for you.  I had hoped you got over your unjust claims of being afraid and wanting to sue.  This is just not a basis for any form of communication.  Sorry, I tried to make it sensible."

230.    Giuliani terminated Ms. Dunphy's employment the same day his long-time mistress and former employee, Maria Ryan, quit her full-time job in New Hampshire.

42

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

231.    Ms. Dunphy has not performed any work for Giuliani or the Giuliani Companies since January 31, 2021, although she continues to store files, recordings, and information.

232.    Ms. Dunphy contacted Giuliani on May 20, 2022 via email to try to "resolve things."  Giuliani did not respond.

233.    Ms. Dunphy was extremely successful in her work for Defendants, having generated millions of dollars' worth of potential business, including from Salem Media, companies producing streaming television series, energy companies, Brighton Health Plan Solutions, insurance firms, Central America Nickel, film producers, and investors for potential litigation funding.  Likewise, Ms. Dunphy excelled at the other tasks that were required of her as Giuliani's assistant and in dealing with his media-related needs.  She also procured substantial savings for Defendants by negotiating business-related refunds and deals.

**O.    Throughout Ms. Dunphy's Tenure, Giuliani Made Sexist, Racist, And Other Highly Distressing And Offensive Comments Which Created And Added To The Hostile Work Environment.**

234.    During Ms. Dunphy's work for Defendants, Giuliani often made outrageous comments that created and added to the hostile work environment that Ms. Dunphy was forced to endure.  Ms. Dunphy found these comments revolting, but there was little she could do to stop them given the lack of any Human Resources personnel and the extraordinary degree of control that Giuliani had wielded over her as her boss and lawyer.

235.    For example, Giuliani made the comments described below, many of which were recorded:

   a.   Giuliani made derogatory comments about Jewish men and implied that their penises were inferior due to "natural selection."

   b.   Giuliani told Ms. Dunphy that "black guys hit women more than anybody else does… and so do Hispanic guys – it is in their culture."

43

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

c.  Giuliani said, "Jews want to go through their freaking Passover all the time, man oh man.  Get over the Passover.  It was like 3,000 years ago.  The red sea parted, big deal.  It's not the first time that happened."

d.  Giuliani made comments about "freakin Arabs" and Jews.

e.  Giuliani demeaned and sexualized Hillary Clinton and mocked her body.

f.  Giuliani demeaned and sexualized Margaret Thatcher and wondered about the effect she would have on his penis.

g.  Giuliani said, "If my life depended on it, if I had to make love to Nancy Pelosi, I couldn't do it.  I'd have to die."

h.  Giuliani referred to employee Vanessa Ryan, who is Maria Ryan's daughter, as "fat" and said that he felt bad for her because she was fat.  He further said he was "trying not to feed" her.

i.  Giuliani disparaged a female lawyer because of her breast size.

j.  Giuliani made a series of derogatory remarks about the LGBTQ community, including:

   i.  Giuliani claimed that Mayor Michael Bloomberg "became gay" because his wife left him.

   ii.  Giuliani named a prominent Republican as gay.

   iii.  Giuliani used the word "fag" to refer to actor Matt Damon.

   iv.  Giuliani mocked Senator Elizabeth Warren as "in search of a gender," stating:  "Pocahontas was a really hot babe, and Warren does not look like a babe.  She looks like a person in search of a gender."  Giuliani later said he was "very hot" for Warren.

44

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

    v.   Giuliani named a prominent lawyer who he believed would require $10 million for gay sex.  Giuliani then insisted that he was the only one of his male friends who would turn down any amount of money to have sex with a man.

k.   Giuliani said to Ms. Dunphy, at various times, in statements that were recorded:

    i.   "I'm gonna make it a little painful."

    ii.   "Stick it up your ass."

    iii.   "You're a fucking slut."

    iv.   You're my bitch.

    v.   "I'm gonna get my cock in there."

    vi.   "Be a slut! Be Rudy's slut!"

    vii.   Giuliani called Ms. Dunphy a "whore."

    viii.   Giuliani said, "I want to own you officially. Legally. With a document."

    ix.   "I can't control myself.  I lose control.  I think of you all the time.  I'm unable to control it.  I'm addicted."

    x.   "I can't think about you without getting hard.  Even when I think about how smart you are, I get hard."

    xi.   Giuliani stated that he would "get in trouble with underage girls" if they were 16 but looked 20.

    xii.   "I think of you as my daughter.  Is that weird?"—which Giuliani said while engaging in sexual contact with Ms. Dunphy.

45

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

xiii.  Giuliani told Ms. Dunphy that she was "his" and he had purportedly "been too easy on [her]."

236.    These statements are just some examples of the inappropriate comments that Giuliani made to Ms. Dunphy while she worked for Defendants.  There are many others.  These types of comments made Ms. Dunphy extremely uncomfortable and contributed to a hostile work environment.

237.    Giuliani's constant fear of the FBI also contributed to inappropriate demands on Ms. Dunphy as his employee.  As discussed above, he demanded that she falsely tell the FBI that she did not know him if they interviewed her.  Her refusal to mislead the FBI angered Giuliani and added to the already-hostile working environment in which she was forced to operate.

**P.    Ms. Dunphy Has Suffered Substantial Damages Due To Giuliani's And His Companies' Misconduct.**

238.    As discussed above, throughout Ms. Dunphy's employment, she was continually subjected by Giuliani to a hostile work environment, misogynistic, racist and antisemitic communications, constant sexual attacks, threats when she brought up the salary she was owed, and threats when she finally found the courage to confront him with her fears and the possibility of legal action.  She had kept her job (and the prospect of being paid) while she was "obedient," but when she finally protested Giuliani's mistreatment of her, Giuliani terminated her without notice, without pay, and without discussion.

239.    While Ms. Dunphy was working for Defendants, Giuliani's conduct in isolating her and keeping her employment secret discouraged her from reporting Giuliani's on-the-job abuses.

240.    Ms. Dunphy continues to believe that Giuliani's network, cronies, and henchmen are vast and powerful, and Ms. Dunphy remains fearful of additional retribution from the Defendants.

46

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

241.    As a direct result of Defendants' misconduct as set forth above, Ms. Dunphy has suffered, and continues to suffer severe emotional distress, humiliation, anxiety, and post-traumatic stress disorder, along with irreparable damage to her career.

242.    Ms. Dunphy has also been deprived of her lawful wages.  She worked for Giuliani and the Giuliani Companies as Director of Business Development and as executive assistant to Giuliani from January 2019 until her termination on January 31, 2021.  At the promised salary of $1 million per year, she should have been paid approximately $2 million during her tenure with Giuliani and the Giuliani Companies.  But Giuliani only paid her approximately $12,000 in cash and reimbursed some (but not all) of her business expenses, leaving unpaid wages in the amount of approximately $1,988,000.

243.    Upon information and belief, Giuliani made small cash payments to Ms. Dunphy to entice her to keep working for him and remain obedient to him in the hopes that she would one day be paid in full, and continue acceding to his demands.

244.    As a direct result of Defendants' wrongful conduct, Ms. Dunphy has been deprived of her wages, and is entitled to liquidated damages, punitive damages, attorneys' fees, and statutory damages, together with reimbursement for business expenses.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Crime of Violence Motivated by Gender – New York City Victims of Gender-Motivated Violence Protection Act, N.Y.C. Admin Code § 10-1101 *et seq.* As Against Giuliani)**

245.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

246.    Giuliani's conduct, including but not limited to, sexual and other assaults (including forcing Ms. Dunphy to perform oral sex on him and forcing Ms. Dunphy to have sexual intercourse with him), constitute "crimes of violence" and "crimes of violence motivated by gender" against

47

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

Ms. Dunphy as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 10-1101 *et seq.* (2017).

247.    Giuliani's conduct constitutes crimes of violence against Ms. Dunphy motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

248.    Giuliani's gender-motivated animus towards women is demonstrated by, among other things, his sexually abusive treatment of Ms. Dunphy and his comments about women.

249.    As a direct and proximate result of the aforementioned conduct, Ms. Dunphy has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Battery As Against Giuliani)

250.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

251.    Giuliani engaged in intentional, and nonconsensual touching and committed battery against Ms. Dunphy by: (i) forcing her to perform oral sex on him; (ii) forcing her to have sexual intercourse with him; and (iii) otherwise touching her without her consent.

252.    Giuliani's physical contact with Ms. Dunphy was offensive, harmful and wrongful.

253.    Giuliani's conduct directly and proximately caused harm to Ms. Dunphy, including but not limited to pain and suffering, lasting psychological harm, loss of dignity, and humiliation.

254.    Giuliani's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.25) sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).

48

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

255.    Ms. Dunphy's claim for battery is timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

256.    As a direct and proximate result of the aforementioned conduct, Ms. Dunphy has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Assault As Against Giuliani)**

257.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

258.    Giuliani committed assault against Ms. Dunphy by intentionally threatening or attempting to engage in battery which caused her to apprehend and fear bodily harm or offensive contact of her by Giuliani.  Giuliani engaged in imminent physical gestures signifying a threat.

259.    Giuliani knew that these acts would cause Ms. Dunphy to apprehend harmful or offensive conduct, and she reasonably apprehended that harmful or offensive conduct would occur. Giuliani was capable of carrying out the attempted or threatened conduct.

260.    Giuliani's conduct caused Ms. Dunphy to live in fear of physical and sexual violence.

261.    As a direct and proximate result of the aforementioned acts, Ms. Dunphy has sustained, and will continue to sustain, *inter alia*, pain and suffering, psychological and emotional distress, humiliation and loss of career fulfillment.

262.    Giuliani's actions constitute sexual offenses as defined in Article 130 of the New York Penal Law, including but not limited to rape in the first degree (§ 130.35), rape in the third degree (§ 130.55) sexual abuse in the first degree (§ 130.65), sexual abuse in the third degree (§ 130.55), sexual misconduct (§ 130.20), and forcible touching (§ 130.52).  Ms. Dunphy's claim for assault is thus timely under the Adult Survivors Act, N.Y. C.P.L.R. § 214-j.

49

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

263.    As a direct and proximate result of the aforementioned conduct, Ms. Dunphy has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Gender Discrimination and Sexual Harassment Under the New York State Human Rights Law as Against all Defendants)

264.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

265.    New York Executive law Section 296(1)(a) provides that: "It shall be an unlawful discriminatory practice… [f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex… to refuse to hire or employ or to bar or discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment."

266.    Giuliani and the Giuliani Companies, jointly and severally, were Ms. Dunphy's employer and Ms. Dunphy was employed by some or all of the Giuliani Companies.  Defendants suffered and permitted Ms. Dunphy to perform work for them.

267.    Giuliani had the power to control Ms. Dunphy's work assignments.  He directed her to perform work for him and the Giuliani Companies.

268.     Among other matters, Giuliani instructed Ms. Dunphy to: 1) work on developing prospective business opportunities for him and the Giuliani Companies, 2) monitor his email account, 3) monitor his social media accounts, 4) handle his travel arrangements, and 5) handle his public relations.

269.    Giuliani had the power to hire Ms. Dunphy and terminate Ms. Dunphy's employment.  Giuliani terminated Ms. Dunphy's employment on or about January 31, 2021.

50

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM          INDEX NO. 650033/2023

NYSCEF DOC. NO. 18                                        RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM          INDEX NO. 650033/2023

NYSCEF DOC. NO. 10                                        RECEIVED NYSCEF: 05/15/2023

270.    Defendants discriminated against Ms. Dunphy in the terms and conditions of her employment on the basis of her gender in violation of the NYSHRL by subjecting Ms. Dunphy to disparate treatment based upon her gender including, but not limited to, subjecting her to assault, battery, sexual harassment, and a hostile work environment.

271.    Ms. Dunphy was subjected to inferior treatment and terms and conditions of her employment because of her gender. Defendants' conduct altered the condition of Ms. Dunphy's employment and created an offensive and abusive work environment.

272.    Giuliani engaged in sexual and other harassment of Ms. Dunphy and the Giuliani Companies failed to comply with New York State requirements and to prevent sexual harassment by, among other matters, failing to have a compliant non-discrimination policy, failing to train employees such as Giuliani, failing to provide a viable complaint procedure and failing to take preventive action despite Giuliani's known conduct.

273.    Defendants engaged in discriminatory and harassing conduct by creating and permitting the hostile, intolerable, offensive and abusive workplace and permitting Giuliani's acts.

274.    As a direct and proximate result of the discriminatory, harassing, and abusive conduct of the Giuliani Companies, Ms. Dunphy is entitled to compensatory damages including but not limited to future wages, and emoluments of employment, as well as damages for mental anguish and humiliation.

275.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights, entitling her to an award of punitive damages.

276.    Defendants are jointly and severally liable for damages including but not limited to compensatory and punitive damages, interest, attorneys' fees and civil penalties.

51

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Hostile Work Environment Animated by Discrimination Under the New York State Human Rights Law as Against all Defendants)**

277.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

278.    New York State Executive Law § 296, *et seq.* prohibits discrimination and harassment based on protected categories, including but not limited to being a victim of domestic violence, race, religion, national origin and gender.

279.    Throughout her employment, Giuliani subjected Ms. Dunphy to harassing comments based on protected categories.  As a result, she was subjected to a pervasively and severely offensive work environment.

280.    Along with being subjected to verbal and other sexually abusive conduct, comments and slurs based on gender, she was subjected to a harassing environment based on other protected categories. Throughout her employment, Giuliani continually directed comments to her, including but not limited to offensive racial, antisemitic, and misogynistic slurs, all of which are unquestionably offensive to a reasonable person.

281.    As a direct result of this improper hostile and abusive work environment, Ms. Dunphy has suffered and will continue to suffer injury and harm in an amount to be determined at trial, including compensatory and punitive damages, interest, reasonable costs and attorneys' fees and Defendants are liable, jointly and severally, not only for her damages but also for civil penalties.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Retaliatory Discharge Under the New York State Human Rights Law as Against All Defendants)**

282.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

52

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

283.    Defendants, jointly and severally, discriminated against Ms. Dunphy because of her vocal opposition to gender harassment and discrimination.

284.    Defendants retaliated against Ms. Dunphy by engaging in adverse employment action against her in retaliation for her complaints, including but not limited to terminating her employment.

285.    Defendants' termination of Ms. Dunphy's employment followed her statements that she would sue Giuliani and the Giuliani Companies for their treatment of her, including but not limited to based on sexual harassment and gender discrimination.

286.    As a result, Ms. Dunphy is entitled to damages, including but not limited to compensatory and punitive damages in an amount to be determined at trial with costs and attorneys' fees.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Aiding and Abetting Sexual Harassment and Gender Discrimination under the New York State Human Rights Law as Against all Defendants)**

287.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

288.    New York Executive Law Section 296(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

289.    Giuliani aided and abetted gender discrimination by conditioning Ms. Dunphy's continued employment upon her being "obedient" and engaging in sex acts with him.

290.    Giuliani made threats that private investigators would retaliate against any woman who tried to report sexual harassment.

291.    Giuliani aided and abetted sexual harassment and gender discrimination by his conduct, including but not limited to subjecting Ms. Dunphy to inappropriate sexual touching,

53

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

making sexual comments about her and about other prominent females, by forcing himself onto Ms. Dunphy when she rebuffed his sexual advances, and by intimidating and threatening her to prevent her from reporting his harassment.

292.     The Giuliani Companies had actual knowledge or should have known of the sexual harassment and gender discrimination.

293.     The Giuliani Companies aided and abetted gender discrimination by, among other things, failing to comply with their obligations under New York law.  These obligations include but not limited to failing to : 1) adopting and/or maintaining and/or distributing and posting and/or follow, required policies and practices for reporting and investigating instances of gender discrimination and harassment, including but not limited to distributing the Giuliani Companies' sexual harassment policy, 2) requiring all employees (including Giuliani) to complete New York State's required sexual harassment training, and 3) posting required notices in all work location and regarding reporting sexual harassment.  Defendants were legally required to comply with New York requirements concerning discrimination and sexual harassment and, upon information and belief,  they had the authority to implement such practices and procedures.

294.     As a direct and proximate result of the discriminatory conduct of Defendants, Ms. Dunphy has suffered mental anguish and humiliation, as well as damages from adverse employment actions, including but not limited to loss of future wages, professional opportunities, and other valuable benefits and emoluments of employment.

295.     Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights, entitling her to an award of punitive damages.

296.     Based on the foregoing, Ms. Dunphy is entitled to compensatory and punitive damages together with costs and attorneys' fees in an amount to be determined at trial, together with interest, and Defendants are liable for civil penalties.

54

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**(Sexual Harassment and Gender Discrimination Against a Contractor or Consultant under the New York State Human Rights Law as Against all Defendants)**

297.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

298.     In the alternative to being an employee, Ms. Dunphy was a contractor or consultant within the meaning of the N.Y.S. Human Rights Law, performing a contract in Defendants' workplace.

299.     Pursuant to N.Y.S. Human Rights Law §296-d, it is an unlawful discriminatory practice for an employer to permit unlawful discrimination upon non-employees in its workplace.

300.     Defendants knew or should have known that Ms. Dunphy was subjected to the aforesaid harassment and discrimination in the workplace.  Nonetheless, Defendants failed to take immediate and appropriate corrective action.

301.     As a result of Defendants' conduct, Defendants are jointly and severally liable to Ms. Dunphy for monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, as well as attorneys' fees and expenses.

### AS AND FOR A NINTH CAUSE OF ACTION
**(Gender Discrimination and Sexual Harassment Under the New York City Human Rights Law as Against All Defendants)**

302.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

303.     New York City Administrative Code Section 8-107(1)(a) provides that: "It shall be unlawful discriminatory practice… [f]or an employer or an employee or agent thereof because of the actual or perceived… gender… to refuse to hire or employ or to bar or to discharge from

55

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

304.    Defendants, jointly and severally, were Ms. Dunphy's employer and Ms. Dunphy was employed by some or all of the Giuliani Companies.

305.    A substantial part of the work Ms. Dunphy performed for Defendants took place in New York, New York.

306.    Giuliani controlled Ms. Dunphy's work assignments and directed her to perform work for him and the Giuliani Companies.  Among other matters, this work included:  1) securing prospective business ventures for him and the Giuliani Companies, monitoring his email account, 3) monitoring his social media accounts, handling his travel arrangements, and handling his public relations.

307.    Giuliani had the power to terminate Ms. Dunphy's employment and did terminate Ms. Dunphy's employment on or about January 31, 2021.

308.    Giuliani sexually harassed Ms. Dunphy and by his conduct, created a hostile work environment.

309.    Defendants discriminated against Ms. Dunphy by treating her less well than male employees on the basis of her sex, including but not limited to by subjecting her to sexual harassment and a hostile work environment and failing to take reasonable measures to prevent sexual harassment and sexual discrimination.

310.    Upon information and belief, the Giuliani Companies did not engage in conduct to prevent discriminatory and harassing behavior, including but not limited to complying with legal requirements to avert discriminatory conduct in the workplace.

311.    Upon information and belief, Giuliani did not make sexual advances against male employees, or talk with them in a demeaning or derogatory manner.

56

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

312.    Defendants acquiesced in the discriminatory and harassing conduct by creating and allowing a hostile, intolerable, offensive, and abusive workplace that a reasonable person would consider intimidating, hostile, and abusive.

313.    The Giuliani Companies condoned the discriminatory and harassing conduct and did not promptly correct the discriminatory, harassing, and abusive behavior.  They were or should have been aware of Giuliani's misconduct, and the damage it caused to Ms. Dunphy.

314.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights entitling her to an award of punitive damages.

315.    As a direct and proximate result of the discriminatory, harassing, and abusive conduct by Defendants, Ms. Dunphy suffered monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, as well as attorneys' fees and expenses.

### AS AND FOR A TENTH CAUSE OF ACTION
**(Hostile Work Environment Animated by Discrimination Under the New York City Human Rights Law as Against all Defendants)**

316.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

317.    New York City Admin. Code § 8-107, *et seq.* prohibits a hostile work environment.

318.    Ms. Dunphy was subjected to a severe and pervasive discriminatory work environment where she was not only abused based on her gender, but was also forced to endure offensive racial, antisemitic, and misogynistic slurs directed towards women, including herself and other women.

319.    As a direct result of this improper hostile and abusive work environment, Ms. Dunphy has suffered and will continue to suffer injury and harm in an amount to be determined at trial, including reasonable costs and attorneys' fees and compensatory and punitive damages.

57

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

### AS AND FOR AN ELEVENTH CAUSE OF ACTION
**(Retaliatory Discharge Under the New York City Human Rights Law as Against All Defendants)**

320.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

321.    Defendants, jointly and severally, discriminated against Ms. Dunphy because of her vocal opposition to gender harassment and discrimination.

322.    Defendants retaliated against Ms. Dunphy by engaging in adverse employment action against her in retaliation for her complaints, including but not limited to terminating her employment.

323.    As a result, Ms. Dunphy has suffered and will continue to suffer injury and harm in an amount to be determined at trial, including reasonable costs and attorneys' fees and compensatory and punitive damages.

### AS AND FOR AN TWELFTH CAUSE OF ACTION
**(Aiding and Abetting Gender Discrimination and Sexual Harassment Under the New York City Human Rights Law as Against All Defendants)**

324.    Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

325.    New York City Administrative Code Section 8-107(6) makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

326.    Giuliani aided and abetted gender discrimination by conditioning Ms. Dunphy's continued employment upon her being "obedient" and engaging in sex acts with him.

327.    Defendants have a policy of intimidating and ignoring female employees' concern about sexual harassment.  Giuliani made threats that private investigators would go after any woman who tried to report sexual harassment.

58

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

328.    Giuliani aided and abetted sexual harassment and gender discrimination by subjecting Ms. Dunphy to inappropriate sexual touching and sexual comments about her and about other prominent females, by forcing himself onto Ms. Dunphy when she rebuffed his sexual advances, and by making intimidating comments to prevent reporting or correcting the harassing environment.

329.    The Giuliani Companies knew or should have known of the illegal conduct, sexual harassment and gender discrimination.

330.    The Giuliani Companies aided and abetted gender discrimination by, among other things, failing to adopt and/or maintain and/or publish or post the legally required policies and practices for reporting and investigating instances of gender discrimination and harassment.  These include but not limited to providing legally required sexual harassment training to employees, enacting and distributing a legally required sexual harassment policy, and posting a legally required notice in all workspaces including office locations and Giuliani's apartment.

331.    As a direct and proximate result of Defendants' discriminatory conduct, Ms. Dunphy has suffered mental anguish and humiliation, as well as adverse employment consequences, including loss of future wages, professional opportunities, and other valuable benefits and emoluments of employment.

332.    Defendants' conduct was willful and motivated by malice and/or reckless indifference to Ms. Dunphy's legal rights, entitling her to an award of punitive damages.

333.    As a result of the foregoing, Ms. Dunphy is entitled to compensatory and punitive damages together with reasonable costs and attorneys' fees in an amount to be determined at trial.

59

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM      INDEX NO. 650033/2023
NYSCEF DOC. NO. 18                                   RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM      INDEX NO. 650033/2023
NYSCEF DOC. NO. 10                                   RECEIVED NYSCEF: 05/15/2023

### AS AND FOR AN THIRTEENTH CAUSE OF ACTION
**(Sexual Harassment and Gender Discrimination Relating to Freelancers and Contractors under the New York City Human Rights Law as Against all Defendants)**

334.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

335.     In the alternative to being an employee, Ms. Dunphy was a contractor or freelancer within the meaning of the N.Y.C. Human Rights Law, performing a contract in Defendants' workplace.

336.     Pursuant to NYC. Human Rights Law § 8-107 (23), it is an unlawful discriminatory practice for an employer to permit discrimination against freelancers and contractors.

337.     Defendants knew or should have known that Ms. Dunphy was subjected to the aforesaid harassment and discrimination in the workplace.  Nonetheless, Defendants failed to take appropriate corrective action.

338.     As a result of Defendants' conduct, Defendants are jointly and severally liable to Ms. Dunphy for monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, as well as attorneys' fees and expenses.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
**(Breach of Contract as Against All Defendants)**

339.     Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

340.     Giuliani and Ms. Dunphy formed an oral agreement that, *inter alia*, provided that Ms. Dunphy would receive a salary of $1 million per year from Giuliani and the Giuliani Companies for her role as Director of Business development and executive assistant to Giuliani, together with reimbursement for her business-related expenses.

60

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

341.     Giuliani and Ms. Dunphy agreed that Ms. Dunphy's salary would be deferred until Giuliani's divorce was finalized, which Giuliani told Ms. Dunphy would be "any day."

342.     This agreement constitutes an enforceable contract.

343.     Ms. Dunphy performed under the contract, including, without limitation, by investing substantial time into developing business revenue sources for the Giuliani Companies, managing Giuliani's personal travel, public relations, email account, social media, and more.

344.     Upon information and belief, Mr. Giuliani's divorce is and has been finalized.

345.     Defendants reimbursed Ms. Dunphy for some but not all of her business-related expenses.

346.     Ms. Dunphy duly demanded payment, but Defendants failed to pay her salary.

347.     Defendants, jointly and severally, breached the contract by failing and refusing to pay Ms. Dunphy the salary that she is owed after two years of work for Giuliani and the Giuliani Companies, together with her expenses.

348.     In view of the foregoing, Ms. Dunphy is entitled to damages in an amount to be determined at trial.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
**(Violation of New York Labor Law – Minimum Wage As Against All Defendants)**

349.     Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

350.     Defendants suffered and permitted Ms. Dunphy to perform work on their behalf from January 21, 2019 through January 31, 2021.

351.     Ms. Dunphy performed work for Defendants for no less than forty hours per week from the date of her hire to the date of her termination.

352.     Defendants failed to keep records of the hours that Ms. Dunphy worked for the Defendants.

61

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

353.     Defendants failed to pay Ms. Dunphy wages for the hours she worked at the minimum wage required under New York's Labor laws.

354.     Pursuant to New York Labor Law §§ 198 and 663, Defendants are jointly and severally liable to Ms. Dunphy in the amount of minimum wage compensation she was due under New York Labor Law § 652 and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.1, for all hours she worked, together with liquidated damages equal to 100% of the total amount of the wages found to be due, together with attorneys' fees and costs, and interest.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
**(Violation of New York Labor Law – Overtime Claim As Against All Defendants)**

355.     Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

356.     New York Labor Law § 160 and 12 NYCRR § 142-2.2 require employers to compensate their employees at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per workweek.

357.     Defendants suffered and permitted Ms. Dunphy to perform work on their behalf which regularly totaled more than 40 hours per week.

358.     Defendants failed to pay Ms. Dunphy overtime pay for the hours that Ms. Dunphy worked over 40 per week.

359.     Defendants failed to keep records of the hours that Ms. Dunphy worked for the Defendants.

360.     Ms. Dunphy is entitled to her overtime pay for all hours worked in excess of forty per week at one and one-half times her regular rate.

361.     Ms. Dunphy is also entitled to liquidated damages, interest, and attorneys' fees for Defendants' violations of the New York Labor Law.

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**(Violation of New York Labor Law for Failure to Provide Notice and Acknowledgement of Wage Rate As Against All Defendants)**

362. Ms. Dunphy repeats, reiterates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

363. Defendants failed to provide Ms. Dunphy with an accurate Notice and Acknowledgement of Wage Rate as required by New York Labor Law § 195(1) and (2).

364. As a result, Defendants are liable for statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
**(Violation of New York Labor Law for Failure to Provide Wage Statements As Against All Defendants)**

365. Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

366. Defendants failed to provide accurate and timely wage statements as required by New York Labor Law § 195(3).

367. As a result, Defendants are liable for statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
**(Unjust Enrichment As Against All Defendants)**

368. Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

369. As discussed in detail above, Ms. Dunphy performed work for Giuliani and the Giuliani Companies from January 21, 2019 through January 31, 2021.

370. Ms. Dunphy invested substantial time and effort to create new streams of revenue for the Giuliani Companies as Director of Business Development.

63

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

371.    Ms. Dunphy also invested substantial time and effort into arranging Giuliani's travel, managing his email account and schedule, managing his social media accounts, obtaining new business opportunities for him and managing his public relations as Giuliani's personal executive assistant.

372.    Ms. Dunphy's work for and on behalf of Giuliani and the Giuliani Companies resulted in the Defendants obtaining significant and valuable benefits.

373.    Giuliani and the Giuliani Companies have failed to compensate Ms. Dunphy for her work for and on behalf of Giuliani and the Giuliani Companies.

374.    It would be against equity and good conscience to permit Giuliani and the Giuliani Companies to retain the benefits of Ms. Dunphy's labor, while failing to compensate Ms. Dunphy.

375.    In view of the foregoing, Ms. Dunphy is entitled to actual, presumed, punitive, and other damages in an amount to be determined at trial.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
**(Quantum Meruit As Against All Defendants)**

376.    Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

377.    Relying on Giuliani's promise to pay $1 million per year in deferred payments, Ms. Dunphy performed substantial services for Giuliani and the Giuliani Companies, several examples of which are detailed above.

378.    Giuliani and the Giuliani Companies knowingly accepted Ms. Dunphy's services.

379.    Ms. Dunphy had a reasonable expectation that she would be compensated for the services she provided to the Giuliani Companies including, but without limitation, her deferred pay as Director of Business Development and executive assistant to Giuliani.

380.    Giuliani and the Giuliani Companies have failed and refused to pay Ms. Dunphy for her services rendered.

64

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

381. In view of the foregoing, Ms. Dunphy is entitled to actual, presumed, punitive, and other damages in an amount to be determined at trial.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
### (Violation of the Freelance Isn't Free Act As Against All Defendants)

382. Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

383. N.Y.C. Admin. Code § 20-928 provides that "[w]henever a hiring party retains the services of a freelance worker and the contract between them has a value of $800 or more, either by itself or when aggregated with all contracts for services between the same hiring party and freelance worker during the immediately preceding 120 days, the contract shall be reduced to writing."

384. NYC Admin. Code § 20-927 defines "freelance worker" as "any neutral person or organization composed of no more than one natural person, whether or not incorporated or employing a trade name, that is hired or retained as an independent contractor by a hiring party to provide services in exchange for compensation."

385. In the event that Ms. Dunphy is found to not have been an employee and, in the alternative, pursuant to N.Y.C. Admin. Code § 20-927, Ms. Dunphy was a freelance worker in that she was hired or retained by Giuliani and the Giuliani Companies to provide services in exchange for compensation.

386. N.Y.C. Admin Code 20-927 defines "hiring party" as "any person who retains a freelance worker to provide any service…"

387. Giuliani and the Giuliani Companies were hiring parties within the meaning of the statute because they retained and received Ms. Dunphy's services.

388. Giuliani and the Giuliani Companies agreed to pay Ms. Dunphy $1 million per year for her work.

65

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

389.     Giuliani and the Giuliani Companies failed to provide Ms. Dunphy with a written contract despite their agreement to pay her more than $800 for her work.

390.     Ms. Dunphy performed the work she agreed to perform but was not paid by Defendants for her work.

391.     Pursuant to N.Y.C. Admin. Code § 20-933(2)(b) Ms. Dunphy is entitled to double damages and payment of attorneys' fees.

**AS AND FOR A TWENTY-SECOND CAUSE OF ACTION**
**(Breach of Fiduciary Duty as Against Giuliani)**

392.     Ms. Dunphy repeats, reiterates, and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth in full herein.

393.     A relationship of trust and confidence existed between Ms. Dunphy and Giuliani as a result of their attorney-client relationship.

394.     A relationship of trust and confidence existed between Ms. Dunphy and Giuliani as a result of their employer-employee relationship.

395.     Giuliani owed Ms. Dunphy fiduciary duties of good faith, fidelity and undivided loyalty, and knew and was aware that Ms. Dunphy was relying on him to represent her interests, to pay her deferred salary, that Giuliani was in a superior position, and that Ms. Dunphy depended upon him to treat her fairly and disinterestedly.

396.     Giuliani took advantage of Ms. Dunphy's reliance on him to manipulate her into an unwanted sexual relationship.

397.     Giuliani also neglected his duties of good faith, fidelity, and undivided loyalty by acting in his own self-interest while rendering Ms. Dunphy's personal needs and interest subservient.

398.     As a direct and proximate result of Giuliani's breach of his fiduciary duties, Ms. Dunphy has been damaged in an amount to be determined at trial.  Moreover, Giuliani's

66

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

actions were willful and wanton and constituted a public wrong sufficient to warrant punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Ms. Dunphy respectfully requests that the Court enter judgment in her favor, and against Defendants, in an amount not less than ten million dollars ($10,000,000.00), as follows:

(1)   On the First Cause of Action, compensatory and punitive damages, as well as attorneys' fees and expenses, in an amount to be determined at trial.

(2)   On the Second Cause of Action, an award of compensatory and punitive damages, in an amount to be determined at trial.

(3)   On the Third Cause of Action, an award of compensatory and punitive damages, in an amount to be determined at trial.

(4)   On the Fourth Cause of Action, an award of compensatory and punitive damages, as well as attorneys' fees and expenses in an amount to be determined at trial, together with civil penalties.

(5)   On the Fifth Cause of Action, an award of compensatory and punitive damages, as well as attorneys' fees and expenses in an amount to be determined at trial, together with civil penalties.

(6)   On the Sixth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(7)   On the Seventh Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(8)   On the Eighth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(9)   On the Ninth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 18

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

(10)    On the Tenth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(11)    On the Eleventh Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(12)    On the Twelfth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(13)    On the Thirteenth Cause of Action, an award of compensatory and punitive damages with costs and attorneys' fees in an amount to be determined at trial together with civil penalties.

(14)    On the Fourteenth Cause of Action, an award to be determined at trial of not less than Two Million Dollars, plus interest, less minimal cash payments, plus expenses.

(15)    On the Fifteenth Cause of Action an award of minimum wage compensation she was due under New York Labor Law § 652 and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.1, together with liquidated damages equal to 100% of the total amount of the wages found to be due, together with attorneys' fees and costs, and interest in an amount to be determined at trial.

(16)    On the Sixteenth Cause of Action an award of overtime pay for all hours worked in excess of forty per week at one and one-half times her regular rate, together with liquidated damages, interest, and attorneys' fees in an amount to be determined at trial;

(17)    On the Seventeenth Cause of Action, an award of statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

(18)    On the Eighteenth Cause of Action, an award of statutory fees and penalties pursuant to New York Labor Law § 198, together with reasonable attorneys' fees.

(19)    On the Nineteenth Cause of Action, an award of actual, presumed, punitive, and other damages in an amount to be determined at trial.

(20)    On the Twentieth Cause of Action, an award of actual, presumed, punitive, and other damages in an amount to be determined at trial.

(21)    On the Twenty-First Cause of Action, an award to be determined at trial of not less than Two Million Dollars, plus interest, less minimal cash payments, plus expenses.

(22)    On the Twenty-Second Cause of Action, an award of compensatory and punitive damages, in an amount to be determined at trial.

68

**FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM**     INDEX NO. 650033/2023

NYSCEF DOC. NO. 18                                        RECEIVED NYSCEF: 06/02/2023

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM**     INDEX NO. 650033/2023

NYSCEF DOC. NO. 10                                        RECEIVED NYSCEF: 05/15/2023

(23)     Awarding to Ms. Dunphy all costs, disbursements, fees, and interest as authorized by applicable law; and

(24)     Awarding to Ms. Dunphy such other and additional remedies as the Court may deem just and proper.


Dated:     Brooklyn, New York
           May 15, 2023

                                                 **ABRAMS FENSTERMAN, LLP**

                                                 _/s/ Justin T. Kelton_____
                                                 Justin T. Kelton
                                                 Sharon P. Stiller
                                                 Amanda P. Small
                                                 1 MetroTech Center, Suite 1701
                                                 Brooklyn, NY 11201
                                                 Tel: (718) 215-5300 x 501
                                                 Fax: (718) 215-5304
                                                 Email:  jkelton@abramslaw.com
                                                 Email:  sstiller@abramslaw.com
                                                 Email:  asmall@abramslaw.com
                                                 *Attorneys for Plaintiff Noelle Dunphy*

69

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 18

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

## <u>VERIFICATION</u>

State of Florida )
County of *Palm Beach* ) Ss.:



MARIE DYNA CIDERA
Notary Public - State of Florida
Commission # GG 979765
My Comm. Expires Apr 19, 2024

    Noelle Dunphy, being duly sworn, deposes and says:  I am the plaintiff herein.  I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, except as to those matters which are alleged on information and belief, and as to those matters, I believe them to be true.

                                                   _____
                                             NOELLE DUNPHY

On the *11th* day of *May* 2023, before me, the undersigned, personally appeared Noelle Dunphy, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as Plaintiff, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 19

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

**B**

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 19

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

6/2/23, 1:43 PM                                                                    Real estate mogul says ex behind rape claim is a hooker

*METRO*

   

## Real estate mogul says ex behind rape claim is a hooker

By Emily Saul

October 4, 2016 12:09am



Steve Kogut

**MORE ON:**
*LAWSUITS*

'Rust' settlement approved in wrongful death lawsuit against Alec Baldwin

Airbnb claims this new NYC rule could spur a 'de facto ban' on the service starting in July

Elon Musk used 'SNL,' other 'publicity stunts' to drive up dogecoin: lawsuit

Getty files second suit against AI firm over image-generation system

A real estate boss whose much younger ex accused him of sexual abuse and other torment aimed at making her "suffer like Hitler made people suffer" claims in a countersuit that she is an escort who fleeces wealthy

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 19

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

6/2/23, 1:43 PM                                                   Real estate mogul says ex behind rape claim is a hooker

men.

Steve Kogut filed suit late Friday against the 35-year-old woman, whose name is being withheld by The Post, asserting she's taken part in "prior schemes to defraud high net-worth men."

She even bragged to the 61-year-old developer about "extorting $5 million from Michael Gabelli," son of Wall Street titan Mario Gabelli, with a fake rape claim in 2011, according to Manhattan Supreme Court papers.

The woman allegedly bragged that she would be Gabelli's "worst nightmare in court," Kogut says, given her "Ivy League" degree and former status as a "beauty pageant contestant."

Lawyers for Gabelli did not return calls for comment.



Kogut's former gal pal is also an "escort," who continued to see other men unbeknownst to him after the couple moved into a multimillion-dollar Greenwich loft, his papers claim.

Kogut says their relationship soured as he became suspicious of an unregistered charity she claimed to have founded — and he came to believe she was "pocketing" donations for the Bright Lights Foundation for Children with Cancer.

When he confronted her about the alleged aid organization, she assaulted him and his daughter, the court papers claim.

After they split, Kogut says he received a "mysterious email" from her lawyer, Derek Smith, asserting she would be filing a suit citing sexual assault and other charges. He was later called, Kogut says, to see if the suit could be "resolved" outside of court.

After he declined to be "blackmailed," the papers claim, the woman filed a suit against him in Manhattan federal court in October 2015.

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 19

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

6/2/23, 1:43 PM                                        Real estate mogul says ex behind rape claim is a hooker

The Post exclusively reported the suit against Kogut, in which the woman says he hissed things like "I want you to suffer like Hitler made people suffer," while he raped her and dragged her around the apartment by her nipples.

The millionaire developer denies the allegations, and notes in the new civil papers that his parents are Holocaust survivors.

He is suing for unspecified damages, citing defamation and impairment to his professional reputation.

Smith did not return a request for comment.

The federal suit against Kogut is still pending.

FILED UNDER   DOMESTIC ABUSE   FRAUD   LAWSUITS   SCAMS   SEXUAL ABUSE   10/4/16

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 20

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

**C**

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/20/2016

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 20

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

In light of the disturbing circumstances described above, the Court agrees that all further depositions in this matter should take place at the Courthouse under the supervision of the assigned Magistrate Judge (or, if she believes that doing so would compromise her efforts to settle the case, another Magistrate Judge).  By separate Order to be entered today, the Court is referring this matter to Magistrate Judge Netburn; no later than October 21, 2016, counsel shall contact Magistrate Judge Netburn to schedule the remaining depositions.  If Magistrate Judge Netburn's schedule does not permit counsel to complete the depositions in enough time to complete the Joint Pretrial Order by the current deadline, the parties may seek an appropriate extension of that deadline.  SO ORDERED.

October 20, 2016

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 21

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X
NOELLE DUNPHY,

               Index No.: 650033/2023

     Plaintiff,

       -against-           Motion Sequence #001

RUDOLPH W. GIULIANI,
GIULIANI PARTNERS, LLC,
GIULIANI GROUP, LLC,
GIULIANI SECURITY & SAFETY, LLC,
JOHN and/or JANE DOES 1-10,

       Defendants.
-----------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO STRIKE PURSUANT TO CPLR 3024(b)

Rudolph Giuliani
*Defendant Pro se*

          Adam S. Katz, Esq.
          GOLDBERG SEGALLA, LLP
          711 Third Avenue, Ste. 1900
          New York, NY 10017
          646-292-8787
          akatz@goldbergsegalla.com

          *Attorneys for Defendants Giuliani Group,*
          *LLC, Giuliani Partners, LLC, Giuliani*
          *Security & Safety, LLC*

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 21

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................................1

II.  LEGAL ARGUMENT.......................................................................................................3

    A.  Legal Standard in Support of Striking Salacious, Scandalous and Prejudicial
        Paragraphs ......................................................................................................................3

    B.  The Specific Paragraphs That Must Be Stricken................................................................5

        i.   *Allegations about Comments Purportedly Made about Various Groups of People
           and Prominent Democratic Politicians* ................................................................5

        ii.  *Allegations about Mr. Giuliani's Affairs* ................................................................6

        iii. *Allegations Related to the Borat Movie and Billions*..........................................7

        iv.  *Allegations Related to the Alleged Sale of Pardons* .............................................8

        v.   *Allegations Regarding Mr. Giuliani's Alleged Consumption of Alcohol* .........................8

        vi.  *Allegations Related to Mr. Giuliani's Purported Sexual Proclivities* ................................9

    C.  Plaintiff Should be Sanctioned for Her Conduct ..................................................................9

III. CONCLUSION...............................................................................................................11

ii

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albany Law School v. New York State Office of Mental Retardation and Developmental Disabilities*,
81 A.D.3d 145 (2d Dept. 2011) ...............................................................................................3

*Aronis v. TLC Vision Centers. Inc., et al.*,
49 A.D.3d 576 (2d Dept. 2008) ...............................................................................................4

*Breest v. Haggis*,
180 A.D.3d 83 (1st Dept. 2019)...........................................................................................6, 8

*Dabidat v. Sandoval*,
653861/2012, 2013 N.Y. Misc. Lexis 5384 (Sup. Ct. New York County Nov. 15, 2013) ...............................................................................................................................10

*Davis v. Richmond Capital Grp.*,
194 A.D.3d 516 (1st Dept. 2021)..............................................................................................8

*Ganieva v. Black*,
2023 NY Slip Op 02380 (1st Dept. May 4, 2023) ...............................................................6, 8

*Greene v. Doral Conference Ctr. Assoc.*,
18 A.D.3d 429 (2d Dept. 2005) .............................................................................................10

*Hurley v. Hurley*,
266 A.D. 701 (3d Dept. 1943) .................................................................................................4

*JC Manufacturing v. NPI Electric, Inc.*,
178 A.D.2d 505 (2d Dept. 1991) .............................................................................................4

*Kaygreen Realty Co. v. IG Second Generation Ptnrs., L.P.*,
78 A.D.3d 1008 (2d Dept. 2010) ...........................................................................................10

*Kinzer v. Bederman*,
59 A.D.3d 496 (2d Dept. 2009) ...........................................................................................3, 5

*Ofman v. Campos*,
12 A.D.3d 581 (2d Dept. 2004) .............................................................................................10

*Pisula v. Roman Catholic Archdiocese of N.Y.*,
201 A.D.3d 88 (2d Dept. 2021) ...........................................................................................4, 5

*Matter of Plaza at Patterson LLC v. Clover Lake Holdings, Inc.*,
51 A.D.3d 931 (2d Dept. 2008) ...............................................................................................4

iii

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

*Soumayah v. Minnelli,*
   41 A.D.3d 390 (1st Dept. 2007).................................................................................3

*Waterbury v. New York City Ballet, Inc.,*
   205 A.D.3d 154 (1st Dept. 2022)............................................................................5, 8

*Wegman v. Dairylea Coop.,*
   50 A.D.2d 108 (4th Dept. 1975) ...............................................................................3

**Other Authorities**

22 NYCRR 130-1.1 ........................................................................................................9

22 NYCRR 130-1.1 [c] [1], [2]......................................................................................9

CPLR § 3013 ..................................................................................................................7

CPLR § 3024 ..................................................................................................................3

CPLR § 3024(b).................................................................................................... *passim*

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

Defendants Rudolph Giuliani ("Mr. Giuliani"), Giuliani Group, LLC, Giuliani Partners, LLC, and Giuliani Security & Safety, LLC (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion a) to strike the complaint, dated May 15, 2023 (the "Complaint") in its entirety as a sanction, or b) in the alternative, to strike paragraphs 9, 33-36, 76, 79, 80-82, 85, 112, 132-133, 142-144, 147-148, 213, 215, 235-237, and Footnote 10 for the Complaint and c) for awarding other sanctions (the "Motion").

## I.     PRELIMINARY STATEMENT

Ms. Dunphy attempts to interpose a 70-page Complaint[1] with over 200 highly salacious and prejudicial allegations. The Complaint contains a blunderbuss of contradictory allegations alleging that Plaintiff Dunphy was both in a consensual and non-consensual romantic relationship with Mr. Giuliani and that she also worked for him as both an employee and an independent contractor. Despite touting her (non-existent) business acumen, Ms. Dunphy claims she was orally promised $1 million per year and then proceeded to continue working for Mr. Giuliani for a further three years, even though, by her own admission, she received only a few thousand dollars from him. She claims that the reason her salary was deferred was due to Mr. Giuliani's pending divorce but, as has been widely reported, that was settled in 2019. Ms. Dunphy's Complaint is a large stretch of the imagination, replete with outright misrepresentations, intentional exaggeration and salacious details meant to create a media frenzy, given Mr. Giuliani's celebrity status. Ms. Dunphy and Mr. Giuliani had a consensual relationship – dating for a few months in 2019, and there was never an employment or independent contractor relationship between the two.

In the meantime, Plaintiff seeks to introduce allegations regarding Mr. Giuliani's alleged previous romantic affairs; his supposed sexual proclivities and purported consumption of alcohol;

---

[1] The Complaint, dated May 15, 2023 is attached to the Katz Affirmation in support of the Motion to Strike as **Ex. A**.

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

about comments he purportedly made in reference to certain groups of people; and, perhaps most egregiously, about an alleged scheme to sell pardons for millions of dollars. She also attempts to analogize him to the character Chuck Rhoades of the television show *Billions* and makes reference to Mr. Giuliani's appearance in the satirical *Borat* films. Based on analogous appellate cases, these scandalous and prejudicial allegations must not be allowed to remain in the Complaint. These allegations, even if true (which they are not), are unnecessary to establish any element of any of the causes of action in the Complaint. They do not remotely pertain to or have any bearing on the nature of the (non-existent) alleged employment or (brief, consensual) personal relationship between Mr. Giuliani and Ms. Dunphy. Rather, they are highly prejudicial and scandalous allegations solely included to inflame the potential jury and the public at large; engender unfavorable media coverage for the Defendants; and ultimately, embarrass the Defendants into a settlement. These allegations and their obvious nefarious intentions should not be tolerated by the Court and therefore, the Complaint should be stricken in its entirety, but, at a minimum and in the alternative, these allegations should be stricken from the complaint, based upon CPLR 3024(b), and Plaintiff should be directed to interpose a new complaint without the inclusion of these scandalous and highly prejudicial allegations.

Moreover, as described in detail *infra*, Ms. Dunphy is a seasoned professional at accusing former romantic partners of misdeeds in civil litigation. She has also been previously sanctioned for her erratic behavior and unethical legal tactics, including similar surreptitious and illegal recordings, like those that form the basis of the Complaint here. *See* Katz Aff. Ex. C, attaching 1:15-cv-07726 (Dkt. No. 85). The Court should stop Ms. Dunphy from doing this yet again. Here, Ms. Dunphy and her attorney have used the Complaint as a shield for the singular objective to defame Mr. Giuliani, using frivolous, inflammatory, and unnecessary allegations. Without any

2

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

proof, the Complaint falsely accuses Mr. Giuliani of committing a serious felony that is wholly unrelated to any cause of action, knowing that such allegations would draw widespread media attention. She accuses Mr. Giuliani of having several affairs – wholly unrelated to any cause of action or other allegation in the Complaint and uses the shield of "upon information and belief" in an attempt to insulate any liability she might have from making such awful allegations. She also includes very personal details in the Complaint making allegations about Mr. Giuliani's sex and social life that are scandalous by their very nature and unnecessary, only meant to create a media frenzy from this action. The Complaint is a disgraceful abuse of the judicial system by someone who has used litigation or the threat of litigation to extort romantic partners.  Based on the foregoing, the Court should sanction Ms. Dunphy for this inappropriate behavior that has forced Defendants to move to strike the allegations in the Complaint.

## II.   LEGAL ARGUMENT

A.   LEGAL STANDARD IN SUPPORT OF STRIKING SALACIOUS, SCANDALOUS AND PREJUDICIAL PARAGRAPHS

Pursuant to CPLR §3024(b), a party may seek to strike "any scandalous or prejudicial matter unnecessarily inserted" into an adversary's pleadings. In reviewing a motion pursuant to CPLR §3024, the inquiry is whether the purportedly scandalous or prejudicial allegations are necessary or relevant to a cause of action. *See, Soumayah v. Minnelli*, 41 A.D.3d 390 (1st Dept. 2007). For purposes of CPLR §3024(b), a statement is relevant if it would be admissible at trial. *See*, *Albany Law School v. New York State Office of Mental Retardation and Developmental Disabilities*, 81 A.D.3d 145 (2d Dept. 2011); *Soumayah*, 41 A.D.3d at 390; *Wegman v. Dairylea Coop.*, 50 A.D.2d 108 (4th Dept. 1975). Similarly, matters that are unnecessary to the viability of a cause of action and would cause undue prejudice to the defendants should be stricken from the pleading. *See*, *Kinzer v. Bederman*, 59 A.D.3d 496, 497 (2d Dept. 2009) (finding that the

3

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 21

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

defendants motion to strike "scandalous and prejudicial language from the complaint should have been granted as the subject language is irrelevant to the viability of a dental malpractice cause of action and prejudicial to the defendants"); *see also, Matter of Plaza at Patterson LLC v. Clover Lake Holdings, Inc*., 51 A.D.3d 931, 932 (2d Dept. 2008) (striking references to collateral matters included in counterclaims "that were not related to the instant litigation, because they were "unnecessary to the viability of the claims and are prejudicial to the petitioners"). Importantly, even a scandalous or prejudicial statement in the pleading that is relevant and possibly admissible at trial may be stricken if the court determines that it is only indirectly relevant to the cause of action. *See, JC Manufacturing v. NPI Electric, Inc*., 178 A.D.2d 505 (2d Dept. 1991).

It is well established that whether the statement in controversy is "scandalous or prejudicial" depends upon a determination of whether the statement, when evaluated in context of the pleading as a whole, is "gratuitous and solely designed to inflame the reader or listener." *See, Aronis v. TLC Vision Centers. Inc., et al.,* 49 A.D.3d 576 (2d Dept. 2008). In other words, material is deemed "scandalous" if it is "reproachful and immaterial, or if it is capable of producing harm to the opposing party without justification." *See, Hurley v. Hurley,* 266 A.D. 701 (3d Dept. 1943).

In *Pisula v. Roman Catholic Archdiocese of N.Y*., 201 A.D.3d 88 (2d Dept. 2021), the court held that the purpose of a pleading "is to give notice of the transactions or occurrence intended to be proved and the material elements of each cause of action or defense (citing to CPLR 3013)," and noted that CPLR 3024(b) "serves a worthwhile purpose of assuring that civil pleadings, which are public documents except for those involving matrimonial and family relief, not contain matter that unnecessarily scandalizes or prejudices the adversary party either within the litigation or beyond it". *Id* at 97. The court also stated "allegations regarding a defendant's statements or conduct involving a subsequent sexual abuse survivor, other than the plaintiff, may be stricken

4

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

from a complaint under CPLR 3024(b) on the ground that they are scandalous or prejudicial and not necessary to the elements of the plaintiff's specific cause(s) of action." *Id*. at 111; *see also*, *Waterbury v. New York City Ballet, Inc*., 205 A.D.3d 154, 166 (1st Dept. 2022) (holding that the terms "assault", "battery", and "abuse", as well as allegations regarding the defendant's use of drugs and alcohol to be highly inflammatory under CPLR 3024(b) and must be stricken); *Kinzer v. Bederman,* 59 A.D.3d 496 (2d Dept. 2009).

B.   THE SPECIFIC PARAGRAPHS THAT MUST BE STRICKEN

i.   *Allegations about Comments Purportedly Made about Various Groups of People and Prominent Democratic Politicians*

In a particularly egregious example of a set of scandalous and unnecessary allegations, Paragraphs 235-237 of the Complaint should be stricken in their entirety. Plaintiff falsely alleges that Defendant Giuliani made comments about certain minorities and other groups of people, which contributed to a purported hostile work environment. To be clear, there are no allegations or representations in the Complaint that Ms. Dunphy is African-American, Jewish, gay, an Arab, or that she personally was the subject of body shaming. These comments on their face, even if true (which they are not), bear no relevance on the causes of action in the complaint and are clearly meant to taint and bias any potential jury pool by alienating entire swaths of people based on their identities. This includes trying to alienate Democrat jurors by including scandalous and prejudicial allegations about comments Mr. Giuliani made about certain prominent Democratic politicians. Mr. Giuliani, himself, is a noted Republican politician, so the Court should not give credence to the flimsy justification that opinions Mr. Giuliani purportedly voiced about competition led to a hostile work environment. There is no link between these purported comments and any hostile work environment and therefore, the aforementioned paragraphs – which are likely not admissible – should be stricken because they are scandalous and highly prejudicial to all Defendants.

5

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

ii.    *Allegations about Mr. Giuliani's Affairs*

In another egregious, awful allegation meant to shame Mr. Giuliani and blemish his standing with (the Court and) jurors, Plaintiff alleges that Defendant Giuliani has had a string of affairs with Maria Ryan; an unnamed communications director; and Jennifer LeBlanc, a GOP fundraiser. *See* Complaint at ¶¶ 35 (referencing the aforementioned affairs) and 215 (referencing an affair with Ms. Ryan). In another sentence of Paragraph 35, Plaintiff also alleges that Mr. Giuliani was sexually interested in Christianne Allen, a new hire to his company, juxtaposing that with the aforementioned affairs. Even worse, these allegations are made "upon information and belief," or unsubstantiated media reports. Even if the allegations in this paragraph were true, which they are not, this list of Mr. Giuliani's purported sexual relationships with other women have no bearing on any claims made by Ms. Dunphy.

These paragraphs are wholly unnecessary; they are meant to create shock and awe through scandalous allegations that do not play any role – let alone the requisite central role – in the allegations. Based on the foregoing, Paragraph 35 must be stricken in its entirety and the Court should also strike references to Mr. Giuliani's alleged affairs contained in Paragraph 215 of the Complaint. The First Department has recently and repeatedly struck such allegations of other relationships in pleadings for similar causes of action. *See, Breest v. Haggis*, 180 A.D.3d 83, 94 (1st Dept. 2019)(striking Jane Doe's allegations in complaint alleging violation of the gender-motivated crime act that "upon information and belief" three other women have accused the defendant of rape or attempted rape); *Ganieva v. Black*, 2023 NY Slip Op 02380, ¶ 1 (1st Dept. May 4, 2023)("The allegations at issue, which employed rhetoric or detailed defendant's misconduct toward other women and his relationships with notorious third parties, were scandalous and prejudicial, and not necessary to establish any element of plaintiff's causes of action.")

6

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

Moreover, even if the Court were to refrain from striking these allegations pursuant to CPLR 3024(b), this paragraph violates CPLR 3013, as it lumps multiple allegations into one paragraph, thereby providing another reason why the paragraph should be stricken.

  *iii.*   *Allegations Related to the Borat Movie and Billions*

Next, in a borderline absurd allegation, Plaintiff seeks to include a screenshot from the movie *Borat: Subsequent Moviefilm* (the "Borat Movie"), claiming this is what it looked like when Mr. Giuliani laid on the bed and tried to engage in a sexual act with Plaintiff. *See,* Complaint ¶ 85. This is the very definition of a scandalous and prejudicial allegation. What transpired in the satirical Borat Movie – where Mr. Giuliani was tricked into thinking he was giving an interview – has no bearing or relevance on any of the causes action in the Complaint. Therefore, Paragraph 85 of the Complaint must be stricken as scandalous.

The irrelevant pop culture references do not end with references to the Borat Movie. Plaintiff also alleges that Mr. Giuliani told her he fantasized about Wendy Rhoades, the character from the Showtime show *Billions* who has proclivities for*,* and that he compared himself to the "flawed" ADA character Chuck Rhoades, whom he allegedly told Ms. Dunphy was inspired by him.[2] *See,* Complaint ¶ 143, and FN 10. This allegation is highly prejudicial and imputes a fictional character on to Mr. Giuliani. None of these references has any relevance to the causes of action in the Complaint. These fictional characters are highly developed, multi-faceted characters with various plotlines developed over six seasons. Plaintiff should not get the benefit of using a fictional character reference in her Complaint. Therefore, Paragraph 143 and Footnote 10 should be stricken.

---

[2] It is well-known among fans of the show that the producers of *Billions* have said that Chuck Rhoades is based on Preet Bahara and his investigation into hedge fund founder, Steve A. Cohen—not Mayor Giuliani—further attenuating the relevance of these allegations. 'Billions' creators react to the firing of US Attorney Preet Bharara - ABC News

7

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 21

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

*iv.     Allegations Related to the Alleged Sale of Pardons*

As with the other untrue, scandalous paragraphs of the Complaint, Paragraph 132 of the Complaint must also be stricken, based on *Breest* and *Ganieva. See also, Davis v. Richmond Capital Grp.*, 194 A.D.3d 516, 518 (1st Dept. 2021) (striking allegations of unrelated criminal acts as scandalous). Plaintiff, without any support, essentially alleges that Mr. Giuliani and former President Trump were involved in a felony – a conspiracy to sell pardons that the President is uniquely able to grant.  These allegations are entirely false and allege a very serious lie. With respect to the Motion, this allegation has no relevance to any cause of action in the Complaint. The Complaint does not claim that Ms. Dunphy was asked to participate in this scheme, a scheme that is completely manufactured by Plaintiff. Instead, Plaintiff uses this allegation to engender media attention, to defame Mr. Giuliani using a legal pleading as a shield, and to propound prejudicial allegations on the public, including potential jurors. It is worth noting that pursuant to well-known reports, the FBI and other authorities have thoroughly surveilled and investigated Mr. Giuliani and have not presented any evidence or filed charges remotely related to the sale of pardons. (In fact, the US Attorney General wrote a letter to the grand jury that there was not evidence of criminality to present to the grand jury.)  Based on the foregoing, Paragraph 132 of the Complaint should be stricken.

*v.     Allegations Regarding Mr. Giuliani's Alleged Consumption of Alcohol*

Next, per the First Department's decision in *Waterbury*, 205 A.D.3d at 166, all references to Mr. Giuliani's consumption of alcohol should be stricken from the Complaint. The Complaint contains superfluous allegations of Mr. Giuliani "smel[ling] of alcohol," "often dr[inking] large quantities of alcohol," and going "on alcohol-drenched rants." They are not relevant to any of the causes of action of the Complaint, and while evidence of alcohol consumption may be educed at trial, it should not be included in the Complaint, as it is only meant to feed a manufactured media

8

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM          INDEX NO. 650033/2023
NYSCEF DOC. NO. 21                                         RECEIVED NYSCEF: 06/02/2023

narrative and prejudice the jury pool against Defendants. Therefore, Paragraphs 9, 76, 79, 80-82, 112, 133, 147, and 213, of the Complaint should be stricken.

      *vi.*     *Allegations Related to Mr. Giuliani's Purported Sexual Proclivities*

Finally, Defendants move to strike Paragraphs 142-144, 147-148 of the Complaint, in which Plaintiff makes graphic allegations regarding Mr. Giuliani's supposed sexual proclivities. These allegations purport to allege in detail how Mayor Giuliani called Ms. Dunphy sexually charged names, how he told her she reminded him of his daughter; and how he supposedly suggested that they engage in BDSM and certain, other purportedly aggressive sexual acts. As with the other allegations in the Complaint, these allegations are also false and they are largely plagiarized from Ms. Dunphy's other lawsuits. These allegations are solely meant to inflame, gain media attention with salacious allegations, portray Mr. Giuliani as a sexual deviant, and otherwise taint the potential jury pool. These allegations have no place in the Complaint; they are certainly scandalous by their very nature and they are wholly unnecessary to the Complaint. Simply put, these allegations are not material to the elements of the causes of action in the Complaint and their prejudicial and scandalous nature far outweigh any probative value.  Such salacious evidence likely will not be admissible at trial, but at a minimum these details should not be included in a publicly-filed pleading until these conversations are considered on a motion to dismiss or a motion *in limine.* Based on the foregoing, these allegations should be stricken in their entirety.

    C.    P LAINTIFF S HOULD be S ANCTIONED for H ER C ONDUCT

Plaintiff's conduct, as discussed *supra*, is so egregious that it warrants sanctions. Conduct is frivolous under 22 NYCRR 130-1.1 if it is 'completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law' or it is 'undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another.' *See,* 22 NYCRR 130-1.1 [c] [1], [2]; *citing Mascia v. Maresco*, 39

9

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM
NYSCEF DOC. NO. 21

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

AD3d 504, 505 (2d Dept. 2007); *Greene v. Doral Conference Ctr. Assoc*., 18 AD3d 429, 431 (2d

Dept. 2005). Making colorable claims may constitute frivolous conduct if the primary purpose is

to delay or prolong the resolution of the litigation, or to harass or maliciously injure the other party.

*See, Dabidat v. Sandoval,* 653861/2012, 2013 N.Y. Misc. Lexis 5384, *21 (Sup. Ct. New York

County Nov. 15, 2013); *Kaygreen Realty Co. v. IG Second Generation Ptnrs., L.P.*, 78 A.D.3d

1008, 1009 (2d Dept. 2010); *Ofman v. Campos*, 12 AD3d 581, 582 (2d Dept. 2004).

Here, the language of the Complaint, as well as the inflammatory attachments thereto, are

completely irrelevant and highly prejudicial. Plaintiff uses the Complaint as a shield to accuse Mr.

Giuliani of committing a very serious felony related to the sale of felonies; this accusation has

nothing to do with the alleged causes of action and has no basis in reality. In another example,

Plaintiff accuses Mr. Giuliani of having numerous affairs and again uses the Complaint and "upon

information and belief" language to protect her from this unnecessarily inserted, scandalous

language. In a final example, Plaintiff includes inflammatory comments that Mr. Giuliani

purportedly made to her about various groups of people, including Jewish people, African-

Americans, and prominent Democrats, in an attempt to completely taint any jury pool hearing this

matter. These defects do not advance any of Plaintiff's claims, and, in actuality, are scandalous

and highly prejudicial to Defendants. The impropriety is so deeply pervasive, the pleading simply

cannot stand in its present form.

Moreover, Plaintiff has engaged in this opportunistic and frivolous behavior on numerous

occasions. It must be stopped. Plaintiff sued her ex-boyfriend, real estate developer Steve Kogut,

for sexual assault and other charges. Mr. Kogut countersued, alleging that Ms. Dunphy took part

in "prior schemes to defraud high net-worth men," and she bragged to Mr. Kogut that she

"extort[ed] $5 million from Michael Gabelli," son of Wall Street financier Mario Gabelli. *See,*

10

FILED: NEW YORK COUNTY CLERK 06/02/2023 04:45 PM

NYSCEF DOC. NO. 21

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

Katz Aff. **Ex. B**, attaching October 4, 2016 New York Post article. As part of the Kogut lawsuit, Ms. Dunphy was caught unethically and illegally wiretapping private conversations between Mr. Kogut and his counsel by surreptitiously leaving her phone on a table. Judge Furman sanctioned Ms. Dunphy for this disturbing behavior. *See,* Katz Aff. **Ex. C**, attaching 1:15-cv-07726 (Dkt. No. 85). The Court should not tolerate Ms. Dunphy's inflammatory and unethical conduct.

Accordingly, Plaintiff should not only strike the existing Complaint and be directed to file an amended compliant without the flagrant, irrelevant and highly prejudicial documents and language, but they should be sanctioned in an amount to be determined at a later date, but not less than the cost of filing the Motion.

### III.    CONCLUSION

Based upon the foregoing, the Court should a) strike the Complaint with prejudice as a sanction, or, in the alternative, strike Paragraphs 9, 33-36, 76, 79, 80-82, 85, 112, 132-133, 142-144, 147-148, 213, 215, 235-237, and Footnote 10 of the Complaint pursuant to CPLR 3024(b); and b) award sanctions and costs to Defendants in this action as this Court deems just and necessary.

Dated: June 2, 2023

GOLDBERG SEGALLA, LLP

_/s/Rudolph Giuliani_ (by AK)
Rudolph Giuliani
*Defendant Pro se*

Adam S. Katz, Esq.
711 Third Avenue, Ste. 1900
New York, NY 10017
646-292-8787
akatz@goldbergsegalla.com
*Attorneys for Defendants Giuliani Group, LLC, Giuliani Partners, LLC, Giuliani Security & Safety, LLC*

11

NYSCEF DOC. NO. 22

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ x

NOELLE DUNPHY ,

                               Plaintiff,            Index No.:  650033/2023

              -against-                     **NOTICE OF MOTION**

RUDOLPH W. GIULIANI, GIULIANI PARTNERS,
LLC, GIULIANI GROUP, LLC, GIULIANI          Motion Sequence #001
SECURITY & SAFETY, LLC, JOHN and/or JANE
DOES 1-10,

                               Defendants.

------------------------------------------------------------------ x

       **PLEASE TAKE NOTICE**, that upon the annexed affirmation of Adam Katz Esq., dated

June 2, 2023 and the exhibits annexed thereto; the accompanying memorandum of law, and upon

all prior pleadings and proceedings previously had herein, the undersigned will move this Court at

the Supreme Court, New York County, 60 Centre Street, New York, NY 10007, on the 19th day

of July, 2023, or as soon thereafter as counsel may be heard, seeking an Order:

       (1) Striking the complaint in this action, dated May 15, 2023 (the "Complaint") in its

entirety, as a sanction;

       (2) In the alternative, pursuant to CPLR § 3024(b), striking unnecessary, inflammatory,

scandalous, and unduly prejudicial allegations contained in the Plaintiff's Complaint at paragraphs

9, 33-36, 76, 79, 80-82, 85, 112, 132-133, 142-144, 147-148, 213, 215, 235-237, and Footnote 10

of the Complaint;

       (3) Pursuant to CPLR § 3013, striking paragraphs 35 and 215 of the Complaint;

       (4) Pursuant to 22 NYCRR 130-1.1, awarding sanctions and costs against Plaintiff, Noelle

Dunphy, for frivolous and malicious conduct, evidenced by the irrelevant and prejudicial language

INDEX NO. 650033/2023
NYSCEF DOC. NO. 22                                          RECEIVED NYSCEF: 06/02/2023

of the Complaint filed and attachments thereto, to Defendants in the instant action in an amount to be determined at a later date by the Court but not less than the costs of filing the instant motion;

(5) dismissing the complaint in its entirety; and/or

(6) mandating that Plaintiff file a new Complaint; and

(7) for such other and further relief as this Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE**, that answering papers, if any, must be served at least seven (7) days prior to the return date of this motion, pursuant to CPLR § 2214(b).

Dated: New York, NY
June 2, 2023

*/s/Rudolph Giuliani* (by AK)
Rudolph Giuliani
*Defendant Pro Se*

GOLDBERG SEGALLA LLP

Adam S. Katz, Esq.
*Attorneys for Defendants
Giuliani Group, LLC, Giuliani Partners,
LLC, Giuliani Security & Safety, LLC*
711 Third Avenue, 19th Floor
New York, New York 10017
Tel.: (646) 292-8700
akatz@goldbergsegalla.com

**Mailing Address:**
P.O. Box 880
Buffalo, NY 14201

To:    *Justin Kelton, Esq., Plaintiff's attorney, via NYSCEF*

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM

NYSCEF DOC. NO. 23

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ x

NOELLE DUNPHY ,

                     Plaintiff,

          -against-

RUDOLPH W. GIULIANI, GIULIANI PARTNERS,
LLC, GIULIANI GROUP, LLC, GIULIANI
SECURITY & SAFETY, LLC, JOHN and/or JANE
DOES 1-10,

                     Defendants.

------------------------------------------------------------------ x

Index No.:  650033/2023

**AFFIRMATION OF
ADAM S. KATZ, ESQ. IN
SUPPORT OF MOTION TO
STRIKE PURSUANT TO
CPLR 3024(b)**

Motion Sequence #001

        Adam S. Katz, an attorney duly admitted to practice in the Courts of the State of New York,

under penalty of perjury, affirms and states:

        1.      I am a partner at the law firm of Goldberg Segalla LLP, attorneys for Defendants

Giuliani Group, LLC, Giuliani Partners, LLC, and Giuliani Security & Safety, LLC in the above-

captioned action (collectively, "Defendants"). As such, I am fully familiar with the facts and

circumstances of this matter.

        2.      I submit this Affirmation, together with the accompanying exhibits, in support of

Defendants' motion to strike, dated June 2, 2023 pursuant to CPLR § 3024(b), CPLR § 3013,  and

22 NYCRR 130-1.1.

        3.      Attached hereto, as **Exhibit A,** is a true and correct copy of the instant Complaint,

dated May 15, 2023.

        4.      Attached hereto, as **Exhibit B**, is a true and correct New York Post article, dated

October 4, 2016, which can be found at Real estate mogul says ex behind rape claim is a hooker

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

(nypost.com). It contains relevant information concerning Mr. Kogut's lawsuit and Ms. Dunphy's claims regarding Mr. Gabelli.

5.      Attached hereto, as **Exhibit C,** is true a correct copy of a "so ordered" letter from the Kogut-Dunphy dispute, dated October 2016, from Mr. Kogut's counsel, in which Judge Furman of the SDNY sanctioned Ms. Dunphy and called her antics, which included surreptitiously wiretapping Mr. Kogut and his counsel and then calling the police on Mr. Kogut's attorney, "disturbing."  The letter can be found at Dkt. No. 85 of Case No. 1:15-cv-07726.

6.      Based upon the foregoing, as well as the reasons set forth in the accompanying memorandum of law, Defendants' motion to strike should be granted.

Dated: June 2, 2023

_____
Adam S. Katz, Esq.

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM

NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023



**A**

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

NOELLE DUNPHY,                                         :
                                                      :     Index No.: 650033/2023
                        Plaintiff,                    :
                                                      :
        -against-                                     :     **VERIFIED COMPLAINT**
                                                      :
RUDOLPH W. GIULIANI,                                  :
GIULIANI PARTNERS, LLC,                               :
GIULIANI GROUP, LLC,                                  :
GIULIANI SECURITY & SAFETY, LLC,                      :
JOHN and/or JANE DOES 1-10,                           :
                                                      :
                        Defendants.                   :

------------------------------------------------------------------X

Plaintiff Noelle Dunphy ("Ms. Dunphy"), by and through her undersigned attorneys,

Abrams Fensterman, LLP, brings this Verified Complaint against Defendants Rudolph W. Giuliani

("Giuliani"), Giuliani Partners, LLC ("GP"), Giuliani Group, LLC ("GG"), Giuliani Security &

Safety, LLC ("GSS") (collectively, the "Giuliani Companies"), and John and/or Jane Does 1-10,

and alleges as follows upon knowledge as to herself and her own actions, and otherwise upon

information and belief:

### INTRODUCTION

1.      This lawsuit arises from unlawful abuses of power, wide-ranging sexual assault and

harassment, wage theft, and other misconduct by Rudolph W. Giuliani and his Companies.

2.      When Giuliani hired Ms. Dunphy in January 2019, he was at the height of his

influence, serving as the personal lawyer for then-President Donald Trump.  He had fashioned

himself publicly as a major player in American politics, a successful businessman, and an

important powerbroker who wielded enormous control over others.

3.      Giuliani worked aggressively to hire Ms. Dunphy, offering her what seemed like a

once-in-a-lifetime opportunity to work as his Director of Business Development with a salary of

1

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM          INDEX NO. 650033/2023
NYSCEF DOC. NO. 24                                        RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM          INDEX NO. 650033/2023
NYSCEF DOC. NO. 10                                        RECEIVED NYSCEF: 05/15/2023

$1 million per year plus expenses.  As an added inducement, Giuliani also offered to provide pro bono legal representation to Ms. Dunphy in connection with an ongoing dispute arising from an abusive ex-partner.  To Ms. Dunphy, the chance to work for an influential politician once dubbed "America's Mayor," combined with the prospect of free legal representation by a former United States Attorney for the Southern District of New York, was a rare opportunity that was simply too good to pass up.

4.      But Giuliani's offer came with a significant catch:  Giuliani was in the midst of an acrimonious divorce, and he told Ms. Dunphy that her pay would have to be deferred and her employment kept "secret" until the divorce proceedings finished.  He claimed that his "crazy" ex-wife and her lawyers were watching his cashflow, and that his ex-wife would "attack" and "retaliate" against any female employee that Giuliani hired.  Giuliani promised Ms. Dunphy that his divorce would be resolved "any day now," and therefore the deferral of her pay and the need to keep her employment secret would soon end.  Ms. Dunphy reluctantly agreed to defer her pay and not to publicize her employment because she viewed the job, the salary, and the free legal representation as being worth the wait.

5.      Unfortunately, Giuliani's seemingly generous offers were a sham motivated by his secret desire to pursue a sexual relationship with Ms. Dunphy—in total disregard for the restraints that should have protected her as his employee and client.  As Giuliani later admitted in a recorded statement, he "wanted [Ms. Dunphy] from the day [he] interviewed [her]."

6.      Giuliani began abusing Ms. Dunphy almost immediately after she started working for the Defendants.  He made clear that satisfying his sexual demands—which came virtually anytime, anywhere—was an absolute requirement of her employment and of his legal representation.  Giuliani began requiring Ms. Dunphy to work at his home and out of hotel rooms,

2

**FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM**
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM**
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

so that she would be at his beck and call.  He drank morning, noon, and night, and was frequently intoxicated, and therefore his behavior was always unpredictable.

7.    Giuliani also took Viagra constantly.  While working with Ms. Dunphy, Giuliani would look to Ms. Dunphy, point to his erect penis, and tell her that he could not do any work until "you take care of this."  Thus, Ms. Dunphy worked under the constant threat that Giuliani might demand sex from her at any moment.  Even when the Covid-19 pandemic halted Giuliani's ability to physically assault her, he demanded that she disrobe during their work-related videoconferences.

8.    Giuliani also abused his position as Ms. Dunphy's lawyer to pressure her into sex. In one instance, for example, Giuliani promised Ms. Dunphy that he would give her $300,000 if she would forgo her legal rights in connection with her pending case and "fuck me like crazy." This statement was recorded.[1]

9.    As Ms. Dunphy continued her work for Giuliani and the Giuliani Companies, the work environment became increasingly hostile.  In addition to his sexual demands, Giuliani went on alcohol-drenched rants that included sexist, racist, and antisemitic remarks, which made the work environment unbearable.  Many of these comments were recorded.

10.    Despite the horrible conditions that she endured, Ms. Dunphy excelled at work. She generated substantial business opportunities, was available around the clock, helped Giuliani maintain his public image, and diligently ensured that his day-to-day business needs were met. Ultimately, however, Giuliani and his Companies callously tossed Ms. Dunphy aside, never paying her for the work she performed, and leaving her traumatized by the abuse she had suffered.

---

[1]    As discussed further below, Giuliani gave Ms. Dunphy permission to record their interactions.

3

**FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM**
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

**FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM**
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

11.    Giuliani presented himself as a generous employer and a hero who would use his legal prowess to save Ms. Dunphy from a difficult situation. But he was neither of those things. Giuliani assaulted and harassed Ms. Dunphy, forced her to work in a deplorable work environment, in secret, and robbed her of the pay she is owed. Through this case, Ms. Dunphy seeks a measure of justice from a man who thought his power and connections rendered him untouchable.

## PARTIES

12.    Ms. Dunphy is an individual who resided in New York at certain times and Florida at other times during the relevant time periods.

13.    Defendant Rudolph W. Giuliani is an individual who at all relevant times was a resident of the State of New York, New York County.

14.    Defendant Giuliani Partners, LLC is a Delaware Limited Liability Company, with a principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Partners, and exercises operating control over the entity.

15.    Defendant Giuliani Group, LLC is a Delaware Limited Liability Company, with a principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Group, and exercises operating control over the entity.

16.    Defendant Giuliani Security & Safety LLC is a Delaware Limited Liability Company, with its principal place of business in New York, New York County. Upon information and belief, Giuliani was and is the sole member of Giuliani Group, and exercises operating control over the entity.

17.    Upon information and belief, John and/or Jane Does 1-10 are individuals who reside in the State of New York.

4

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM

NYSCEF DOC. NO. 24

INDEX NO. 650033/2023

RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

NYSCEF DOC. NO. 10

INDEX NO. 650033/2023

RECEIVED NYSCEF: 05/15/2023

18.     The Giuliani Companies comprise a "single employer" or "single integrated enterprise" since they share interrelated operations, centralized control of labor relations, common management, and common ownership or financial control.

19.     Upon information and belief, Giuliani owns a controlling interest in each of the Giuliani Companies, and he exercises complete dominion and control over the Giuliani Companies.

20.     Giuliani and the Giuliani Companies constitute "joint employers" with respect to Ms. Dunphy since they share authority to hire and fire employees such as Ms. Dunphy, determined rate, method, and timing of her pay, approved payment of business expenses, had authority to discipline her, controlled her work schedule and other terms and conditions of her employment, and directed and supervised her work.

21.     The work performed by Ms. Dunphy benefited all Defendants and/or directly or indirectly furthered their joint interests, and Defendants shared control of Ms. Dunphy's employment, either directly or indirectly, because Defendants either control, are controlled by, or are under common control with each other.   Defendants are therefore collectively Ms. Dunphy's "joint employers" under the New York Labor Law's broad definition of "employer." 29 C.F.R. § 791.2(b).

**JURISDICTION AND VENUE**

22.     The Court has personal jurisdiction pursuant to Civil Practice Law and Rules ("CPLR") § 301 because, *inter alia*, Giuliani has resided in New York at all relevant times, and each of the Giuliani Companies had a principal place of business in New York at all relevant times.

23.     Venue is proper in this County pursuant to CPLR § 503 because a substantial part of the events giving rise to Ms. Dunphy's claims took place in New York County, where Giuliani resides, works, and maintains offices for the Giuliani Companies.

5

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM

INDEX NO. 650033/2023
NYSCEF DOC. NO. 24                                           RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM

INDEX NO. 650033/2023
NYSCEF DOC. NO. 10                                           RECEIVED NYSCEF: 05/15/2023

## FACTUAL ALLEGATIONS

**A.** **Ms. Dunphy's Background**

24.    Ms. Dunphy is a Columbia University graduate and skilled businesswoman with 22 years of experience in business development, associate producing, and communications.

25.    Ms. Dunphy has owned her own consulting firm, Strategic Consulting, since 2001.

26.    Throughout her career, Ms. Dunphy has worked with companies to generate increased business, create new revenue streams, and promote positive brand images.

27.    Despite her professional successes, Ms. Dunphy has experienced substantial pain and hardship.  When she met Giuliani, Ms. Dunphy was highly vulnerable, having just begun the arduous process of recovering from severe domestic abuse.  She was involved in a difficult lawsuit arising from that situation,[2] and she was desperate for an opportunity to move forward in a positive direction.

**B.** **Background of Giuliani and the Giuliani Companies**

28.    Giuliani is a lawyer,[3] former Mayor of New York City, and former United States Attorney for the Southern District of New York.

29.    Giuliani prides himself on being a well-connected political power broker.  When Ms. Dunphy met Giuliani, he was known as a longtime friend and close confidante of then-President Donald Trump, in addition to being a member of Trump's legal team.

30.    Giuliani also owns and manages several businesses, including the Giuliani Companies.

31.    Giuliani operated the Giuliani Companies as his personal fiefdoms, disregarding virtually all corporate formalities and blurring the boundaries between the Companies and their

---

[2]    Ms. Dunphy was granted permission to proceed under the pseudonym Jane Doe in that lawsuit.

[3]    Upon information and belief, Giuliani's law licenses have been suspended in New York and Washington, D.C.

6

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

personnel.  Upon information and belief, employees of the Giuliani Companies regularly acted and referred to themselves as working for Giuliani and did not maintain separation among the Giuliani Companies.  For example, Giuliani's former interim CEO, Maria Ryan, wrote in emails that GP and GSS "are one," meaning that they operate as a single company.  Upon information and belief, the Giuliani Companies had intermingled bank accounts, and Giuliani treated his corporate credit card as a personal credit card.

32.    Upon information and belief, Giuliani has a history of using his businesses— including, but not limited to the Giuliani Companies—to groom and aggressively pursue women for sexual relationships.

33.    For example, upon information and belief, Giuliani repeatedly agreed to give significant job titles and large salaries to women he found attractive, with the intention of having a sexual relationship with them.  Upon information and belief, Giuliani achieved this goal in several instances, and engaged in sexual relationships with women he had hired and whose employment he controlled completely.

34.    Upon information and belief, Giuliani had an affair with Maria Ryan, who was Giuliani Partners' interim CEO, although Giuliani claimed in the media that there was "no proof" that the two had sex.[4]  In addition, media reports note that Giuliani had an affair with his communications director in the 1990s.[5]  Media reports also reflect that Giuliani had an affair with Jennifer LeBlanc,[6] a GOP fundraiser who, upon information and belief, received indirect

---

[4]    https://www.dailymail.co.uk/news/article-5836499/Rudy-Giuliani-accused-having-affair-assistants-married-mother.html

[5]    https://abcnews.go.com/GMA/story?id=126961&page=1;  *see also*  https://nypost.com/2000/05/11/former-rudy-aide-back-in-the-storm-is-lategano-the-one-donna-referred-to/

[6]    https://www.nydailynews.com/news/politics/ny-pol-rudy-giuliani-jennifer-leblanc-20180613-story.html

7

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

payments from Giuliani and who, upon information and belief, worked in Gracie Mansion when Giuliani was Mayor.   And, upon information and belief, Giuliani also hired 19-year-old Christianne Allen as the Communications Director for the Giuliani Companies because, as he told Ms. Dunphy, he had "a certain sexual attraction to" Ms. Allen.   In fact, Giuliani admitted to Ms. Dunphy that he kissed Ms. Allen.   These statements were recorded.

35.     Ms. Dunphy knew nothing about this predatory history until she became a victim of the same scheme.

C.     **Giuliani Tries To Hire Ms. Dunphy In 2016 And Then Again In 2019**

     i.     **Giuliani's First Overture in September 2016**

36.     In September 2016, Giuliani met Ms. Dunphy while they both were waiting in the lobby of Trump Tower in Manhattan.

37.     Giuliani spoke to Ms. Dunphy and began asking for details about her work and life, and then indicated that he was interested in hiring her to work for him.

38.     Ms. Dunphy had no reason to believe that the interaction was anything other than business.

39.     Giuliani gave Ms. Dunphy his business card at the end of the interaction and asked that she contact him to talk further about working with him.

40.     Ms. Dunphy had no intention of working with Giuliani and did not contact him.

41.     Ms. Dunphy had no contact with Giuliani until he contacted her again in 2019.

     ii.     **Giuliani's Second Overture in January 2019**

42.     On or about January 9, 2019, Giuliani sent Ms. Dunphy an unsolicited Facebook message and friend request.   A true and correct copy of the Facebook friend request is annexed hereto as Exhibit A.

8

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM
NYSCEF DOC. NO. 24
INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10
INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

43.     Ms. Dunphy was surprised that Giuliani had tracked her down years after their first interaction.  But the timing was fortuitous, as Ms. Dunphy was seeking new career opportunities, and she also needed legal advice.

44.     Ms. Dunphy accepted Giuliani's friend request and responded to his message. Giuliani invited her to a formal interview for a business development job with his organization.

45.     Ms. Dunphy agreed to meet Giuliani for a job interview in Florida, where she was living at the time.

**D.     Giuliani Hires Ms. Dunphy as Director of Business Development and Agrees to Represent Ms. Dunphy Pro Bono.**

46.     On January 21, 2019, Giuliani interviewed Ms. Dunphy at the Trump International Golf Club of West Palm Beach, Florida.  During the interview, they discussed Ms. Dunphy's career and experience, and her legal issues.  They also spoke about her ability to help Giuliani generate new revenue streams and to support him on a day-to-day basis, including by fielding media inquiries.

47.     The interview seemed to go well.  Giuliani told Ms. Dunphy that he was impressed by her experience, and he offered her a job as Director of Business Development for the Giuliani Companies, and also as his executive assistant for travel, communications, and public relations.

48.     Giuliani told Ms. Dunphy that her salary would be $1 million per year, and that any business expenses she incurred would be reimbursed.

49.     Upon information and belief, the salary that Giuliani offered Ms. Dunphy was within the same general range that Giuliani and the Giuliani Companies paid to other employees of Giuliani and the Giuliani Companies, when accounting for expenses and other benefits, including for example Maria Ryan (who served in various roles).

50.     During the job interview, Giuliani and Ms. Dunphy discussed that her responsibilities would include generating business opportunities, including speeches and clients

9

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

which Giuliani told her historically earned him approximately $10 million per year, public relations work (such as editing Giuliani's social media posts and ensuring that he was presentable to the public), monitoring his email, assisting him with responding to emails, making travel arrangements, scheduling meetings, and generally being "on call" for whatever Giuliani and his Companies needed. Giuliani told Ms. Dunphy that the job required her to be available "24/7."[7]

51.   As they talked, Ms. Dunphy suggested several ideas for ways in which Giuliani and his Companies could generate revenue. These included creating a podcast,[8] creating a Netflix series, documentaries, and other similar endeavors. Later, Giuliani took advantage of several of these suggestions, and Ms. Dunphy worked to develop some of these projects.

52.   Giuliani and Ms. Dunphy also discussed during the interview that she one day write a book on Giuliani and Trump.

53.   Giuliani gave Ms. Dunphy permission to record her interactions with Giuliani anytime, anywhere, as well as Giuliani's interactions with others. Giuliani thereafter continually permitted and authorized Ms. Dunphy to make such recordings. He never asked her to stop recording any interaction. At times, Giuliani pressed "record" himself on Ms. Dunphy's cell phone to record their conversations.

54.   As the parties reached agreement on the general terms of Ms. Dunphy's employment, Giuliani added a strange requirement: Ms. Dunphy's pay would have to be deferred and her employment kept "secret" until Giuliani's divorce proceedings finished. Giuliani claimed that this arrangement was necessary because his ex-wife and her lawyers were watching his

---

[7]   When Giuliani made this job offer to Ms. Dunphy, Giuliani understood that Ms. Dunphy would be financially reliant on him and the Giuliani Companies—particularly since Giuliani required that Ms. Dunphy be available 24/7, leaving no time for her to pursue any other source of employment or income.

[8]   Ms. Dunphy was surprised to learn during the discussion that Giuliani did not know what a podcast was, so she educated him about podcasts.

10

FILED: NEW YORK COUNTY CLERK 06/02/2023 05:25 PM
NYSCEF DOC. NO. 24

INDEX NO. 650033/2023
RECEIVED NYSCEF: 06/02/2023

FILED: NEW YORK COUNTY CLERK 05/15/2023 09:37 AM
NYSCEF DOC. NO. 10

INDEX NO. 650033/2023
RECEIVED NYSCEF: 05/15/2023

cashflow and he was limited in what he could spend and who he could hire. Giuliani also claimed that his ex-wife would "attack" and "retaliate" against any female employee that Giuliani hired.

55.    Giuliani told Ms. Dunphy that his divorce would settle "any day now" and therefore the need to keep her employment secret and her pay deferred would not last long.

56.    Giuliani promised Ms. Dunphy that in the meantime, he would pay her in cash whenever he could so that she could support herself during the deferral period.

57.    During the interview, Giuliani offered Ms. Dunphy an additional inducement: he had learned that she was a survivor of domestic abuse and he offered to represent her pro bono in connection with legal matters arising from those circumstances. Giuliani later sent Ms. Dunphy an email confirming this arrangement, a redacted copy of which follows:



58.    Giuliani had served as the United States Attorney for the Southern District of New York. Thus, his offer of pro bono legal representation was an important inducement of seemingly incalculable value due to his experience and recognition in New York legal circles.

59.    At the end of the interview, Ms. Dunphy accepted Giuliani's job offer and reluctantly agreed to defer her pay and keep her employment non-public, based on: (i) Giuliani's job offer (including the salary of $1 million per year and expenses); (ii) his claim that his divorce would be finalized soon; and (iii) his promise that he would represent Ms. Dunphy pro bono.

11